**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

| | |
|---|---|
| **ANNIE LUCAS BROWN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) |
| **v.** | ) **CASE NO.: 2:07cv841-MHT** |
| | ) |
| **ALABAMA PUBLIC LIBRARY SERVICE,** | ) |
| | ) |
| **Defendant.** | ) |

RECEIVED

2008 MAY 30 P 4:44

**PLAINTIFF'S EXHIBITS INDEX LISTING TO
PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Comes now the Plaintiff, **Annie Lucas Brown,** by and through her attorney of record, and files the Plaintiff's Exhibits Index Listing to the Plaintiff's Opposition to Defendants Motion for Summary Judgment, as follows:

**Multiple Documents**

| Part | Description | |
|---|---|---|
| 1 | Main Document | 3 pages |
| 2 | Exhibit A | 104 pages |
| 3 | Exhibit B | 10 pages |
| 4 | Exhibit C | 31 pages |
| 5 | Exhibit D | 22 pages |
| 6 | Exhibit E | 21 pages |
| 7 | Exhibit F | 2 pages |
| 8 | Exhibit G | 2 pages |
| 9 | Exhibit H | 2 pages |

| 10 | Exhibit I | 10 pages |
| 11 | Exhibit J | 5 pages |
| 12 | Exhibit K | 3 pages |
| 13 | Exhibit L | 4 pages |
| 14 | Exhibit M | 2 pages |
| 15 | Exhibit N | 2 pages |
| 16 | Exhibit O | 1 page |
| 17 | Exhibit P | 1 page |
| 18 | Exhibit Q | 9 pages |

**DONE THIS 30TH DAY OF MAY 2008.**

Respectfully submitted,

**DEBORAH HILL BIGGERS (BIG002)**
Attorney for Annie Lucas Brown
113 East Rosa Parks Avenue
Tuskegee, Alabama 36083
PH: (334) 727-0092
FAX (334) 727-7117

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing **PLAINTIFF'S EXHIBITS INDEX LISTING TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** upon the following Counsel of record, by regular U. S. Mail, postage prepaid and properly addressed this 30th day of May 2008:

Hon. R. Austin Huffaker, Jr.
Hon. T. Grant Sexton, Jr.
Attorneys for Defendant
P. O. Box 270
Montgomery, AL 36101

**DEBORAH HILL BIGGERS**
Attorney at Law

EXHIBIT A

STATE OF ALABAMA    )
                        )
COUNTY OF MACON   )

## <u>AFFIDAVIT OF ANNIE LUCAS BROWN</u>

Before me, the undersigned Notary Public in and for said state and county, personally appeared **ANNIE LUCAS BROWN,** who is known to me, and who being by me first duly sworn, deposes and states the following:

1.    I am Annie Lucas Brown, an African American.  I am currently employed as a Library Operations Manager with the Alabama Public Library Service ("APLS").  I have personal knowledge of all the facts set out herein, which are to refute the allegations in the affidavit executed by Rebecca Mitchell submitted in support of APLS's Motion for Summary Judgment, in my Title VII case pending in the United States District Court for the Middle District of Alabama.

2.    I have always enjoyed being a librarian and I am passionate about my work and I have prepared myself educationally to work as a professional librarian.  I have a Master of Science in Library Services from Atlanta University, Atlanta, Georgia and prior to working at APLS, I was Director of the Macon County-Tuskegee Public Library from 1989 – 1997 as described in my vita, attached as **Exhibit 1.**

3.    I was initially employed with APLS in 1997 as a Consultant in Library Administration and Management and in May 2002, I was promoted to Library Operations Manager.  As Library Operations Manager, I am the only professional minority (African American) employed in the Alabama Public Library Service.

4.    On July 25, 2006, Ms. Rebecca Mitchell who is Caucasian and the Director of the Alabama Public Library Service, gave me an alleged written reprimand based on erroneous facts as described in attached **Exhibit 2.**

5.    The reprimand was improper for several reasons.  First, the travel policy in the Alabama Public Library Service Employee Handbook, attached as **Exhibit 3,** does not prohibit an employee from contacting the Governor's Office to inquire on the status of one's travel.

6.    The affidavit of LaTonya Moore, who processed the travel for APLS employees, states that there were no verbal nor written policy or directive that prevented APLS employees from inquiring about the status of their out of state travel.  See attached **Exhibit 4.**  Ms. Moore further states in her affidavit that my actions were in compliance with the only travel policy for APLS, in effect in July 2006.

7.    Secondly, I never contacted a "Joan", a secretary in the Speaker of the House's Office, who contacted Cheryl Fondon, an employee in

the Governor's Travel Office, as alleged by Ms. Mitchell in the July 25, 2006 Written Reprimand.

8.    On or about July 24, 2006, I merely contacted Johanna Bise, a former APLS employee whom I knew, who is employed as a Committee Clerk in the Alabama House of Representative, to inquire whether she knew someone who worked in the Governor's Office, Travel Department, to check on the status of my travel.    See Johanna Bise's Affidavit, attached as **Exhibit 5**.

9.    Johanna Bise called someone in the Governor's Office, who transferred us to a Cheryle Fondon, who processed out of state travel for state employees.

10.    I was respectful and professional at all times during my discussions with Ms. Fondon.  I told her I only was seeking to inquire on the status of my reimbursement of travel expenses in the amount of $1,575.00, which were incurred while attending a conference in New Orleans, Louisiana from June 23 – 27, 2006.  See attached **Exhibit 6**.  I never made any disparaging comments about the travel process nor did I voice any complaints about how LaTonya Moore had handled my travel.  But Ms. Fondon did state that my travel would have been processed sooner if LaTonya had submitted all the necessary documentation with the original submission.    I engaged in no discussions in this regard with Ms. Fondon.    At no time during the

telephone conference did Ms. Fondon mention that I should go through LaTonya Moore for all inquiries and she appeared to be quite helpful without hesitation.

11.  Ms. Fondon advised me that my travel was in the pick up box and I stated that was fine.  I never asked Ms. Fondon if I could personally pick up my travel reimbursement nor did I ever tell her that I would come to pick up my travel.

12.  I never called the Governor's Office; Johanna Bise called the Governor's Office.  See Bise's Affidavit, **Exhibit 5**.

13.  Thirdly, the reprimand falsely accuses me of being insubordinate, disruptive and undermining Ms. Mitchell's authority.  I committed none of these allegations and my inquiry about the status of my travel reimbursement could not embarrass the agency nor Ms. Mitchell, nor did it harm the relationship between APLS and the Governor's Office or Legislature.  Ms. Mitchell in APLS' brief points to no evidence of such alleged embarrassment.

14.  Fourthly, my supervisory responsibilities were immediately removed. See **Exhibit 2,** Written Reprimand.

15.  Finally, the reprimand violated the State of Alabama Progressive Discipline Manual's policy on the Steps of the Discipline Process, which states that the first step is a "warning".  This was the first time any disciplinary action has been taken against me.  A "reprimand" is

outlined in the State Progressive Discipline Manual as the second step of discipline. See attached Excerpt from State of Alabama Discipline Manual, **Exhibit 7.**

16.    My performance appraisal completed on August 31, 2006 violated the State of Alabama Performance Appraisal Manual. See attached **Exhibit 8.** My mid-appraisal for that year, is required to be a formal "sit-down" session between me and my rating supervisor to discuss performance and identify weaknesses. This did not occur with my mid-appraisal. See attached **Exhibit 9.**

17.    My final appraisal violated the Performance Appraisal Manual in that Ms. Mitchell never conducted the Appraisal Session as described in Phase Three of **Exhibit 8**.

18.    The Performance Appraisal completed on August 31 2006, attached hereto as **Exhibit 8,** was manipulated to give me unreasonably low scores in my area of "Responsibilities", so when  coupled with the improper reprimand, prevented me from being eligible for a two-step pay increase, since the overall appraisal rated "Partially Meets Standards". This is an adverse employment action.

19.    I submitted a rebuttal to the contested appraisal, which attached my Performance Appraisal for 2002 – 2003, which rated "Consistently Exceeds Standards"; my Performance Appraisal for 2003 – 2004 which was "Exceeds Standards"; and my Appraisal for 2004 – 2005, which

was "Exceeds Standards". I received my two step pay increases for each of the previous years, so I clearly know my duties and I consistently perform my duties. I also addressed the "Responsibilities" ratings in my appraisal. See attached **Exhibit 10.**

20.     In reviewing Ms. Mitchell's affidavit in support of the Motion for Summary Judgment, I never voiced any complaints to Mary Payne regarding not wanting to travel to Bayou La Batre to view the library site for the placement of furniture, for which I was in charge. I had been working diligently with other libraries and entities to obtain furniture for Bayou La Batre but was not allowed to travel to Bayou La Batre as I had requested. See **Exhibits 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, & 25.**

21.     Instead the APLS staff left on a day I had a new employee, Kim Own reporting to work and failed to tell me that they were traveling to Bayou La Batre that day. See **Exhibit 11.**

22.     I never complained to Mary Payne about Kim Owen, a consultant that I supervised, getting a 19 inch monitor and computer, because as her supervisor, I would be the one to request or ensure that she received this office equipment.

23.     In regard to the alleged complaint made by the Director of the St. Clair  County Library System, Judy Douglas, Ms. Douglas did not accuse me of being rude, insistent or threatening to cancel their

Gates computer grant.  I never had such a conversation with Ms. Douglas. Ms. Mitchell never discussed this specific allegation with me.

24.  It is not unusual for a state employee to call the State Personnel Department to inquire about participating in upcoming training classes.  This is especially true in my case, because I was denied opportunities to attend training, such as the Library Services Technology Act training in Washington, D. C.  However, a Caucasian APLS employee, Laura Lee, was allowed to attend.  Ms. Lee was an administrative assistant and I was a division head who worked with federal grants and this workshop would have provided vital information regarding federal grants.

25.  When I coordinated the continuing education sub-committee meeting on July 27, 2006, I did not order lunch because those attending were to provide feedback on whether lunch was desired. Only three people responded that  they desired lunch.  I never received a response from Denita Oliver that she needed lunch because she was an insulin dependent diabetic.  If Ms. Oliver would have provided me with such a response, I would have provided lunch for all or at least I would have notified Ms. Oliver that lunch would not be provided so that she could make other arrangements to eat.

26.  I never made the alleged comment to LaTonya Moore that "*I better not find out that you all are not doing the same for  me as  what you*

*do for the white people."*   There is no memo nor any e-mail from me using such language.  There was a conversation that I had with Ms. Moore, who advised that Rebecca Mitchell required me to take annual leave for the day it took to drive from an approved conference.  However, John Tran, a non-black APLS employee was not told that he would have to take annual leave for the day it would take him to travel home from the same conference.  I knew this and I merely told LaTonya that there would be a problem if I was required to take annual leave when others were not required to take annual leave for traveling from the same conference.  Mr. Tran's supervisor intervened and Rebecca Mitchell changed the directive to me and neither I nor Mr. Tran were required to take annual leave on the day it took to travel back from the conference.

27.    In regard to the Alabama Humanities Foundation making a claim with the Board of Adjustments, I was not handling this matter.  In fact, Ms. Mitchell told me not to do anything regarding this "My United States Training" grant.  However, Ms. Mitchell failed to submit an invoice to APLS business office before the cut-off date for the end of the fiscal year, in the amount of $3,600 to pay the registration fee for eight (8) librarians who attended this training.  Therefore, the funds could not come from APLS and a claim had to be made to the Board of Adjustments to pay the registration fee for the eight (8) librarians as

promised.  See attached **Exhibit 26**.

28.    Although I have not complained, on June 14, 2006 I was  the only Library Operations Manager who has been assigned additional consulting responsibilities and is only referred to as a "Consultant" by Management, i.e. Rebecca Mitchell, Director, Hulen Bivens, Assistant Director and Caucasian and Harry Lensch, Confidential Assistant to the Director, a Caucasian. See attached **Exhibits 27 & 28.**  All other Caucasian Library Operations Managers are still referred to as Library Operations Managers, i.e. Judith Shepard, Fara Zaleski and Janet Hamilton and they do not have to visit 28 libraries located across the state, twice a year.  Ms. Shepard, Ms. Zaleski and Ms. Hamilton have consultant responsibilities in special limited matters and they only respond to their respective libraries on an "as needed basis."

29.    I am the only Library Operations Manager who has received a reprimand, and whose supervisory responsibilities were removed and said responsibilities were given to a Caucasian.  See **Exhibit 2.**  I also have been the only Library Operations Manager whose reprimand on a Performance Appraisal has prevented them from receiving a pay raise. See **Exhibit 2.**

30.    Judith Shepard, a Caucasian Library Operations Manager, did not have her supervisory responsibilities removed after receiving a reprimand on February 27, 2006, for allegedly failing to perform her

job, thus causing a disruptive influence; plagiarism; and insubordination on two different occasions.  See **Exhibit K.**

31.    Janet Hamilton, a Caucasian Library Operations Manager received a written reprimand on July 21, 2007 for putting diesel fuel in the APLS's 2005 Dodge Caravan instead of putting gasoline in the vehicle.  She did not have her supervisory responsibilities removed and relegated to only a consultant as I was.  See **Exhibit N.**

32.    On March 8, 2007, I was honored by being selected by librarians across the State of Alabama as Librarian of the Year for 2007.  See **Exhibit 29.**  My Director Rebecca Mitchell ignored and said nothing about this honor bestowed upon one of the members of her staff.

33.    On April 14, 2008, I requested permission from Rebecca Mitchell to respond favorably to a request from Tina Nolen, the Ashland City Library to attend an event at their courthouse.  Judith Shepard a Caucasian Library Operations Manager was allowed to attend but I was not.   See **Exhibit 30.**

34.    I was forced to file this EEO Charge because of the racially discriminatory denial of my merit pay raise in 2006 and the continued hostile work environment.

    Done this 29th  day of May, 2008.

**ANNIE LUCAS BROWN**

STATE OF ALABAMA          )
                          )
COUNTY OF MACON           )

     Sworn to and subscribed before me this 29th  day of May, 2008.

**NOTARY PUBLIC**

**MY COMMISSION EXPIRES:  6/08/09**

EXHIBIT 1

# ANNIE LUCAS BROWN, MSLS
## 2508 BROTHERS DRIVE
## TUSKEGEE, AL 36083
### 334-727-2080 (h)
### 334-213-3917 (w)- 334-354-7460 ©

## Summary of qualifications

Master of Science in Library Service, Atlanta University, Atlanta, Georgia, 1986
B.S. Sociology; Alabama State University; Montgomery, Alabama, 1984
Associate Degree, Business Administration; Alexander City State Junior College, Alexander City, Alabama, 1977

## Library Operations Manager- 2006 to present

- **E-rate Coordinator/Certify Technology Plans statewide for public libraries;**
  E-rate is a federal funded discount programs that refunds libraries/schools for access to advanced telecommunications service. This program is administered by USAC-Universal Service Administrative Company and the FCC-Federal Communications Commission. My responsibility is to train public libraries statewide and encourage them to apply for e-rate; post updates and deadlines to list servs; certify technology plans and provide technology plan instructions; track libraries that apply and find out reasons they are not applying; site visit if targeted for audit.

- Serve as consultant for one of the state's library districts. Meet with each library director, staff and/or board of trustees in the assigned district twice a year, contacting each of these libraries a minimum of 4 times a year. Report contacts and outcomes to director in monthly report due by the 10th of the month.

- Provide statewide public librarians and public trustees assistance in the areas of administration, planning and facility planning by on-site consultations, by telephone, correspondence, and/or electronic mail to assist local public libraries in the provision of library services.

- Identify continuing education training needs and assess the appropriate method by which training can be provided or obtained for public librarians and trustees to assist local public libraries in the provision of local library services. Coordinate continuing education training programs with speakers and all arrangements for the programs. Review all evaluations and develop a report for the director on the success of teach training program conducted. Work with the Business Department to assure that appropriate funding is available and that financial obligations are met in a timely manner. Schedule a minimum of 12 continuing education programs per fiscal year.

- Assist the agency Grants Coordinator in the development, monitoring and evaluating the federal and other grant programs as assigned to keep public librarians informed and up-to-date on grant opportunities.

- Represent the agency on statewide committees as assigned by the agency director.

- Maintain liaison with other relevant library and other groups for information gathering and sharing with public libraries.

## Library Operations Manager- 2002 to 2006

## Division Head, Networking, Development & Planning (NDP)

- Plan, organize, coordinate, monitor, coach, supervise and complete performance appraisals for NDP staff, consultants, library administration & management and youth service consultant; coordinate E-rate program and filing of reports, state certified technology plan approver for public libraries; interpret and apply laws-regulations and standards governing public libraries; interview candidates for hire and make recommendations

- Provide consulting service in the area of library administration, facility planning, space needs assessment, strategic planning, networking, library technology and telecommunications to public library trustees and librarians by telephone-onsite visits- electronic mail and correspondence

- Coordinate statewide library continuing education training programs and identify training needs, develop and conduct training workshops for librarians and trustees; assess appropriate method by which training can be provided or obtained; coordinate vendors, speakers and make all arrangements for programs; review all evaluations and develop a report for agency director

- Coordinate with Business Manager to assure that appropriate funding is available and financial obligations are met in a timely manner; complete Quarterly Performance Reports, Smart Budgeting reports and submit Budget Request for NDP division

- Assist LSTA Grant Coordinator in development, monitoring and evaluating federal grant program; knowledge of grant-writing & management; assist in developing policies and criteria for competive grants; inform librarians of grant opportunities

- Coordinate statewide family literacy projects and activities; establish and maintain effective working relationships with broad range of stakeholders; coordinate the work of statewide committees as assigned by agency director; liaison with other relevant libraries, informational and other collaborative efforts to exchange information

- Represent agency at various functions as assigned by agency director

- Attend professional development training, conferences, conventions, continuing education workshops to keep librarians and library environment informed on current issues such as legislation that affects public libraries, programs, grant opportunities, state aid and emerging technology in the library field; attended **Gates Rural Library Sustainability Institute "Train the Trainer Workshop", Santa Fe, New Mexico 2005, serve as facilitator and co-coordinator for series of workshops for rural librarians;** serve on Public Libraries Directors Strategic Planning Committee Continuing Education Sub-Committee to create a program for non-degreed librarians

## Consultant-Library Administration & Management; Alabama Public Library

**Service; Montgomery, Alabama; August, 1997 – 2002**

Responsibilities included:

- Represent agency on occasions at library open houses, continuing education activities, and other meetings as assigned by director or supervisor or on own initiative with approval of director and supervisor. Develop, train, coordinate and conduct workshops for Alabama Public Librarians. Planning, organizing and implementing programs and workshops for librarians and write articles for APLS publication

- Consult and make recommendations to librarians and library boards in such areas as personnel, budget and finance, day-to-day operations, buildings and facilities planning, policy development and procedures, collection development and maintenance, establishment of local libraries, standards for public libraries, and state aid requirements

- Assist librarians, as requested, in grant writing so that librarians have necessary information and expertise available

- Coordinate orientation workshops for new public library directors so that new directors gain understanding of library infrastructure within the state, state aid, federal programs for public libraries, and agency requirements

- Inform supervisor and director of contacts with libraries in the field that will require follow up or that may be indicative of problems so that fellow staff can assist as needed

- Conduct continuing education/information exchange activities for public librarians as need is identified so that librarians have professional development opportunities for themselves and staff

- Coordinated the Uniontown Public Library Building Project, partnering with the Alabama Cooperative Baptist Fellowship and the Mayor of Uniontown. Transformed a bank into a functional, attractive public library within 30 days and moved the library from one room in the community center to a spacious public library on the main street in downtown Uniontown with easy accessibility

- Coordinated Library Board of Trustees Workshop at the Alabama Library Association Convention 2001; served on the APLS committee to revise the **"Alabama Public Library Trustee Manual"** for board members; presented a series of workshops around the state for board members along with co-presenter, George Stewart

- Coordinated the Viburnum Family Literacy Project workshop held August 22-24, 2001, in Montgomery, Alabama. Alabama was the host state and five other states participated in the workshop. Numerous speakers from Alabama participated, including Senator Sandra Escott-Russell as our luncheon speaker. An estimated ten companies from around the state donated items for registration bags to greet visitors

- Facilitator – Virburnum Family Literacy Conference, South Carolina – 2002

- Facilitator – Viburnum Family Literacy Conference, Little Rock, Arkansas, August-2003

- Coordinated Alabama Humanities Foundation Programs such as **"Motheread/Fatheread Family**

Literacy Initiatives; My United States (civic family literacy); Story-Sharing workshops

- Coordinated "Promoting Literacy Collaboration" workshop and two national programs collaborating with the **American Library Association "Every Child Ready To Read @ Your Library and "Creating Policies"; these were statewide initiatives**

- Coordinated "The Regional Library Directors" – 2-day seminar held at Alabama Public Library Service for regional library directors in state

- Attended the Continuing Education Forum – Savannah, Georgia, August –2002

- Facilitator for the Arts and Humanities Summit, Huntington College, Montgomery, AL

- Served as liaison on standards committee, public library division, Alabama Library Association; and for The Library of Congress, Center for the Book, Viburnum Family Literacy Project

- Certified Public Library Association trainer known as PLA Trainer; attended a five-day **"Managing for Results: Effective Resource Allocation for Public Libraries"** training, June, 2000, Nashville, TN. **Presentor - Alabama Library Association Convention, Montgomery, 2001, Planning For Results** – "Managing for Results" along with Co-Presenter, Theresa Trawick

- Attended training **"Helping Libraries Use The New Planning For Results Process"** Public Library Association, Nashville, TN, April-2005, Sandra Nelson, Presenter/Instructor

- Selected and participated in the **Southeastern Institute on Collaborative Library Leadership** – February, 2000, Atlanta, Georgia

- Selected by the Alabama Public Library Service to participate in the **Snowbird Leadership Institute**, Snowbird, Utah, July, 1991. Represented the State of Alabama in a five-day leadership seminar

- Attended **Lessons In Leadership** seminar, Civic Center, Montgomery, AL, 1992

## Library Director:  Macon County-Tuskegee Public Library, 1989-1997

Planned, organized, coordinated programs and activities, evaluated staff performance as well as library services. Supervised staff, advised and made recommendations to the library board. Assessed library needs, facilities planning/building program, implemented CLSI Automation System, networked with other community agencies, wrote grant proposals, worked with legislative development committee, Alabama Legislators, local officials, Alabama Library Association, consultants from APLS, wrote and revised long-range plans, coordinated special projects, prepared yearly budget/local and state aid funds, and coordinated the day-to-day operation of the library

**Reference Librarian: Tuskegee University, Hollis Burke Frissell Library, 1992-96 (part-time)**

**Coordinator, Cooperative Education, University of Alabama, Southeastern Training Center, College of Continuing Education, 1987-1989**

**Coordinator, Cooperative Education/Career Counselor, Tuskegee University, 1985-87**

**Administrative Assistant, Tuskegee University, Hollis Burke Frissell Library, 1982-1985**

**Financial Aid Counselor (Bank Loans), Tuskegee University, 1981-82**

**Secretary, Macon County Board Of Education, 1980-1981**

**Social Worker Aid, Macon County Department of Pensions & Security (presently DHR), 1972-1979**

## AFFILIATIONS

### Alabama Library Association

Chair, Public Library Division Policy Committee 2006-2007
Chair –co-chair Intellectual Freedom Committee 2005-2007
Chair – Alabama Library Association Convention – 2004
Secretary – 1992-1993, Chairperson, Friends & Trustees Division, 1994-1995
Board Member of Alabama Libraries – 1993-1994
Chairperson, District III – Legislative Day Activity – 1992
Treasurer – 1996-1997
Standards, A Plan For Excellence – Liaison 1997 to present
Coordinator, Library Board of Trustee Workshop (PLD-ALLA-)
PLA Certified Trainer Facilitator, Planning For Results/Managing For Results 2000-2001,
  Alabama Library Association (ALLA) Convention

### American Library Association – Public Library Division

Served on committee for rural library service for small and medium size public libraries, Certified PLA Trainer

Former Board Member – Library School Alumni Association, University of Alabama, School of Library and Information Studies

## CIVIC AND COMMUNITY SERVICE

United Way Community Council Member- Early Childhood & Youth Development
  Committee, 2005 to present

Macon County Democratic Conference, Assistant Secretary, August, 2006 to present

Southern Community College Library Media Center—Advisory Committee, 2005

Alpha Kappa Alpha Sorority, Inc., Beta XI Omega Chapter, Tuskegee, AL, President

January, 2008 to present- Vice President – 1993-1994 & 2004-2005, Chair, Connection Committee, served on various committees.

Jack and Jill of America, Inc., Tuskegee Chapter, President, 2000-2002; Received $3,000 grant to implement Get-Ready Read Project from Jack & Jill Foundation of America, Inc., Foundation – Chair, 2003-2004

Greater St. Mark Missionary Baptist Church, Tuskegee, AL.  Usher auxiliary, former President of Library Club, Youth Ministry

Kiwanis Club, Tuskegee, AL, Vice President, 1996-1997.  Served on "Macon County Junior Miss" Committee

Coordinator of Tuskegee Chapter, Alabama Sports Festival, Public Relations and also worked with City Recreation, Youth Programs and Cub Scout Troop #170, 1990-1995.

Test Administrator, Advisory Board Member, Southern Community College, Tuskegee, AL, 1994-1997.

Member of Tuskegee-Macon County YMCA


## COMMITTEES- Alabama Public Library Service

Public Library Capital Improvement Study, 1990
Advisory Search Committee-Executive Director, 1991
Governor's Conference-Group Leader, 1991
Advisory Council-Library Service Construction Act (LSCA), 1992-1995
Electronic Access Task Force, 1996-1997
Standards-A Plan for Excellence & Standards Achievement Awards Committee
    1997 to present
Summer Reading Program Committee, 1997 to present
Continuing Education Sub-Committee, 2005 to present
Public Library Selection Interview Committee 2006


## PROFESSIONAL ACHIEVEMENTS

**Received the "Librarian of the Year" award 2007 from Beta Kappa Chapter of Beta Phi Mu International Honor Society, School of Library & Information Studies, University of Alabama to be honored at the Alabama Library Association Conference, Mobile, AL.**

Awarded national grant for $145,000 to participate in the **"Libraries Online Project", sponsored by Microsoft Corporation and co-sponsored by the American Library Association.**  Attended a 5-day training in Seattle, Washington, Microsoft Corporation, 1996-1997.

Received recognition for being the recipient of national grant at the Alabama Library Association Conference, April, 1997.

Awarded **LSCA Title II grant from the Alabama Public Library Service in the** amount of $274,624, $15,000 technology enhancement, $7110 collection development, $1000 fax machine grant.

Awarded $500 Grant from the March of Dimes Foundation partnering with the Macon County Health Department.

Awarded $3,000 from Governors Discretionary Funds/former Governor Guy Hunt.

Awarded $1000 from Education Advancement Foundation / Alpha Kappa Alpha Sorority, Inc.

Awarded $1250 Grant from the National Coalition of 100 Black Women / Tuskegee Chapter.

Received LAMP – Exceptional Service Award, 1997


Reference

Alice Stephens            1912 Green Acres Drive   Montgomery, AL 36106
334-277-4955              (Retired Supervisor-Alabama Public Library Service)


George Stewart            141 Brookshire Lane  Pelham, Alabama   35124
205-620-4275(H)            (Retired Public Library Director-Birmingham Public)
205-908-7103 (c)


Jimmy Dismukes            520 Buckview Ct.  Pike Road Montgomery, AL 36064
334-272-4896              (Retired Business Manager)

Jesse L. Upshaw, Chair    Macon County Commission   101 E. Northside   Tuskegee, AL
36083
334-724-2557
334-727-4760


Attorney Deborah H. Biggers    2404 Charles Avenue        Tuskegee, AL  36083
334-727-0092
334-727-5490

EXHIBIT 2

# MEMORANDUM

July 25, 2006

**TO:**    Annie Brown

**FROM:**    Rebecca S. Mitchell, Director

**Subject:**    Written Reprimand

Ms. Brown,

I am informing you that effectively immediately, you are removed from any and all supervisory responsibilities of your current position.

You refused to accept that my Executive Secretary was working on your travel problem with the Governor's office and took matters into your own hands by contacting Joan, a secretary in the Speaker of the House's office, who then contacted Cheryl Fondon head of the Governor's travel office. These actions were taken without notice to me, or my Executive Secretary and I consider them to be a gross breach of trust, management responsibility, and professional courtesy to the point of insubordination.

I have since contacted the Governor's travel office and discovered that you did in fact contact another individual, who along with you contacted the Governor's office and she stayed on the phone line while you talked to the Governor's representative. Ms. Fondon was unaware until part of the way into the conversation that Joan was still on the line. She felt this was not professional on your part not to let her know that Joan was staying on the phone  Then I emailed you that you could pick up the amended travel form from the Capital, but you replied that you never agreed or asked to pick up the form  Ms. Fondon emphasized to me in a conversation I had with her that you did tell her you wanted to pick up the form. In effect, you have misled, evaded, and lied to me on this matter.

I am taking this action as a direct result of your gross insubordination, and disruptive conduct undermining my authority. Your actions have shown that you have a problem submitting to authority, have intentionally made a false accusation on staff competency, and through your demeanor and words created an environment of personal and professional embarrassment for this agency and me. As Director of this agency, I have strived hard to develop goodwill and a positive working relationship with the Governor's office and members of the legislature and I will not allow you to harm that any farther. Additionally, you have also created a serious breach of trust both within and outside of this agency. I cannot, nor will I, condone your behavior and as a senior management official working under my direction since I can no longer rely upon your judgment, leadership, or loyalty.

I am also informing you that I am continuing to investigate this incident and there is the possibility of more serious disciplinary actions that may be taken up to and including termination of employment with the this agency and the State of Alabama.

Rebecca S. Mitchell
Director

Pursuant to ALA. CODE § 36-26-27.1 (2000 CUM. SUPP.), you are being notified that this reprimand and accompanying information will be placed in your personnel file. You have a right to file a written response to this reprimand which will also be placed in your personnel file.

_____          _____
Employee                                                   Witness

_____7-26-06_____                    _____7/26/06_____
Date                                                        Date

Signature denotes receipt of notification that reprimand will be placed in the employee's disciplinary file and that there is a right to file a written response to same.

EXHIBIT 3



ALABAMA
PUBLIC LIBRARY
SERVICE

# Employee
# Handbook



## TRAVEL

(For examples of travel forms filled out by state employees, refer to the back of the manual.)

1.    Travel Approval:  A travel request form must be filed with the Director as soon as possible prior to the date of travel.  All travel must be approved by the Director and is not considered definite until such time as it is approved.

2.    Schedule:  Each person is responsible for submitting to his/her supervisor, no later than Wednesday of the preceding week, any travel for the following week.  Supervisors of each division are responsible for submitting to the Director, no later than Thursday of the preceding week, any travel for the next week.

3.    In-State:  A reimbursement form must be submitted upon return.  In-state travel is reimbursed on a per diem schedule with the Director's approval.  Check with the Business Office for the reimbursement rates.  For overnight travel, check with the Business Office to determine what receipts are required.

4.    Out-of-State:  A "Request for Out-of-State Travel" form must be submitted to the Director as soon as possible prior to date of travel.  Then a letter must be sent to the Governor's Office for approval and is not valid until signed.  A copy of the approved form will be returned to the employee.  In rare situations, advances for travel expenses can be issued. If an employee receives a travel advance, he/she will submit all receipts, excess funds, etc. to the Business Office upon return. Reimbursements will be made only after an expense form is submitted to the Business Office.  Check with the Business Office to determine what receipts are required.

## TRAVEL ALLOWANCES

Employees are entitled  to reimbursement for official travel. Act No. 91-564 allows you to receive mileage and per diem rates for in-state travel based on trips of six hours or more. Out-of-state trips are reimbursed for actual expenses with prior approval.

Employees must be pre-approved for all travel. See the section in the back on forms which must be filled out for approval and then for reimbursement.

## STATE VEHICLES

All state vehicles must be scheduled and checked out through the Business Office.  Any needed repairs should be reported to the Business Manager immediately after the vehicle is returned.

STATE OF ALABAMA       )
                               )
COUNTY OF MONTGOMERY   )

## <u>AFFIDAVIT OF LATONYA D. MOORE</u>

Before me, the undersigned Notary Public in and for said state and county, personally appeared **LATONYA D. MOORE,** also known as **TONYA MOORE,** who is known to me, and who being by me first duly sworn, deposes and states the following facts of which I have personal knowledge:

1.    I am LaTonya D. Moore, also known as Tonya Moore and my race is African American.

2.    I was employed by the Alabama Public Library Service (APLS) from October 2000 through March 2004 as an Administrative Support Assistant II and from October 2004 through May 31, 2007 as the Executive Secretary to Director Rebecca Mitchell, Caucasian.

3.    That while employed as Executive Secretary for APLS, I was charged with processing both in state and out of state travel for APLS employees.

4.    I did process the out of state travel of Mrs. Annie Brown, an African American, which was related to the written reprimand given by Rebecca Mitchell to Annie Brown, dated July 25, 2006.

5.    When I processed the travel for APLS employees, specifically in July 2006, there existed no verbal or written policy or directive that

prevented APLS employees from inquiring about their out of state travel with the Governor's Office.

6.   The out of sate travel pertaining to Mrs. Annie Brown which was the subject of her reprimand involved travel to New Orleans, Louisiana for Mrs. Brown to attend the American Library Association Annual Conference, June 23 - 27, 2006.

7.   Mrs. Brown did not receive a travel advance but was merely seeking reimbursement for her related travel expenses, after attaching the required receipts, in the amount of $1,575.00.

8.   The only policy is the travel policy found in the Alabama Public Library Service Employee Handbook, which is attached to this Affidavit as Exhibit "A".

9.   Mrs. Annie Brown complied with the only travel policy in effect,  in regard to her out of state travel which is the subject of the July 25, 2006 Written Reprimand given to Mrs. Annie Brown from Rebecca Mitchell.

10.   Mrs. Annie Brown has the reputation among her peers as being a very competent, hardworking professional who is well liked among her counter-parts at APLS.

Done this 29th day of May, 2008.

LATONYA D. MOORE

STATE OF ALABAMA                    )
                                    )
COUNTY OF MONTGOMERY    )

    Sworn to and subscribed before me this _29th_ day of May, 2008.

                                                                      NOTARY PUBLIC

MY COMMISSION EXPIRES: 3/26/2011

EXHIBIT 5

STATE OF ALABAMA        )
                        )
COUNTY OF MONTGOMERY    )

## AFFIDAVIT OF JOHANNA BISE

Before me, the undersigned Notary Public in and for said state and county, personally appeared **JOHANNA BISE,** who is known to me, and who being by me first duly sworn, deposes and states the following facts of which I have personal knowledge:

1.  I am Johanna Bise and I am Caucasian.

2.  I am currently employed as a Committee Clerk in the State of Alabama House of Representatives.

3.  In the past, I have been employed with the Alabama Public Library Service (APLS) where I became acquainted with Mrs. Annie Brown.

4.  When I voluntarily resigned from APLS, I became employed with the Governor's Office, before being employed with the State of Alabama House of Representatives.

5.  On or about July 24, 2006, I received a telephone call from Mrs. Annie Brown, inquiring whether I knew anyone in the Governor's Office that handled out of state travel that she could speak with to check on the status of her out of state travel.

6.  I viewed this request as no different from any other request or inquiry of a constituent, which my office regularly receives.

7.  I obtained the approval of Mrs. Brown's representative, the Honorable Pebblin Warren, in the House of Representative, and I then called

Phillip in the Governor's Office, who transferred me to a lady named Cheryl Fondon. I also had Mrs. Brown on the telephone line.

8.    I introduced Ms. Fondon to Mrs. Brown, via telephone and they discussed Mrs. Brown's travel.

9.    I remained on the line to be sure that my services would not be needed any further.

10.   The conversation between Mrs. Brown and Ms. Fondon was cordial and Mrs. Brown was professional at all times.

11.   I initiated the telephone call to the Governor's Office and not Mrs. Brown.

12.   The call I received appeared to be a professional inquiry about the reimbursement of her travel expenses.

Done this _29_ day of May, 2008.

_____
JOHANNA BISE

STATE OF ALABAMA          )
                          )
COUNTY OF MONTGOMERY      )

Sworn to and subscribed before me this _29th_ day of May, 2008.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES: _1-25-2062_

EXHIBIT 6



**ALABAMA
PUBLIC LIBRARY
SERVICE**



REBECCA S. MITCHELL
DIRECTOR

## AMENDMENT

## REQUEST FOR OUT-OF-STATE TRAVEL

Honorable Bob Riley                                    Date:  July 11, 2006
Governor of Alabama
Montgomery, AL 36130

Dear Governor Riley:

Request is respectfully made for authorization of travel to New Orleans, LA, to attend the American Library Association (ALA) Annual Conference, June 23-27, 2006.

**TRAVEL WILL BE PAID FROM GATES FOUNDATION GRANT.**

> Mode of Transportation:             State Vehicle
> Date of Departure:                  June 23, 2006
> Date of Return to Home Base:        June 27, 2006**

**ESTIMATED COST:**

Transportation:      $ 000.00          Signature: _Annie L. Brown_
Conference:          $ 000.00                     Annie L. Brown
Registration Fee:    $ 395.00
Room:                $ 800.00
Meals:               $ 250.00

In City Transportation:                 APPROVED: _Rebecca S. Mitchell_
   Taxi:        $  00.00                    Division Head
   Car Rental:  $
   Parking:     $ 130.00          APPROVED: _Rebecca S. Mitchell_
                                                  Director

**TOTAL        $1575.00**               APPROVED: _Bob Riley_
Expenses will be paid from:                       Governor
   **(0394)**

Charge to Organization:  (0430)

2006
RECEIVED
GOVERNORS OFFICE

# STATE OF ALABAMA

# PROGRESSIVE DISCIPLINE MANUAL



**State of Alabama Personnel Department
Training Division**

**June 2006 Edition**

## STEPS OF THE DISCIPLINE PROCESS

## STEP ONE: WARNING

The first step of discipline is a warning. A warning must be documented in writing. Make sure that the warning has the word "Warning" on it so that there is no doubt as to what step of discipline the supervisor has taken. The supervisor must provide the employee with the warning in the method of a memo, letter, or form. A sample form is included in this section on which to document the reprimand. A supervisor should hold a formal session (meeting) with the employee.

The session should outline the unwanted behavior and desired changes. The supervisor should be specific in describing the issues and the change needed by the employee. Supervisors should not take for granted that employees automatically know the specifics of the desired change. It is best for supervisors to be direct but show that they care about the employee's performance. After all, the supervisor is the team coach of the office or group.

The supervisor would be wise to let the employee repeat back to them the needed change in behavior. The most effective way to talk with the employee is for the supervisor to ask the employee about solutions to the performance issues. If the supervisor "asks" for solutions rather than "tells" the employee their solution, the employee will be more apt to look at the discipline as constructive rather than punishment. This action allows the employee to take responsibility in his/her performance changes. In addition, the employee should be informed of further disciplinary actions that will occur if the behavior does not change.

It would be helpful to set up a corrective plan of action for the employee. This corrective action plan lets an employee know what behavior needs to be changed, the results that are desired, and a time period in which the behavior will be monitored. How the supervisor will assist and a follow-up date to review performance should be included in the corrective action plan. To learn more about corrective action plans, please refer to Corrective action plan section of this Manual. The supervisor should document the discussion regarding the warning and corrective action plan, if used, in his or her own supervisory files. Supervisory file means the informal notes that each supervisor should maintain on each employee. These informal supervisory files are also mentioned in the Performance Appraisal Manual as documentation that is collected in order to justify ratings at the end of the year and serve as a memory source for that appraisal.

The supervisor is to wait until after the session with the employee and then proceeds to write a warning. The wait is suggested because, if the supervisor has used appraisal and discipline correctly, this meeting is conducted only after one or two counseling sessions (in most situations). Therefore, the meeting may result in the employee providing information that may change the perspective of the supervisor. For example, information from the employee indicates that in the particular situation, no infraction actually occurred – it was

10

hearsay. However, in most cases, the supervisor proceeds with the warning if there is no change in perspectives and it is fair for the employee to receive a warning.

The supervisor must then instruct the employee to sign and date the warning to indicate acknowledgment and receipt of the warning. If an employee refuses to sign the warning, despite being instructed to do so, the employee is insubordinate, and the next step of discipline—the reprimand—is to be taken with the employee. If an employee continues to refuse to sign the documents, discipline should progress, up to and including termination.

Under the State Personnel Board Rules, "insubordination" includes the following misconduct:

- ✓ Failure to follow an order (of a supervisor or someone with authority to direct the employee or agency policy or procedures);
- ✓ Disobedience (not obeying supervisor's instructions or agency policy or procedures);
- ✓ Failure to submit to authority as shown by demeanor or words, except in circumstances where the employee has good reason to believe the order is unsafe or illegal.

Rule 670-x-19.01(2)(b), State Personnel Board Rules. Furthermore, any disruptive or disrespectful behavior is insubordination. An employee who commits the act of insubordination may be suspended or dismissed on the first offense, considering work record and length of service.

A copy of the warning is given to the employee after the session has been held. The supervisor should document appropriate information in the supervisory file regarding what occurred in the meeting with the employee. The discussion should include the information as discussed in the session to include the problem area, the correct behavior, future consequences if behavior does not change, date of the session, and the agreement made between the employee and supervisor. An appropriate corrective action plan is written for the employee as an agreement to change within a certain period. Any corrective action plan is to be given to the employee immediately after the disciplinary session. A copy of the warning and corrective action plan should be kept in the supervisory file. A copy of the warning is given to the reviewing supervisor. A copy of the warning and corrective action plan must be sent to the central Personnel Office of the agency. Any other copies should be handled according to department policy. A sample form is included in this section or one may use a letter or memo format.

A warning is documented on the Employee Performance Appraisal at the end of the appraisal year for the employee. The documentation simply explains the situation for which a warning was given. In addition, a work habit area or responsibility should reflect that discipline took place. However, no points are deducted under "Disciplinary Score" on the Employee Performance Appraisal. Counseling and warnings are giving the employee an opportunity to change behavior with no future action that would deduct points from the appraisal. This documentation on the appraisal form (with no points deducted) is also a record of when troublesome behavior started in case it continues into the next appraisal period. The appraisal will either support or refute future personnel actions.

Remember if, a warning is placed in a formal file of the employee, a copy should be given to the employee within ten days of receipt into the file. Failure to do so can result in the warning being made null or void, as dictated by state law.

The warning and session, openly labeled as a warning, should set the employee on the right track. However, there are those times when the conduct of an employee continues to deteriorate. In this case, the next step of the discipline system should be taken. The next step is a reprimand.

## STEP TWO: REPRIMAND

The second step of the discipline system is referred to as a reprimand. This involves a more serious approach to problem areas. A reprimand is documented in writing. A letter, form or memo should be written to the employee should clearly state it is a "Reprimand." The employee must sign that they received the reprimand.

Additionally, a reprimand should state the continued or additional unwanted behavior and the necessity of the desired behavior. It should state that further disciplinary action would take place if the behavior does not come in line with the job standards. Again, a corrective action plan should be developed if possible. The supervisor may choose to discuss the corrective action plan then or in another session. The letter or memo may include both the reprimand and the corrective action plan. A supervisor may reprimand the employee in conjunction with a corrective action plan. A sample form is included in this section or one may use a letter or memo to document the reprimand.

The supervisor is to hold a disciplinary session with the employee. The supervisor should talk through the problem area including correct behavior and future consequences. The supervisor must then instruct the employee to sign and date the reprimand to indicate acknowledgment and receipt of the reprimand. If an employee refuses to sign the reprimand, despite being instructed to do so, the employee is insubordinate and the next step of discipline—suspension—is to be taken with the employee. If an employee continues to refuse to sign the documents, discipline should progress, up to and including termination. The employee is given the reprimand letter or form as the session ends.

A copy of the letter is given to the reviewing supervisor. A copy is maintained in the supervisor's file. A copy is maintained in the official employee files of the Personnel Office of the agency. Departmental procedure should dictate whether any other copies are to be maintained. All sessions with the employee should be documented in supervisory files.

Remember if, a reprimand is placed in a formal file of the employee, a copy should be given to the employee within ten days of receipt into the file. Failure to do so can result in the warning being made null or void, according to state law.

A written reprimand is documented on the Employee Performance Appraisal at the end of the employee's appraisal year. The work habit area or responsibility of poor performance should reflect the discipline that occurred. This reprimand should be documented in the "Disciplinary Action" section of the Employee Performance Appraisal. In addition, one or more reprimands, if the most severe step taken with the employee during an appraisal year, results in 7 points being calculated in the "Disciplinary Score" section of the Employee Performance Appraisal.

Unfortunately, there will be times when a warning and a reprimand does not change behavior. In this case further disciplinary action should be taken. The next step of the discipline process is suspension.

## SAMPLE FORM THAT MAY BE USED FOR A COUNSELING, WARNING OR REPRIMAND

THIS IS A      ☐    COUNSELING

            ☐    WARNING

            ☐    REPRIMAND

Employee Name

_____

State the facts of the performance or work conduct problem:

_____
_____
_____
_____

State what actions have been taken with the employee prior to this step of discipline (include counseling, coaching, and/or any disciplinary step):

_____
_____
_____
_____

State how the situation can be resolved based on discussion with employee and input from the employee:

_____
_____
_____
_____

If a corrective action plan is developed in conjunction with the discipline, include the time frame that is being monitored for change in performance and the follow-up meeting date:

_____
_____

Supervisor's Signature: _____

Employee's Signature: _____

Date of Meeting _____

Employee's signature denotes discussion not necessarily agreement.  The employee may add comments which must be attached to this form.  The form must be given to the employee with copies to the supervisory file and Personnel Office file in the agency.

14

EXHIBIT 8



*This is to certify that*

# APLS2 APLS2

*has mastered the course*

## Office 2003 - What's New Changes in Applications

**Date:** __August 01, 2006__
**Estimated Course Hours:** 1

*Carol A. Clark*
**President, MindLeaders**

# PERFORMANCE APPRAISAL

## PROGRAM AGENDA
## 2005

### DAY ONE

| | | |
|---|---|---|
| 8:00 | - 8:30 | Registration |
| 8:30 | -10:00 | Introduction to Performance Management |
| 10:00 | -11:30 | Phase One:  Preappraisal – Job Clarification |
| 11:30 | -12:30 | Lunch |
| 12:30 | - 2:15 | Phase Two:  Midappraisal – Process |
| 2:15 | - 4:00 | Phase Two:  Midappraisal – Coaching for Performance |

### DAY TWO

| | | |
|---|---|---|
| 8:00 | - 8:30 | Registration |
| 8:30 | -10:00 | Phase Two:  Midappraisal – Impact |
| 10:00 | -11:30 | Phase Three:  Final Appraisal – Process |
| 11:30 | -12:30 | Lunch |
| 12:30 | - 2:15 | Phase Three:  Final Appraisal – Impact |
| 2:15 | - 4:00 | Responsibilities and Results |

Breaks Included

**Speaker:**    Sharleen Smith
Director of Training
State Personnel Department

# STATE OF ALABAMA PERFORMANCE APPRAISAL MANUAL

S.Smith@personnel.state.al.us



## State of Alabama Personnel Department
## Training Division

### June 2005 Edition

• Work Habits —
• attendance

## PHASE TWO: MIDAPPRAISAL

• Employee is off & on their Way
& You are the "<u>Coach</u>"

• Observe Employees Working
• Monitor on going Performance

*discuss appraisal*
*pre - appraisal*

## PHASE TWO:  MIDAPPRAISAL

### Prepare for the Midappraisal

The Midappraisal Period is the timeframe during which the employee and supervisor perform assigned work Responsibilities in coordination with the services of the agency. Supervisory Responsibilities contain Appraisal duties.  Appraisal related duties include observing employees, monitoring on-going performance, documenting examples of performance, completing the Midappraisal form, conducting a mid-year Session with employee, distributing copies of the form properly and coaching employees on performance.  Most importantly, effective performance management and performance Appraisal depend on two way communication.  Today's employee wants to be involved. Employees want to participate in their future -- want ownership in the decisions affecting their jobs.  In order for these employees to be motivated, supervisors need to listen to them and use their ideas if appropriate.

### Monitor and Observe Employee Performance  *— document performance*

Performance Appraisal is not just one of those things that roll around every twelve months or so just to make life more difficult.  The job of a supervisor includes making daily observations of employee performance.   A planned system of performance Appraisal converts these daily, informal observations and evaluation into factual statements about the abilities of employees.

It is important for the supervisor to be aware of how well the employee is performing their Responsibilities and applying the Work Habits listed on the Employee Performance Preappraisal.  If a supervisor cannot personally observe performance or review a work product, then it is impossible for the supervisor to correctly measure performance.  A supervisor cannot measure or rate something that was never seen.  If performance cannot be measured, it cannot be rated.   If performance cannot be rated, the Responsibility does not belong on the Preappraisal form.

### Modify Responsibilities and Results

If an employee's Responsibilities change during the course of a Midappraisal Period, the changes in duties should be noted on the Employee Performance Preappraisal.  Any new Responsibilities should be added to the form with a corresponding date.  Any Responsibilities that are no longer being performed should be highlighted and a date added as to when the Responsibility was no longer performed by the employee.  Any modification to the Employee Performance Preappraisal should be initialed by the rating supervisor and employee.   If there are fewer than ninety days remaining in the Appraisal year, the employee should be rated on the current Responsibilities and Results.  Then, modifications should be made during the next Preappraisal Session. Three months of performance is the minimal period of time sufficient to observe an employee for a reliable evaluation.  The supervisor should use good judgment of timing

37

when modifying, adding, or deleting Responsibilities. Obviously, it would be more of an impact to change all Responsibilities and Results than to modify one. Supervisors should take this fact into account when making a judgment of whether to modify Employee Performance Preappraisal information when a few months or less are left in the Appraisal Period.

## Coach Employees

Some employees work at their satisfactory level when no one notices what they are doing. There are other employees who work above the standards when no one is watching. Either way, most employees flourish under supervision that includes positive reinforcement when work meets or exceeds expectations. In addition, studies and experience demonstrates that most employees respond positively to constructive help when a supervisor offers suggestions to help the employee's performance problems.

In order to understand the importance of ongoing feedback to Performance Appraisal, we need to recognize the role of effective Performance Appraisal -- not only to measure employee performance, but also to improve it. Whereas clearly defined and communicated expectations are needed to measure performance, ongoing feedback is needed to improve performance.

Quality feedback yields positive Results. One, there will be no surprises. Employees know from the beginning what is expected and have been kept informed of their progress in meeting the set Results. Secondly, feedback can help improve employee performance immediately. Receiving praise for meeting and/or exceeding expectations encourages employees to continue positive behavior. Assistance in correcting performance problems encourages them to improve in less satisfactory areas. Being held accountable on an ongoing basis helps employees develop consistency in good performance.

Informal communication and feedback should take place between the rating supervisor and the employee. This coaching consists of the daily, weekly, monthly discussion of work assignments, projects, performance Results, and Work Habits. Coaching means letting the employee know how well the employee is performing each assignment, project, etc. Coaching may be done with one word, by a discussion, or in writing. The idea is that a rater serves as a coach to employees.

Coaching is the process of recognizing, monitoring, and providing feedback regarding three levels of performance; exceptional, fully competent, and poor performance. Coaching means discussing performance levels with an employee but does not stop there.

38

Coaching includes the following:

1.  Rewarding strong performance during the year,
2.  Reinforcing fully competent performance during the year, and
3.  Counseling employees with poor performance or unacceptable work conduct during the year.

Rewarding performance that is outstanding takes on more tangible benefits. Awards, parking spaces, conferences, breakfast biscuits, tickets to a movie, improved work conditions, or even something as simple as candy can make the employee feel appreciated. Rewards are given when the performance is seen by the supervisor – not weeks later. Reinforcement takes on a similar meaning as rewarding. Reinforcements, however, are mostly intangible. Examples include praise, recognition in front of a higher level manager, decision making, cross training or even a simple "thank you."

Some managers find that their efforts to improve performance do not come easy. Below is a five-step model that can help deal more effectively with performance problems. It is not the only approach to upgrading performance, but it has been shown to be 75 percent effective according to Supervisory Management. It involves five steps. 1) Looking at a subordinate's total performance and focusing on significant, not trivial, or insignificant, behavior requiring improvement.  2) Agreeing on a description of current performance.  3) Finding out why expectations are not being met.  4) Developing a performance improvement plan as discussed in the next section under Documentation.  5) Making sure improvement provides a positive Result for the employee.

*Motivational Principles*

# MOTIVATION

1 Positive motivation    (3) Be specific w/Praise
(1) Develop A Plan    (4) Continuous motivation Motivation
(2) know what you want to    (5) Positive works
reinforce;    better than Negative
(6) Continuous motivation
A simple "thank you"

> "People often say that motivation doesn't last.
> Well, neither does bathing;
> that is why we recommend it daily."
> Zig Ziglar

Mardi Gras Party w/training workshop
Chili Cook Off
Spring Cook out — AT-LAKE
Invite employees to Home + cook out
Employee Appreciation Day —

## Performance Levels

A.    Employee With Productivity at Competent Level – ***Reinforce***
B.    Employee With Strengths – ***Reward*** *Visionary*
C.    Employee With Areas that Need Development – ***Counsel***

## A. *REINFORCE* COMPETENT PERFORMANCE

Monitor job and work levels
Acknowledge work performed to standard
Provide motivation

*"Only positive consequences encourage good future performance."*
**Ken Blanchard**

*Reinforce is intangible*
*– Monitor*          *· Verbage*
*– acknowledge*
*– Reinforce*         *reinforces performance*

## B. *REWARD* EMPLOYEE WITH STRENGTHS

Identify strong performance
Recognize the behavior
Reward the strength in performance



*What gets rewarded gets done. If you reward the right thing you will get the right thing. If you reward the wrong the thing you will get the wrong behavior. LeBouff*

*Rewards are tangible*
*– identify*
*– What gets Rewarded – gets Done!*

## C. *COUNSEL* EMPLOYEE NEEDS

Identify areas of weakness
Meet with employee
Develop a path out of weakness
Motivate to stronger performance

*"Do not confuse motion and progress. A rocking horse keeps moving, but does not make any progress."*
**Alfred A. Montapert**

40

# COUNSELING

**1. INFORMAL "SIT DOWN" COUNSELING SESSION**
   **Identify problem**
   **Discuss correct behavior**
   **Explain consequences if no change**
   **Ask for solutions/ agree on solution**
   **Document _meeting_ / signatures of rater and employee**
   **Monitor progress and provide feedback**

**2. ACTION PLAN (same as above with written plan form)**
   **Hold Session with employee**
   **Develop an action plan in writing**
      **Review the problem**
      **Discuss correct behavior**
      **Set a time frame for monitoring**     *must Do*
      **Provide feedback along the way**
      **Set a meeting for end of the time**
   **Signatures by rater and employee**
   **Copy the action plan for employee/ file**

**3. TWO MIN. CHALLENGE (conducted at time behavior is seen)**
   **State what you observed**
   **Wait for a response**
   **Remind them of the goal**
   **Ask for a solution**
   **Agree on the solution**
   **Document in supervisory file**

*What if the employee has problems which continue or escalate?*
Use the Progressive Discipline Process for problem employees.
**Refer to the State of Alabama Progressive Discipline Manual**

## Discipline Process
Warning
Reprimand
Suspension
Termination

41

## Document Performance

Most of the clear, specific objectives and much of the ongoing feedback will be lost if it is not documented. The problem is that we all have faulty memories. After two or three weeks or months our memories cannot be depended upon. Therefore, documentation is needed to insure proper follow-up. It's also needed to insure sufficient data for an effective Performance Appraisal. Without documentation, a supervisor may only remember one or two situations instead of using examples of an entire year's performance.

The documentation does not have to be fancy. Documentation methods range from post-it notes, spiral notebooks, calendars, to file folders. It's essential that the content of all performance management interactions be documented -- that is, written and dated, documentation should include job Responsibilities, specific Results, positive behavior, and performance problems. Without documentation the Performance Appraisal reverts to "guesswork" and becomes and ineffective management tool.

Documentation is a necessary part of the entire Midappraisal phase. The rating supervisor must document examples/samples of employee's performance, work conduct, work discussions, and the Midappraisal Session. Documentation serves as a memory source and justification for ratings during the final Appraisal Period. Both are for legal and managerial considerations. Documentation may be conducted several ways including:

1.      Diary keeping -- making daily or weekly notations per employee.

2.      Critical incident -- documenting employee behavior and/or the situation surrounding any critical event including strong and weak performance.

3.      Summary -- summarizing the performance of each employee for a certain time frame, possibly on a monthly basis.

The best documentation is a compliment between critical incident and summary. Diary keeping is best used in situations where there are daily/weekly shift changes or supervisor shift changes.

In addition, documentation should be a paper trail where someone that does not know the employee could review the supervisory file and come to similar conclusions of personnel actions that the supervisor or agency reached. A concise method of explaining proper documentation is the ABC Method:

A – Accurate – The supervisor should never falsify documentation to carry out an agenda. Similarly, a supervisor should never backdate documentation. The post dating of notes usually occurs when a supervisor has forgotten to document an incident. Months later they may be reminded of the situation and date the documentation as if it

42

was documented when the situation occurred. This    action would be falsifying the date on the documentation. It would be appropriate to date the document on the day that it is written and then refer to the date of the incident or event being documented.

B – Behavioral – The supervisor should document the behavior and actions that took place on the job just as the situation occurred. It is not proper to label people such as "worst employee." It is improper to label the behavior and not describe exact details. For example, "The employee is poor at typing." Behavioral documentation takes into account the situation in context, specific behavior actions and who conducted the actions, consequences of behavior as related to agency/division function, and how the incident is connected to job performance.

C – Consistent - The supervisor should consistently document work performance for all employees under his/her management. Documentation should be performed the entire year, not just the last few months or only around the Midappraisal Session.

Most documentation is maintained in an informal supervisory file. Only formal documents such as Appraisal forms, disciplinary steps, etc. are sent to agency personnel offices. Remember, a copy of any document to be used in the disciplinary process must be given to the employee within 10 days after inclusion in the formal personnel file. The employee must sign and date to acknowledge receipt/discussion of this documentation. Disciplinary signatures are mandatory. This "10 day rule" is in compliance with Section 36-26-27.1 of the Code of Alabama (1975). Any failure to provide this document to the employee will result in the document being removed from the personnel file. However, this law does not apply to informal notes that are taken by supervisors regarding daily, weekly performance of employees.

A corrective action plan is recommended anytime a step of discipline is taken with an employee. An action plan should be used with a warning, reprimand and suspension. In fact, an action plan is useful for any performance problem. The level of the problem may have not risen to the action of discipline and a corrective action plan can be developed by the supervisor. Once written, the corrective action plan must be discussed with the employee with the supervisor and employee signing the written plan.

## Develop a Corrective Action Plan

A corrective action plan consists of five areas. Each area needs to be communicated to the employee verbally and in writing. This may be done through a memo or an informal form developed by the supervisor. It may be communicated during the disciplinary Session that is held in conjunction with the discipline process. Again, remember that discipline is to assist an employee in changing undesirable behavior to desirable performance. An action plan assists in this goal by providing an orderly, precise, and practical plan to overcome the weak area.

43

*Next page*

There are five areas included in a corrective action plan. The supervisor should:

1. State the behavior or area of conduct that is deficient and needs to change. Be very specific in this explanation. It is helpful to include the consequences that make the conduct undesirable.

2. State the correct behavior, policy, or conduct. Be specific as to what actions would be appropriate for the employee to take to get back on track. Provide the method or steps necessary for change.

3. Set a timeframe that will be used to monitor the behavior to assure that the employee changes the conduct to proper behavior. This timeframe should be long enough such that the area in question can be observed enough times to ensure the proper behavior is occurring. For example, a one month period is appropriate for a punctuality problem.

4. State any assistance that the supervisor or department will provide to the employee, if appropriate. For example, the employee may need training or additional resources such as equipment or supplies. If so, those should be outlined. If the issue is in Work Habits, there is no assistance since attendance, punctuality, etc. is the employee's sole Responsibility.

5. Set a follow-up date and time to meet with the employee. This meeting should be at the end of the original timeframe that was set. For example, a supervisor may set one month as the timeframe in which to monitor a change in employee behavior. The supervisor should set a day and time for a meeting on the last day of the fourth work week. Actually set the date and time of a meeting. Notes of this Session should be written on the action plan to record the end Result of employee performance. It gives the employee a point of closure to determine whether a change in conduct has occurred or not. It is important for this Session to be conducted and not neglected even if the employee's behavior appears to have improved.

A corrective action plan will clarify to the employee the importance of the situation. An action plan demonstrates that conduct has gotten to a critical part of performance. Again, an action plan is appropriate at any time an employee's performance is not up to standards, policies, or procedures.

## Conduct Midappraisal Session

At least once during the Midappraisal phase, ideally at the six-month interval time, the rating supervisor is to conduct a formal "sit-down" Session with the employee to discuss performance. Discussion should include employee's performance in meeting Results and Work Habits including strengths and weaknesses. Identified weaknesses should be monitored in order to provide the employee an opportunity to change the behavior by

44

the end of the Appraisal Period. Corrective action plans for weak areas are often useful at this point in the Appraisal year. If any discipline has been taken thus far in the year, the supervisor should remind the employee of the continued need for a change in behavior. If a counseling session has been conducted that is going to be used on the final Appraisal, the matter should be made known or the employee reminded of this fact during the Midapprasial Session. The Session should also include praise regarding the strong points of the employee's performance. In particular, an employee should be informed if the performance is meeting the Responsibilities' Results or goals set in the Preappraisal. This candor allows an employee to know exactly where they stand. Thus it is up to the employee to bring up performance if below goals in some areas or bring up performance if wanting to score in a category above standards on the Final Appraisal form.

## Complete the Midappraisal

The date of the Midappraisal Session should be specified in the space provided below the performance documentation. The supervisor should complete the three areas on the form regarding employee's strengths, weaknesses, and fully competent performance and any corrective action plan to alleviate any uncertainty about what the supervisor expects regarding the employee's weaker performance.

Specific Responsibilities and Work Habit areas should be cited. Each of these areas should be discussed with the employee. This time is not to be used as a time to formally conduct counseling, warning, reprimand, or recommending suspension. Mid appraisal is a time to discuss what has occurred during the prior time since Preappraisal. It is not a disciplinary session. When applicable, the employee should be made fully aware of the correct expectations by developing a written corrective action plan. The action plan should include the consequences of failing to fulfill the goals. Reward the areas of strengths with praise and encouragement. There are other ways supervisors can choose to reward employees other than monetary rewards. If the supervisor is in doubt as to what might be a reward for an employee, they need to only ask the employee. If any discipline has occurred during the first half of the Appraisal year, corrective action plans and consequences of further noncompliance should be made clear. If the employee is "Meets Standards" in each Responsibility, the supervisor should be candid and tell the employee at the Midappraisal Session.

Remember, this is a time set aside to inform the employee how well they are performing. One reason for this discussion is to provide an opportunity for an employee to change performance that is not consistent with productive work as set out in the Preappraisal. The second reason for the Midappraisal discussion is so that the employee is not surprised by the outcome of the final Appraisal. Third reason is so the supervisor can reward or reinforce strong points of performance. Reinforcing and rewarding performance usually means the performance will be repeated in the second half of the Appraisal year. Both reasons are for legal and managerial considerations.

The rater, reviewer, and employee sign the Midappraisal. The signature denotes that the performance discussion has been conducted. It does not denote agreement with information written by the rater. Comments may be attached by the employee, rater, or reviewer for any reason. The appropriate space is to be initialed if comments are attached. All signatures are mandatory and, if refused, discipline can be taken with the individual.

Any comments or "rebuttal" added by an employee can be made, submitted and attached to the Midappraisal. A reasonable time frame, as defined by agency guidelines, should be afforded to the employee to write the rebuttal. However, if comments are written by the employee at a later date, the employee may send Midappraisal comments to the agency personnel office up to the day of the Final Appraisal. When comments are sent in, the agency must attach the document to the Midappraisal located in the official agency personnel file.

## Maintain Records

The Midappraisal Session is documented on the opposite side of the Preappraisal. A copy of the Midappraisal should be provided to the employee and reviewing supervisor. The rater should maintain a copy. Any other copy is dictated by agency policy. If the agency does not maintain copies of Preappraisals and Midappraisals, the rating supervisor maintains the original form to use in completing the Employee Performance Appraisal. Comments stay with the Preappraisal and Midappraisal.

## Supervisory Checklist for Midappraisal

During the Appraisal Period supervisors should ask themselves the following questions. If they can honestly answer "yes" to each, a successful Appraisal Period has occurred. If any question is in doubt, the rating supervisor must deal with the issue immediately.

1. Are you aware of how well the employee is performing? Have you observed the performance personally? Have you been able to monitor performance via telephone calls, reports, etc.? Is there a way to measure that performance?

2. Does the employee know how well you think the Responsibilities are being performed? Have you specifically told the employee if the performance is meeting standards, exceeding standards or above standards? Does the employee receive regular feedback/coaching on a daily, weekly, or monthly basis?

3. Does the employee know where they are in regard to the Work Habit areas? Does the employee receive regular feedback/coaching on a daily, weekly, or monthly basis?

4. Has a "sit down" Midappraisal Session been held with the employee at approximately six-months?

46

5. After the Midappraisal Session, did the employee understand the areas that need improvement in performance?   Did you develop a corrective action plan for the employee?

6. After the Midappraisal Session, did the employee understand the areas that exceed goals in performance?  Did you reward the employee?

7. After the Midappraisal Session, did the employee understand the areas that meet Results in performance as set in the Preappraisal?  Did you reinforce the employee?

8. Have you documented examples of performance during the Midappraisal to serve as a memory source and to substantiate final ratings?

47

*Midappraisal does Not go to State Personnel*

## EMPLOYEE PERFORMANCE *MIDAPPRAISAL*

be any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, the first half of the appraisal period.

_____

_____

be any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, served, during the first half of the appraisal period. Document any actions taken or the corrective action hat was developed to improve the areas of weakness. If a plan has not been developed, it is appropriate e rater to consider developing a plan at this time.

*weakness) can be corrected before final appraisal*

_____

_____

the areas where the employee has performed in a fully competent manner during the first half of the sal period. Documentation in this area means that the employee performed to the expected level of rmance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this n should be completed.

*mployee meets Expectation level of performance.*

_____

_____

appraisal session has been held on this date and performance has been discussed:

oyee Signature: _____   Initial if comments attached: _____

r Signature: _____   Initial if comments attached: _____

ewer Signature: _____   Initial if comments attached: _____

atures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are mandatory. oyee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. The n attaching comments must initial in the appropriate space.)

*Employees Strength - anything from pre-appraisal to midappraisal, that merits a 3 or 4 on appraisal*

48

## EMPLOYEE  PERFORMANCE *MIDAPPRAISAL*
## REFERENCE MATERIALS

1. Whale Done: Power of Positive Relationships – Ken Blanchard
2. FISH – Stephen Lundin
3. 7 Habits of Highly Effective People – Stephen Covey
4. One Minute Manager – Ken Blanchard
5. First, Break All the Rules: What the World's Greatest Managers Do Differently - Marcus Buckingham
6. The 17 Essential Qualities of a Team Player – John Maxwell
7. Leadership and the One Minute Manager – Ken Blanchard
8. The Fifth Discipline – Peter Senge
9. 1001 Ways to Reward Employees – Bob Nelson
10. Love Em or Lose Em – Beverly Kaye
11. When Generations Collide – Lynn Lancaster
12. Crucial Conversations – Karey Patterson
13. Crucial Confrontations – Karey Patterson
14. Generations At Work – Ron Zemke
15. Developing the Leader Within – John Maxwell
16. Emotional Intelligence At Work – Hendrie Weislinger
17. Team Players – Glenn Parker
18. The Heart of a Leader – Ken Blanchard
19. The Art of Winning Commitment – Dick Richards
20. Little Book of Coaching – Ken Blanchard and Don Shula
21. The Power of Ethical Management – Ken Blanchard
22. Carolyn 101 – Carolyn Kepcher
23. Management Challenges for the 21st Century – Peter Drucker
24. Discipline Without Punishment – Dick Grote
25. Managing From the Heart – Hyler Bracey

*1001 - Ways to Energize Employees*

*10001 Ways to Reinforce*

*"Why this Horse Won't Drink"*

49

**PHASE THREE:  FINAL APPRAISAL**

## PHASE THREE:  FINAL APPRAISAL

### <u>Prepare for the Final Appraisal</u>

The final Appraisal Period is considered the end Result of the Appraisal process.  It is still a continuous process of synthesizing the information collected and observed during the year but, for practical terms, ends with completing the Final Appraisal Form.  The final performance Appraisal phase may be referred to as a two step process.  The first is preparing the employee's performance Appraisal by completing the necessary forms and paperwork.  The second, and the one that often worries supervisors, is the Appraisal Session.

Completing the form does not require the supervisor to be face to face with the employee.  Only during the Appraisal Session does the supervisor need to be face to face with the employee to provide an assessment of the employee's level of performance.

Some supervisors consider the Performance Appraisal session as unpleasant.  If, for example, an employee has not been performing up to the level expected, it may cause an unpleasant emotional response by an employee.  But this situation need not occur.  If the Midappraisal is conducted properly, the employee may be disappointed but will not be surprised by poor ratings.  If handled properly, the Session could be used to assist the employee in improving performance.  The supervisor should discuss the positive side of Performance Appraisal feedback as well as the weaker areas of performance.  It is your opportunity to coach, counsel, direct, and help the employee improve job performance.  At the same time, it will help the employee improve his opportunities for growth within the organization.

Another way to help employees is for the supervisor to ask the employee to prepare for and anticipate the Appraisal interview.  This anticipation will tend to make the employee feel more confident and less anxious during the Appraisal process.  Since Performance Appraisal inevitably overlaps with key management and planning activities, it usually has a far-reaching impact, beyond the scope of one-shot evaluation or "report card."

It is impossible and unfair to try to measure performance independently from managing performance.  If a supervisor has a "hands off" management approach, they may not have the best information on which to measure the employee's performance.  This fact is why the Midappraisal Period is so important.  The independent Performance Appraisal is a meaningless exercise whereby a manager distributes ratings by guesswork and intuition.   One common approach, but poor management process, is to work backwards--to look at the employee who is a nice guy, has been with the department 13 years, and has two kids in college; determine this employee needs a particular raise; then come up with data to justify it.  This approach has nothing to do with improving employee performance, motivating employees, or awarding merit pay.  An accurate and reliable Performance Appraisal needs to be based on a clear definable position; performance planning; ongoing feedback; and documentation.  If you have conducted an effective Midappraisal Period, you will be prepared for a proper final Appraisal.

51

## **Gather Information, Seek Input, and Review the Employee's Work Record**

At this point the rating supervisor reviews, evaluates, and documents the performance of the employee during the Appraisal Period. The rater should consider the employee's Work Habits and performance of Responsibilities while reviewing their informal file of documentation and seeking input from appropriate others. The performance should be compared to what was listed on the Preappraisal and discussed in the Preappraisal Session. The Responsibility is rated based on the performance level starting at "Meet Standards" performance as discussed in the Preappraisal. The Employee Performance Appraisal is the form on which Responsibility and Results performance, Work Habit conduct, and, if any, disciplinary actions during the Appraisal year are documented. Remember, the Appraisal form is like a mirror; it accurately reflects what has occurred during the rating Period. This information should include strengths, weaknesses, disciplinary actions, and/or the fully competent performance performed in the position as it occurred during the year. The ratings for each Responsibility, the marking of Non-Compliance or Compliance of Work Habits, and information regarding any disciplinary actions will deduct points that reflect an accurate picture of the entire year, if any discipline was involved.

The Final Employee Performance Appraisal should only include the performance for the period of dates indicated on the form. The dates reflect the immediate past year. This procedure should be obvious but is not always used appropriately at times. It is not appropriate to continue to use past years' performance to determine a current rating or score. For example, often times the inappropriate use comes when a supervisor is still mulling over a mistake made by the employee two years ago. The supervisor, knowingly or unknowingly uses that past experience to "bias" or "shade" the current year's Appraisal score. The employee has already been counseled or disciplined two years ago and the current Appraisal should not reflect performance outside the dates listed on the Employee Performance Appraisal.

However, there may be occasions where an employee performed a Responsibility, for example, two years ago. In this example, the errors made two years ago were not discovered until the current year. In this case, the Appraisal should reflect the finding of errors during the current year. A more specific example is where an employee has a client, project, audit, etc. that occurred two years ago in their routine caseload. The file regarding the project, audit or client had no need to be brought to view until the current year when a situation arose needing the file to be reviewed. So, two years after the actual performance, the file is reviewed and found to have errors that cost the department in terms of public image, money, incorrect procedure, harm to others, etc. The mistakes found in the two year old file should be used in rating the appropriate Responsibility or Work Habit involved on the current form. The job related reason behind such exception to only scoring current performance is that the performance was not known until the current need developed and the file was reviewed – even if the actual error occurred two years ago. Clarification on a specific issue may be obtained from your agency's Personnel Office.

52

## **Conduct the Final Appraisal Session**

When all appropriate input has been gathered and examined, the supervisor then carefully plans and conducts a final Appraisal Session with the employee. The documents to be used in reviewing and evaluating an employee include the Preappraisal, Midappraisal, supervisory file of documentation and input from appropriate others, and the Final Employee Performance Appraisal form. Planning a Session may include rationale for ratings and scores, writing a corrective action plan for areas less than "Meets Standards," considering reward/praise of strong performance areas. The reaction of the employee for the given score should be considered and the supervisor should be prepared to deal with the assumed possible reaction. Often a supervisor knows the employee well enough to anticipate the reaction an employee may have to disciplinary point deduction or lower Responsibility ratings. The Responsibilities and Results ratings and Work Habits scoring should be discussed one by one with the employee. This Session is designed to give the employee specific and detailed performance information on how well the employee performed in the agency and for taxpayers during the year. However, past history is not the only reason for feedback. The supervisor should prepare any pertinent actions or suggestions for improving performance. This information will allow an employee to know how well they need to perform in the future to achieve goals and objectives.

There are several guidelines for conducting an effective Appraisal Session. The supervisor should schedule a mutually agreed upon period of time that is adequate for the supervisor and the employee to discuss each rating and suggestions for improved performance. Appraisal Sessions should not be scheduled during the employee's lunch break or after work hours. A private setting should be provided for the Session. Interruptions should not be allowed. This is a formal "sit-down" Session with the employee.

The supervisor should prepare thoroughly for the Appraisal Session and have the necessary forms and factual information ready to present at the proper time during the Appraisal feedback Session. The documents include the Preappraisal, Midappraisal, supervisory file of documentation, input from appropriate others and the Final Employee Performance Appraisal form. The supervisor should be ready to respond to any questions regarding the reasons for the ratings. Again, in particular, Work Habits not marked as "Satisfactory" or a Responsibility Rating below "Meets Standards" should be addressed, and a corrective action plan developed if appropriate Corrective action plans are discussed in the Midappraisal section of this Manual under Documentation. This corrective action plan may be developed by the supervisor prior to the final Appraisal Session or developed with the employee during the final Appraisal Session. This type of communication and documentation allows ample opportunity for an employee to adhere to the expected Results for the job position during the next Appraisal year.

The supervisor should listen to the employee's point of view. Each employee is different and will react differently to the ratings and suggestions discussed in the Appraisal Session. It is extremely important to allow sufficient time for the employee to ask questions and discuss any performance topics.

In the case of extreme duration of leave without pay or sick/annual leave, the employing agency may consider an extension of the Appraisal Period. No employee is entitled to a pay adjustment solely because twelve months have passed since the last raise. The employing agency may evaluate the employee based upon performance during the Period. If the agency is not satisfied that the Period is adequate to measure compensable performance, the appointing authority may request an extension, in writing, to the State Personnel Director. If approved, the employee should be informed. If an agency determines to postpone the performance Appraisal, then the effective date of an Appraisal action will be two months following the time the Employee Performance Appraisal was eventually submitted.

It is important to realize that Performance Appraisals that are not turned in on a timely manner will result in the employee's name being on the denial list for annual raises.

## Complete the Employee Performance Appraisal

### Heading

General information such as the employees' name, classification, and social security number, is normally printed on the Employee Performance Appraisal that is distributed by the State Personnel Department. If inaccurate or incomplete, this information should be corrected on the form. The Personnel and Payroll Audit Division of the State Personnel Department will be notified by your personnel office by use of a Form 11. In addition, the dates of the Appraisal Period are printed on the form. Only performance occurring during this timeframe should be rated on the form.

In addition, an Employee Performance Appraisal form may be downloaded from the State Personnel Department's website at www.personnel.state.al.us. White standard paper should be used.

### Work Habits

At this time, the evaluation of Work Habits should be completed. A Work Habit area may be "rated" as "satisfactory" or "unsatisfactory" depending upon the defined expectations of the supervisor and the performance of the employee during the year. An individual Work Habit may be marked in one level only. There are no points deducted in the Work Habits section of the form.

Satisfactory: A mark in this area means that the employee's conduct in that Habit has been according to the defined supervisory policies throughout the majority of the year. No points are to be deducted on the Appraisal. Thus the "Discipline Score" is a "0."

Unsatisfactory: A mark in this area means that the employee's conduct in that Habit has deviated at times during the year from the defined supervisory policies.

Again, Work Habits are terms and conditions of employment that are similar for many employees, yet job related, to all employees. For example, when someone says "yes" to a job, they are saying "yes" to compliance with the four Work Habit areas as defined

54

by the agency and supervisor.  It will help with consistency of Work Habit policies for a reviewing supervisor to monitor Work Habit definitions and evaluations for consistency within the unit office or department.

The actual warning, reprimand, or suspension paperwork should be sent to the agency's personnel office along with the Employee Performance Appraisal.  This is documentation for the file that justifies the evaluation of the Work Habit section.  It is important to remember this section is not meant as a substitute for progressive discipline.  It is simply a reflection of what has occurred during the year.  Therefore, attachments must include actual copies of the warning, reprimand or suspension papers.

Remember, if an employee has been penalized with discipline it should affect the one area of the form in which the problem occurred.  Documentation attachments verify or justify the low rating or level of Work Habit.  This procedure means an employee should not be marked down in more than one Work Habit area for a single infraction.  This also means that an employee is not to be marked down in Work Habits and a Responsibility.  For example, if an employee has been tardy such that the employee received a reprimand, the only low mark would be in Punctuality of Work Habits.  It would not be marked in Compliance with Rules also.  Accordingly, no ratings on the Responsibilities would be lowered due to the reprimand in Punctuality.  Ideally, disciplinary actions are for work conduct.  Performance problems are indicated by a given rating.  When the Heading section has been checked and the Work Habits section has been completed, the supervisor then completes the Responsibilities/Results section and Disciplinary Actions section on the back of the form.

**Responsibility/Results**

An abbreviated version of the Responsibilities from the Employee Preappraisal should be listed in the Responsibility/Results section of the Employee Performance Appraisal. The supervisor should assign a numerical rating (0, 1, 2, 3, or 4) to each Responsibility listed.  Only whole numbers, not fractions or decimals, may be used in providing the individual Responsibility ratings.

Supervisors should be able to substantiate their judgments about employee performance ratings.  Any Responsibility that has not been performed by the employee during the current Appraisal year should be dropped from the Responsibility list during this final evaluation.  It is not to be included on the form and, as often done, marked as N/A (Not Applicable).  Only those Responsibilities performed during the year should be listed.  Below are the ratings and corresponding level of performance to receive the particular rating.

"4" Consistently Exceeds Standards:  This rating indicates that an individual's performance on a particular Responsibility consistently and clearly exceeded requirements for the position over the twelve months of the year.  This rating is used to represent an employee that continually exceeded the expected Results set for the Responsibility almost every time it was performed.  The rating is used to recognize that the employee

can be relied upon to accomplish the most complex assignments required of an employee in that position with little or no supervision from the management.

3" Exceeds Standards:  This rating recognizes that the employee's performance frequently exceeded expected Results for the Responsibility and the employee needed little or no supervision on routine tasks as discussed in the Preappraisal.  The difference between "exceeds" performance and "consistently exceeds" rating is that the exceptional performance on a particular Responsibility may have not occurred each time the Responsibility was performed but occurs more often than not through out the year.

2" Meets Standards:   This rating recognizes that the employee's performance in an individual Responsibility met the expected Results set for the position in the Preappraisal Session.   It indicates that the employee performed the specific Responsibility in a fully competent manner and met goals.   In other words, the employee performed the necessary Responsibility as hired to do.  The employee may also be rated in this category when the Responsibility was performed consistently at the fully satisfactory level during the year.

'1" Partially Meets Standards:  This rating recognizes that an employee's performance on an individual Responsibility was below the expected Results required for the position as discussed in the Preappraisal Session.   The rating means that the Results were not routinely met by employee in performance.  More often than not the level of expected performance fell below what had been discussed between the supervisor and employee.  This rating may be used for performance that must be supervised closely in a position where the employee should be operating independently.

"0" Does Not Meet Standards:  This rating indicates that the employee's performance on the individual Responsibility consistently and clearly fell below the expected Results set for the position in the Preappraisal.  The performance did not meet the goal continually as the Responsibility was conducted throughout the Appraisal year.  This rating may be used for performance that must be supervised closely in a position where the employee should be operating independently.

Remember that to arrive at a particular rating, an employee's performance is to be compared to the position's requirements as discussed and written in the Preappraisal. Employees are not to be compared to one another.  The supervisor basically rates an employee with only Preappraisal, supervisory documentation, input from appropriate others and memory of events.  A supervisor should be able to substantiate or justify the reason for the rating to the employee giving specific examples of performance or situations.

When each Responsibility has been rated, it is then time to calculate the Responsibilities Score.  The Responsibilities Score is calculated in the following manner:
Add together the ratings that were assigned to each Responsibility.  Divide this sum by the number of Responsibilities.   The sum, at this time, should be carried out three decimal places and rounded to the nearest digit using standard accounting principles of rounding (e.g., 1.445=1.45).  This score will then have two places after the decimal — having rounded using the third place.  Next multiply this number by 10 to arrive at the

56

final Responsibility Score. Please use a calculator in this process. Do not utilize math by hand. In addition, make it common practice to use the same calculator with each employee's Appraisal since calculators are often programmed differently. However, this is done when possible and not an area of controversy if the same calculator cannot be found.

An example of the computations follows:

| _Rating_ | _Responsibility_ |
|---|---|
| 2 | A. Types documents |
| 3 | B. Files documents |
| 2 | C. Exchanges information |
| 2 | D. Proofreads documents |
| 1 | E. Composes correspondence |
| <u>4</u> | F. Trains employees |
| 14 | Total of ratings |

Responsibility Score:



$$\underline{14} \div \underline{6} = \underline{2.33} \times 10 \quad \underline{23.3}$$

| Total of Responsibility Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |
|---|---|---|---|---|

• Carry out 3 places (denials)

**Disciplinary Actions**

Any formal counseling (which is not discipline) and/or discipline that has been taken with the employee during the current Appraisal year should be documented in this section. The documentation of each disciplinary action must include the disciplinary step taken, the date of action, the reason, or nature of unwanted behavior it involved. This brief description of discipline is written on the form.

This section of discipline must include the above mentioned documentation for any warning, reprimand, or suspension step of the discipline system that was marked as Unsatisfactory in the Work Habits section of the Employee Performance Appraisal. Any disciplinary documentation that has been written during the year is attached to the form and sent to the agency personnel office. This disciplinary documentation is to be kept in the agency's central personnel file.

Remember, a copy of any document to be used in the disciplinary process must be given to the employee within 10 days after its inclusion in the formal personnel file. Otherwise, the documentation must be removed from the file and can not be used in future disciplinary actions. The employee must sign and date to acknowledge

ceipt/discussion of this documentation.  Disciplinary signatures are mandatory.  This 0 day rule" is in compliance with Section 36-26-27.1 of the Code of Alabama (1975).

**isciplinary Score**

nly reprimands, suspensions and or involuntary demotions are to be scored in this ction.  Again, the Disciplinary Score section contains the mark of any warnings that ere given to the employee during the year with no points being deducted.   The sciplinary Score is derived by use of only reprimands, suspensions, and/or involuntary emotions.  The supervisor should identify the most severe step of discipline taken with e employee during the year.   If the most severe step consisted of one or more primands, the Score is 7.  If the most severe step taken consisted of one or more spensions, the Score is 17.   If the most severe step taken consisted of a demotion, e Score is 24.  Record the appropriate points in the blank labeled Disciplinary Score. no discipline, counseling or only a warning was given, the Score is 0.

arning:  A mark in this area means that the employee's conduct in that Habit, as efined by supervisory policies, has not been followed during the year.  Due to those fractions, the supervisor has given the employee a warning according to the rogressive Discipline Manual.  Documentation of the date and reason is to be placed in e "Disciplinary Action" section on the final Performance Appraisal.  No points are to be educted on the Appraisal.  Thus the "Discipline Score" is a "0."

eprimand:  A mark in this area means that the employee's conduct in that Habit, as efined by supervisory policies, has not been followed during the year.  Due to the ontinued or severity nature of the infractions, the supervisor has given the employee a eprimand according to the Progressive Discipline Manual.  Documentation of the date nd reason is to be placed in the "Disciplinary Action" section on the final Performance ppraisal.  The "Discipline Score" is a "7."

uspension:  A mark in this area means that the employee's conduct in that Habit, as efined by supervisory policies, has not been followed during the year.  Due to the ontinued or severity nature of the infractions, the supervisor has given the employee a eprimand according to the Progressive Discipline Manual.  Documentation of the date nd reason is to be placed in the "Disciplinary Action" section on the final Performance ppraisal.  The "Discipline Score" is a "17."

<u>Involuntary Demotion</u>:  A mark in this area means that the employee's conduct in that Habit, as defined by supervisory policies, has not been followed during the year.  Due to the continued or <u>severity nature of the infractions,</u> the supervisor had to involuntarily demote the employee to a lower classification according to the Progressive Discipline Manual.  Documentation of the date and reason is to be placed in the "Disciplinary Action" section on the final Performance Appraisal.  The "Discipline Score" is a "24."

The text box in this section is to document the unsatisfactory conduct and the disciplinary step taken with the employee, the date(s) of the incidents and actions taken by the supervisor.  Information regarding each discipline step should be documented.

An example is as follows:

<u>Disciplinary Actions:</u>

"Reprimand given on April 27 after seven occurrences of tardiness.  The employee continued in tardiness three more times in May.  Continued to discuss problem with employee each time.  Another reprimand was given on May 20.  Performance changed to correct punctuality."

<u>Disciplinary Score</u>:   7

When the Responsibility Score and Disciplinary Score have been calculated, the supervisor is ready to complete the Performance Appraisal Score.

**Performance Appraisal Score**

The Performance Appraisal Score is computed by subtracting the Disciplinary Score from the Responsibility Score.  The Result of this computation yields the Performance Appraisal Score.  The Score falls into one of five categories based on the number.

Identify which of the performance ranges contain the employee's Performance Appraisal Score.  Check the box directly above that numerical range.  There will also be a narrative label to accompany the numerical range.  This narrative label describes the overall performance level of the employee during the Appraisal year.

Definitions for these categories are as follows:

<u>Consistently Exceeds Standards</u>:   (36.7 or 40) Overall job performance on Responsibilities and Work Habits were consistently performed, throughout the year, above the expected level for the position.  This score recognizes performance which clearly exhibits the highest level.  The score indicates where an employee has gone above and beyond in performing the job on most Responsibilities and Results.  It can indicate an employee that operates on their own without supervisory instructions on the most complex assignments within most Responsibilities.

*attach documentation for score of "4" on appr...*

59

Exceeds Standards:  (26.7 - 36.6) Overall job performance was above the level of expected Results set for the position in the Preappraisal.  The employee has gone above the fully competent level in performing the job Responsibilities and has complied with policies for Work Habits.  More often than not the performance of overall work exceeded the goals set for the Responsibilities and Results.  This score may often indicate performance of more complex tasks with less supervision.

Meets Standards:  (16.7 - 26.6) Overall job performance of Responsibilities and Work Habits were at a fully competent level and met the expected goals set for the position on the Preappraisal.  This is fully satisfactory performance and at the level for which one is hired to perform.  The dependable employee correctly performs the job in a timely manner with only necessary supervisory instruction.

Partially Meets Standards:  (6.7 - 16.6) Overall job performance of Responsibilities and Work Habits has not met the acceptable requirements for the position.  Occasionally goals were achieved but some Results did not meet terms discussed in the Preappraisal. The employee's performance shows potential for improving to a fully competent level because on a routine basis the Responsibilities and Results performance fell below the fully competent level and demanded too much supervision.

Does Not Meet Standards:  (6.6 - or below) Overall job performance on Responsibilities and Work Habits consistently failed to meet the requirements set for the position on the Preappraisal.  This score may indicate performance that is not timely, of proper quality or quantity, or need too much instruction for someone in the classification.  ¼" on Eval.

If a final Performance Appraisal Score falls in "Consistently Exceeds Standards" or "Does Not Meet Standards" category, a rating supervisor must provide documentation explaining the performance and/or provide examples of the exceptional behavior.  The demonstration of how the exceptional performance (strong or poor performance) continued throughout the year should be specified.  This documentation is to accompany the Employee Performance Appraisal and be sent to the agency's personnel office.  The justification documentation is not sent to State Personnel but is kept in the agency's central personnel office.  If a supervisor truly evaluates an employee as "Consistently" there should be plenty of examples from which to document.  This is the same case with a rater who scores an employee under "Does Not Meet" performance. Documentation should not be used as an excuse to provide all ratings with a "central tendency" so that the rater does not have to provide documentation.

An example is as follows:

| *21.7* | - | *7* | = | *14.7* |
|---|---|---|---|---|
| *Responsibility Score* | | *Disciplinary Score* | | *Performance Appraisal Score* |

## Appraisal Signatures

Upon preliminary completion of the Employee Performance Appraisal, the rating supervisor should forward the form and any documentation to the reviewing supervisor for review. If this review cannot be conducted in person with rater and reviewer, proposed ratings/score should be discussed with the reviewing supervisor. In this way, both the rating and reviewing supervisors will have the opportunity to discuss and agree on the ratings and Performance Appraisal Score before it is discussed with the employee.

While it is optimal to have both the rating and reviewing supervisors examine and agree on the rating before the employee sees the Appraisal, each department may formulate its own policy with respect to the review process and the role of the reviewing supervisor at this point in the review process.

The supervisor and the employee should meet to review and discuss the Employee Performance Appraisal. At this time, the supervisor and employee sign and date the form in the appropriate spaces. Signature by the employee does not indicate that the employee agrees with the content of the Appraisal form but that the Appraisal has been discussed with the employee. Employee signature is mandatory and must be submitted. If an employee refuses to sign the form which denotes only discussion, then the first step of discipline is to be taken with the employee on the current Performance Appraisal form. If refusal continues, discipline continues. Refusal to sign the form does not relieve the employee from the Responsibility of performing the duties of the position. Signatures are also mandatory for raters and reviewers.

If supervisory comments are attached, the appropriate line on the signature section should be completed. If an employee has comments about the Appraisal or wishes to file a rebuttal to the Appraisal, the comment page should be attached to the form. If comments are attached, the employee is to initial the appropriate line in the signature section of the form. These employee comments should accompany the form to State Personnel.

Any comments or "rebuttal" added by an employee can be made, submitted and attached to the Appraisal. A reasonable time frame, as defined by agency guidelines, should be afforded to the employee to write the rebuttal. However, if comments are written by the employee at a later date, the employee may send Appraisal comments to the agency personnel office and the State Personnel Department for up to one year. When comments are sent in, the agency must attach the document to the Appraisal located in the official agency personnel file.

If any disciplinary documentation is attached, the supervisor is to complete the appropriate line for signifying that comments are attached.

When the Appraisal Session has been completed, the rating supervisor should forward the Employee Performance Appraisal and any documentation to the reviewing supervisor for signature. The reviewing supervisor must sign, date, and include the social security number on the form in the appropriate spaces. The reviewing

supervisor, at a minimum, must investigate any situation when an employee refuses to sign the form or when comments are attached. Problems should be addressed, and attempts made to resolve conflicts at this time. When a reviewing supervisor investigates a situation, it is important to document the actions and discussions on a comment page and attach it to the form. The reviewer should then initial the space in the Appraisal Signatures section that indicates the attachment of comments. Any additional Responsibilities of the reviewing supervisor are to be addressed by departmental policy. The rater should then send the form and any documentation/comments to the agency personnel office or designated personnel representative.

The Appraisal can not be changed after the signature of the employee unless the employee is to be given an amended form and an opportunity to respond. Any changes necessary should be initialed by the person who corrects the error, and copies of the changes should be provided to the appropriate individuals including the employee. Any changes after the Appraisal has been sent to State Personnel must be made through request in writing and approval from the State Personnel Department.

## Maintain Records

The original copy of the Employee Performance Appraisal is to be forwarded to the State Personnel Department. A copy should be kept by the rating supervisor. A copy must be given to the employee. The employee should be given a copy of all formal Appraisal documentation attached by the supervisor to the Final Appraisal form. A copy of the Employee Performance Appraisal and all formal Appraisal documentation and employee, rater, reviewer comments must be maintained in the personnel file of the agency personnel office.

The Agency Personnel Office Appraisal file of an employee should include:

Optional (set by department policy):
(a)     Essential Functions List per ADA
(b)     Separate Responsibilities and Results for the position
(c)     Letters/emails of commendation
(d)     Letters/emails of complaints

Necessary:
(e)     Original Preappraisals
(f)     Original Midappraisals
(g)     Copies of the Employee Performance Appraisals
(h)     Copies of the Employee Probationary Performance Appraisals
(i)     Comments attached to Appraisals by employee, rater, and/or reviewing supervisor
(j)     Disciplinary documentation associated with Employee Performance Appraisals
(k)     Appraisal documentation for supporting Appraisal scores per policy
(l)     Copies of any discipline actions that have been taken with the employee

62

Each employee's official records are maintained in the State Personnel Department. The appropriate Appraisal paperwork includes:

a)   Position Classification Questionnaire (Form 40)
b)   Original Employee Performance Appraisals (employee comments, if attached)
c)   Original Employee Probationary Performance Appraisals
d)   Appointment forms
e)   Raise/increase information

Employees, if needed, may review their official records at the State Personnel Department according to Section 36-26-22(b) of the Code of Alabama (1975).

63

## **Supervisory Checklist for Final Appraisal**

After the final Appraisal Session, supervisors should ask themselves the following questions.  If they can honestly answer "yes" to each, a successful final Appraisal Session has been conducted.

1. Was the Appraisal completed accurately and fairly, without bias, and based on the set Preappraisal goals and the employee's Results of meeting, exceeding, or falling below?

2. Does the employee understand the Responsibility Score?  Were you able to answer questions and provide examples to the employee as to why a specific rating was given?

3. Does the employee understand the Disciplinary Score?  Did you attach the appropriate documentation for discipline?

4. Have the employee and you reached agreement on an action plan to improve performance in areas below "Meet Standards" or on a Work Habit that received a "Noncompliance"?

5. Does the employee appear motivated to improve in these areas?  What have you done to motivate the employee?  Do you know what a motivational factor is for this specific employee?

6. Does the employee understand what will happen if agreed upon plans for performance improvements are not fulfilled?

7. Have you rewarded or reinforced exceptional performance?  Besides a salary increase, if any, what      have you done to tangibly reward excellent work?

8. Do you believe the Appraisal Session built a more constructive relationship between the employee      and you?  If not, have you met again to seek input from the employee on how you might build a better working relationship?

9. Have you made the necessary changes to the job description, Form 40, Preappraisal, and/or Responsibilities for the next year?

64

**Form 13**        **EMPLOYEE PERFORMANCE *APPRAISAL***
**Revised (06/2005)**       **STATE OF ALABAMA**
                        **Personnel Department**

Employee Name: _____   Social Security Number: _____

Agency: _____   Division: _____

Classification: _____   Class Code: _____ Position #: _____

Period Covered From: _____ To: _____   Annual Raise Effective: _____

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN _____ - _____ - _____ | | SSN _____ - _____ - _____ |
| _____ | _____ | _____ |
| Rater Signature | Employee Signature | Reviewer Signature |
| _____ | _____ | _____ |
| Date | Date | Date |
| _____ | _____ | _____ |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

***PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

_____ - _____ = _____
Responsibility          Disciplinary         Performance Appraisal
Score               Score              Score

This employee's work:

| ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

***WORK HABITS:*** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary.

| | **Unsatisfactory** | **Satisfactory** | |
|---|---|---|---|
| Attendance | ____ | ____ | _____ |
| Punctuality | ____ | ____ | _____ |
| Cooperation with Coworkers | ____ | ____ | _____ |
| Compliance with Rules | ____ | ____ | _____ |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

*Responsibility*                                                                 *Rating*

1. _____  ☐

2. _____  ☐

3. _____  ☐

4. _____  ☐

5. _____  ☐

6. _____  ☐

7. _____  ☐

8. _____  ☐

9. _____  ☐

10. _____  ☐

**RESPONSIBILITY SCORE:**

| _____ | ÷ | _____ | = | _____ | x | 10 | = | _____ |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| **Warning** | **Reprimand** | **Suspension** | **Demotion** |
|---|---|---|---|
| _____ | _____ | _____ | _____ |

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, suspension, and demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:** _____

*must do 2/3 of average level —*

**Form 13P**
**Revised (06/2005)**

**EMPLOYEE PERFORMANCE *PREAPPRAISAL***
**STATE OF ALABAMA**
**Personnel Department**

EXHIBIT 9

Employee Name: ANNIE L BROWN

Agency: 045/PUBLIC LIBRARY SERVICES

Classification: LIBRARY OPERATIONS MGR

Period Covered From: 09/01/2005 To: 09/01/2006

Social Security Number: ▮▮▮

Division:

Class Code: 30515

Position Number: 03880103

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These factors should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of preparing, conducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop responsibilities and results.

1.  Plan, organize, coordinate, monitor, and evaluate the Networking, Development and Planning Division and staff to maintain an effective and efficient delivery of assistance to local public libraries and librarians. Supervise one Children's/Young Adult consultant and one Public Library consultant.

2.  Provide public librarians and public library trustees assistance in the areas of administration, planning, networking, library automation, filing of e-rate reports, and facility planning by on-site consultations, by telephone, correspondence, and/or electronic mail to assist local public libraries in the provision of library services. Contacts a minimum of 20 libraries per month.

3.  Coordinate the statewide continuing education training for public librarians and trustees to assist local public libraries in the provision of library services. Identify training needs and assess the appropriate method by which training can be provided or obtained. Coordinate continuing education training programs with vendors, speakers, and coordinate all arrangements for the programs. Review all evaluations and develop a report for the agency director on the success of each training program conducted. Work with the Business Manager to assure that appropriate funding is available and that financial obligations are met in a timely manner. Schedule a minimum of 10 to 15 continuing education programs per fiscal year.

4.  Monitor Internet, telecommunications legislation and programs that are relevant to the public libraries telecommunications rates and issues so that librarians are kept informed and trained in this area. Reports on monthly basis to Director, no later than 10th of each month.

5.  Assist the agency Grants Coordinator in the development, monitoring, and evaluating the federal grants program to assist librarians in keeping informed and up-to-date on grant opportunities. Site visits a minimum of 25% of grant recipients per year.

6.  Coordinate the work of statewide committees as assigned by the agency director.

7.  Maintain liaison with other relevant library, informational, and other groups for information gathering and sharing.

**WORK HABITS:** Provide a check in the appropriate space to document that the policies and procedures concerning the following areas have been discussed with the employee.  For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

| | |
|---|---|
| _____ | Attendance |
| _____ | Punctuality |
| _____ | Cooperation with Coworkers |
| _____ | Compliance with Rules |

---

**PREAPPRAISAL SIGNATURES:** Signatures are mandatory.

Date the Preappraisal Session was held with the employee: _____ *Rebecca J Mitchell*

Employee Signature: (denotes discussion and receipt of form, not agreement) *Almiest Brown*

Rater Signature: (denotes discussion and employee receipt of form) *Rebecca Mitchell*

Reviewer Signature:_____

---

## EMPLOYEE  PERFORMANCE  *MIDAPPRAISAL*

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period.
Ms. Brown has an excellent rapport with the librarians in the field.


Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period.  Document any actions taken or the corrective action plan that was developed to improve the areas of weakness.  If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.
Coordination among fellow staffers on needs for workshops held at agency needs to be

clearer.


State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period.  Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session.  If there is no documentation in the first two areas, this section should be completed.



A Midappraisal session has been held on this date and performance has been discussed:_____

Employee Signature: *Almiest Brown*          Initial if comments attached:_____

Rater Signature: *Rebecca S Mitchell*          Initial if comments attached:_____

Reviewer Signature: *Rebecca S Mitchell*          Initial if comments attached:_____

(Signatures denote that a Midappraisal session has been held between the supervisor and employee.  Signatures are mandatory.  Employee signature does not denote agreement but discussion of the form and rater comments.  Comments may be attached.  The person attaching comments must initial in the appropriate space.)

EXHIBIT 10

January 12, 2007

To:     Rebecca Mitchell, Director
        Alabama Public Library Service

From:   Annie L. Brown, Library Operations Manager
        Alabama Public Library Service

Ref:    Employee Performance Appraisal
        August 31, 2006
        Rebuttal

I strongly disagree with the performance appraisal rating dated August 31, 2006.

My performance appraisal for my duties and responsibilities as supervisor of NDP for the years **2002-2003 "Consistently Exceeds Standards" a 37.1 rating; ; 2003-2004 a 32.9 rating "Exceeds Standards"; and 2004-2005 a rating of 30 which "Exceeds Standards".** These performance appraisals clearly indicate that I know the requirements of my job and I perform my responsibilities well.
Therefore I cannot comprehend how all of a sudden, for **2005-2006 I received a rating of 13 which " Partially Meets Standards".** The only explanation for this unreasonable deviation from my prior appraisals was the fact that I had filed an EEO complaint against you and APLS and you had received notice of my complaint prior to performing my 2005-2006 appraisal.  I am specifically writing to rebut your bias and unfounded conclusions in my 2005-2006 appraisal.

As supervisor of Networking, Development & Planning (NDP), I performed the following tasks: coached my staff members; planned programs and activities; coordinated continuing education programs and services; prepared Budget for NDP division; represented agency statewide and nationally through liaison contacts; and partnered with other agencies.

I also served with United Way, Alabama Library Association –Co-Chair Intellectual Freedom—Standards Achievement Award(Public Library Division) and I cultivated partnerships with United Way and the American Library Association.

Although my division was short one consultant, I successfully implemented the following tasks:  made 37,177 contacts with public libraries; coordinated, facilitated and participated in 33 continuing education workshops and distributed 714,629 pieces of children/youth services summer reading materials statewide; assisted 89 public libraries in filing e-rate for 2005; made 3424 e-rate consultations; approved 12 technology plans; shared information on current issues to libraries/trustees/friends/others by networking with professional colleagues and reading professional literature both internet and print form; posted current information on library legislation and grant opportunities to public

libraries through list-serv; and each month I prepared and submitted a monthly report to the agency director.

Any perceived reduction in my productivity is directly due to (1) removal of funds from the Networking, Development and Planning division budget and (2) loss of the authority to manage my division.

My division was successful in these endeavors because I not only performed my tasks but also assumed the responsibilities of the vacant positions without additional compensation. I was treated differently from my white counterparts who were paid additional compensation for assuming the duty of vacant positions in their divisions.

Due to changes in the **"Smart Budget Process"** various tasks performed by NDP staff have been condensed into the following 3 broad categories: (1)workshops for public libraries (2) contacts with public libraries and (3) distribution of children/youth service materials.

Under each of these 3 broad categories the following tasks were successfully performed: consultation visits; other consultations via phone, e-mail, fax; liaison contacts; on-site monitoring of federal grants; review notices-of –intent for federal grants and grant applications, data entry to IMLS for federal grant program (Institute of Museum and Library Service); summer reading program distributions; e-rate contacts and approval of technology plans.

The NDP staff and I assisted the agency grant coordinator in evaluating, reporting and monitoring of 207 LSTA grants during the year 2005-2006; input grant information data into Institute of Museum and Library Service (IMLS) database for LSTA annual report; read Notice-of-Intents for grant applications and made evaluative comments on each. We assisted by doing everything we were asked to do by grant coordinator.  I disagree vehemently with the rating I received in responsibility # 5.  Therefore, I should have received at least a 3 rating which is consistent with all my prior appraisals not a rating of one (1).

The NDP division to my knowledge received no complaints. However we have received numerous letters of appreciation; thank yous and positive ratings on our evaluations regarding our work performance and interaction with others for services and programs provided.  This  performance rating for year 05-06 is the lowest ever received  during my nine years (9) with Alabama Public Library Service and was definitely unwarranted.

**I have always cooperated with coworkers and have been consistently professional and pleasant even in this hostile, disrespectful and unprofessional environment that has hindered me from doing my job.**  I have read our Employee Handbook and I have complied with all policies therein.

Lastly, I have received only one letter of reprimand and that should not have been issued. It was based on false allegations and in violation of the Alabama **"Progressive Discipline Policies"**; and my supervisory status should be restored.

Since I had no input into this performance appraisal rating as required, I am requesting a meeting with you to discuss the revision of my appraisal so that it will accurately reflect my more than outstanding job performance.

Please respond to this letter within seven (7) days.


Sincerely,

Annie Lucas Brown
Library Consultant


CC:    State Personnel Board
       APLS Executive Board

**Form 13**
Revised (1/1/1999)

## EMPLOYEE PERFORMANCE APPRAISAL
### STATE OF ALABAMA
**Personnel Department**

☐ Number of Steps

Employee Name: ANNIE L BROWN

Social Security Number: ██████

Agency: 045/PUBLIC LIBRARY SERVICE

Division: _____

Classification: LIBRARY OPERATIONS MGR

Class Code: 30515

Period Covered From: 09/01/2002   To: 09/01/2003

Annual Raise Effective: NOVEMBER 2003

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN 587 - 28 - 0058 | | SSN 587 - 28 - 0058 |
| *Rebecca S Mitchell* | *Annie L Brown* | *Rebecca S Mitchell* |
| Signature | Signature | Signature |
| 9-17-03 | 9-17-03 | 9-17-03 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

***PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

|  37.1  | – |  0  | = |  37.1  |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

---

This employee's work:

| ☐ | ☐ | ☐ | ☐ | ☒ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7-16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7-40) |

---

***WORK HABITS:*** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☒ | ☐ |
| Punctuality | ☒ | ☐ |
| Cooperation with Coworkers | ☒ | ☐ |
| Compliance with Rules | ☒ | ☐ |

**Form 13**
**Revised (1/1/1999)**

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
**Personnel Department**

Number of Steps ☐

Employee Name: ANNIE L BROWN _____     Social Security Number: ███████

Agency: 045/PUBLIC LIBRARY SERVICES _____     Division: _____

Classification: LIBRARY OPERATIONS MGR _____     Class Code: 30515 _____

Period Covered From: 09/01/2003 ___To: 09/01/2004     Annual Raise Effective: NOVEMBER 2004

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN 587 - 28 - 0058 | | SSN 587 . 28 . 0058 |
| *Rebecca S Mitchell* | *Annie L Brown* | *Rebecca S Mitchell* |
| Signature | Signature | Signature |
| 9-28-04 | 9-28-04 | 9-28-04 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 32.9 | − | 0 | = | 32.9 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

---

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7-16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7-40) |

---

**WORK HABITS:** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☒ | ☐ |
| Punctuality | ☒ | ☐ |
| Cooperation with Coworkers | ☒ | ☐ |
| Compliance with Rules | ☒ | ☐ |

Form 13
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

☐ Number of Steps

Employee Name: ANNIE L BROWN                Social Security Number: ████████

Agency: 045/PUBLIC LIBRARY SERVICES          Division: _____

Classification: LIBRARY OPERATIONS MGR       Class Code: 30515

Period Covered From: 09/01/2004   To: 09/01/2005   Annual Raise Effective: NOVEMBER 2005

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN  587 · 28 · 0058 | | SSN  587 · 28 · 0058 |
| *Rebecca Mitchell* | *Annie L Brown* | *Rebecca Mitchell* |
| Signature  8/29/05 | Signature  8/29/05 | Signature  8/29/05 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 30 | − | 0 | = | 30 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7-16.6) | Meets Standards (16.7-26.6) | Exceeds Standards (26.7-36.6) | Consistently Exceeds Standards (36.7-40) |

---

**WORK HABITS:** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☒ | ☐ |
| Punctuality | ☒ | ☐ |
| Cooperation with Coworkers | ☒ | ☐ |
| Compliance with Rules | ☒ | ☐ |

PLAINTIFF'S
EXHIBIT

20

*RESPONSIBILITIES:* List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Plan, organize, coordinate, monitor, and evaluate the Networking, . . . | 3 |
| 2. Provide public librarians and public library trustees assistance in . . . | 3 |
| 3. Coordinate the statewide continuing education training for public . . . | 3 |
| 4. Monitor Internet, telecommunications legislation and programs that . . . | 3 |
| 5. Assist the agency Grants Coordinator in the development, monitoring . . . | 3 |
| 6. Coordinate the work of statewide committees as assigned by the . . . | 3 |
| 7. Maintain liaison with other relevant library, informational, and . . . | 3 |
| 8. | |
| 9. | |
| 10. | |

*RESPONSIBILITY SCORE:*

| 21 | ÷ | 7 | = | 3 | x | 10 | = | 30 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be ?. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____ 0 _____

**WORK HABITS:** Provide a check in the appropriate space to document that the policies and procedures concerning the following areas have been discussed with the employee. For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

| | |
|---|---|
| _____ | Attendance |
| _____ | Punctuality |
| _____ | Cooperation with Coworkers |
| _____ | Compliance with Rules |

**PREAPPRAISAL SIGNATURES:** Signatures are mandatory.

Date the Preappraisal Session was held with the employee: _____ *Rebecca / Mitchell*

Employee Signature: (denotes discussion and receipt of form, not agreement) *Annett Baker*

Rater Signature: (denotes discussion and employee receipt of form) *Rebecca Mitchell*

Reviewer Signature:_____

## EMPLOYEE PERFORMANCE *MIDAPPRAISAL*

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period.

_____

_____

Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period. Document any actions taken or the corrective action plan that was developed to improve the areas of weakness. If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.

_____

_____

State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period. Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this section should be completed.

_____

_____

A Midappraisal session has been held on this date and performance has been discussed:_____

Employee Signature:_____     Initial if comments attached:_____

Rater Signature:_____     Initial if comments attached:_____

Reviewer Signature:_____     Initial if comments attached:_____

(Signatures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are mandatory. Employee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. The person attaching comments must initial in the appropriate space.)

**Form 13**
**Revised (01/2006)**

## EMPLOYEE PERFORMANCE *APPRAISAL*
### STATE OF ALABAMA
#### Personnel Department

Employee Name: ANNIE L BROWN

Agency: 045/PUBLIC LIBRARY SERVICES

Classification: LIBRARY OPERATIONS MGR

Period Covered From: 9/1/2005 To: 9/1/2006

Social Security Number: XXX-XX- 8791

Division:

Class Code: 30515    Position #: 3880103

Annual Raise Effective:

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN  XXX - XX - 0058 | | SSN  XXX -XX- 0058 |
| *Rebecca S Mitchell* | *[signature]* | *Rebecca S Mitchell* |
| Rater Signature | | Reviewer Signature |
| Rebecca S. Mitchell | | Rebecca S. Mitchell |
| Rater Printed Name | Employee Signature | Reviewer Printed Name |
| *8-31-06* | *8-31-06* | *8-31-06* |
| Date | Date | Date |
| | | |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

| 20.000 | - | 7 | = | 13.000 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| [ ] | [X] | [ ] | [ ] | [ ] |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary. No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | | X | |
| Punctuality | | X | |
| Cooperation with Coworkers | X | | |
| Compliance with Rules | X | | |

PLAINTIFF'S
EXHIBIT

21

***RESPONSIBILITIES:***   List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Plan, organize, coordinate, monitor, and evaluate the Networking, Development and . . . | 2 |
| 2. Provide public librarians and public library trustees assistance in the areas of . . . | 3 |
| 3. Coordinate the statewide continuing education training for public librarians and . . . | 2 |
| 4. Monitor Internet, telecommunications legislation and programs that are relevant . . . | 2 |
| 5. Assist the agency Grants Coordinator in the development, monitoring, and evaluating . . | 1 |
| 6. Coordinate the work of statewide committees as assigned by the agency director. | 2 |
| 7. Maintain liasion with other relevant library, informational, and other groups . . . | 2 |
| 8. | |
| 9. | |
| 10. | |

***RESPONSIBILITY SCORE:***

| 14 | ÷ | 7 | = | 2.00000 | x | 10 | = | 20.000 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

***DISCIPLINARY ACTIONS:***   Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| **Warning** | **Reprimand** | **Suspension** | **Demotion** |
|---|---|---|---|
| 0 | 1 | 0 | 0 |

***DISCIPLINARY SCORE:*** **This section should include the use of the discipline steps of reprimand, suspension, and demotion only.**  The Disciplinary Score does not include scores for counseling and warnings.  To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period.  If the most severe step was one or more reprimands, the Disciplinary Score will be 7.  If the most severe step was one or more suspensions, the Disciplinary Score will be 17.  If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24.  Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:** _____7_____

EXHIBIT 11

Brown, Annie

| | |
|---|---|
| From: | Mitchell, Rebecca |
| Sent: | Thursday, November 10, 2005 3:48 PM |
| To: | Brown, Annie |
| Subject: | RE: Monday trip to Bayou LaBatre |

Wed. is fine if it works for Ada.
Becky

-----Original Message-----
From:       Brown, Annie
Sent:       Thursday, November 10, 2005 1:47 PM
To:         Mitchell, Rebecca
Subject:    Monday trip to Bayou LaBatre

Becky, Mary told me of the trip planned for Monday to Bayou LaBatre..  Just a reminder that Kim Owens is reporting to work on Monday in my division and I would very much like to be here to greet her and orientate her to the state agency....Mary says that Wednesday is also a good day for her if we do not go on Monday... Please advise because Mary want you to give her a call at home.  She is leaving today at 2pm.... Thanks, Annie

-Thursday leaving @ 7:30 am
ADA has someone to do
CAT 5 wiring - she needs to
know - what to tell them
"Mary call her"

11-15-05 meeting
Dec. 1, 2005 - Opening Bayou LaBatre
600 - Books - Ready

Send April info. on "Hold"

1

**EXHIBIT 12**

## Brown, Annie

| | |
|---|---|
| **From:** | Wendy [wcongiardo@hotmail.com] |
| **Sent:** | Wednesday, October 26, 2005 12:25 PM |
| **To:** | abrown@apls.state.al.us |
| **Subject:** | Bayou La Batre |

Hi Annie,
I have an adult reading table for Ada also.  So from the original request list, I have 1 adult reading table, and 8 children's chairs.  I also will be sending her a newspaper rack, 3 spinners she can use for her books on tape, and a bookrack with shelves on both sides and a slanted top.  That's what I have so far.
Thanks,
Wendy

*→ Carpet In*
*→ Lease completed*

*address For Building*
*Painting Walls*

10/26/2005

**EXHIBIT 13**

## Brown, Annie

| | |
|---|---|
| **From:** | Mitchell, Rebecca |
| **Sent:** | Wednesday, October 26, 2005 8:55 AM |
| **To:** | Division Heads; APLS ADMIN LIST (E-mail); Public Library Directors (E-mail) |
| **Subject:** | FW: Tapia Furniture Needs |

Below is a list of the furniture that Bayou La Batre will need to open in their temporary location.  If you have any of the following items that you could donate, please <u>contact Annie Brown on</u> our staff.  Annie is working with Ada to gather what she will need to open in the new location in December.  You can contact Annie at <u>abrown@apls.state.al.us</u> or 334-213-3917.  Ada did not have on her list book carts, but I am sure she will need some.  Thank you for your generosity in helping one of our own get back on her feet.

Rebecca

The room is 20x70.

1. Circulation Desk
2. Children's reading table  — *Huntindon College*
3. Two children's computer tables
4. Eight children's chairs  ← *Done*
5. Two adult reading tables
6. Ten adult chairs

Anything else you can think of

Thanks for all your help,
Ada

<u>Yahoo! FareChase - Search multiple travel sites in one click.</u>

**EXHIBIT 14**

**Brown, Annie**

| | |
|---|---|
| From: | Mitchell, Rebecca |
| Sent: | Wednesday, November 16, 2005 10:57 AM |
| To: | Brown, Annie |
| Subject: | RE: furniture |

Can you get a description of the chairs and the number? Thanks.

-----Original Message-----
| | |
|---|---|
| From: | Brown, Annie |
| Sent: | Wednesday, November 16, 2005 10:41 AM |
| To: | Mitchell, Rebecca |
| Subject: | furniture |

Becky, just spoke with staff @ Lewis Cooper Memorial Library. The tables are 71-inches long; 29 1/2inches wide and 291/2 inches tall. chairs are non-stackable. Please let me know if you need additional info...Annie

1

**EXHIBIT 15**

Brown, Annie

| | |
|---|---|
| From: | Annie Brown [abrown@apls.state.al.us] on behalf of Brown, Annie |
| Sent: | Wednesday, November 16, 2005 1:14 PM |
| To: | Mitchell, Rebecca |
| Subject: | RE: furniture |

There are 12 armless chairs and Michelle is e-mailing us a picture of them shortly, chairs and tables... I will forward it on to you... thanks, Annie

-----Original Message-----
From: Mitchell, Rebecca
Sent: Wednesday, November 16, 2005 10:57 AM
To: Brown, Annie
Subject: RE: furniture

Can you get a description of the chairs and the number? Thanks.

-----Original Message-----
From: Brown, Annie
Sent: Wednesday, November 16, 2005 10:41 AM
To: Mitchell, Rebecca
Subject: furniture

Becky, just spoke with staff @ Lewis Cooper Memorial Library. The tables are 71-inches long; 29 1/2inches wide and 291/2 inches tall. chairs are non-stackable. Please let me know if you need additional info...Annie

EXHIBIT 16

**Brown, Annie**

| | |
|---|---|
| From: | Annie Brown [abrown@apls.state.al.us] |
| Sent: | Wednesday, November 16, 2005 2:56 PM |
| To: | 'ekidwell@huntingdon.edu' |
| Subject: | RE: Council Meeting |

Oh, Eric thank you so much.. You can order the table and when it comes give me a call and bring it to APLS or we can come and pick it up... thanks a million...Annie

-----Original Message-----
From: ekidwell@huntingdon.edu [mailto:ekidwell@huntingdon.edu]
Sent: Wednesday, November 16, 2005 2:43 PM
To: abrown@apls.state.al.us
Subject: Council Meeting


Annie:

I attended the AlaLA Council meeting today but wasn't able to stay through the entire meeting as yesterday I found out about a campus meeting I had to attend.  Unfortunately, by the time I had to leave Council they had yet to get to committee reports so I asked Tim to give the report from our committee.

On another matter, I have spoken with the faculty and staff here at the Huntingdon Library and we would like to contribute a reading table to the children's room of the Bayou LaBatre library.  Let me know the best way of going about this.  I've looked through a couple of library supply catalogues (Demco, BroDart) and need to know if it would work for us to order then when the table arrives just bring it to you at APLS.  We have students at Huntingdon from the Gulf area so I think this is even more appropriate for us to do.

Thanks!

Eric

1

```
> > table to the children's room of the Bayou LaBatre library.  Let me
> > know the best way of going about this.  I've looked through a couple
> > of library supply catalogues (Demco, BroDart) and need to know if it
> > would work for us to order then when the table arrives just bring it
> > to you at APLS.  We have students at Huntingdon from the Gulf area
> > so I think this is even more appropriate for us to do.
> >
> > Thanks!
> >
> > Eric
> >
> >
> >
>
>
```

Eric


On 17 Nov 2005 at 11:26, Annie Brown wrote:

```
> Eric I like your thinking however, Bayou is in a building just
> 20x70feet. Not very much space, so I suggest that you order the 48x30;
> thanks, Annie
>
> ----Original Message-----
> From: ekidwell@huntingdon.edu [mailto:ekidwell@huntingdon.edu]
> Sent: Thursday, November 17, 2005 10:46 AM
> To: abrown@apls.state.al.us
> Subject: RE: Council Meeting
>
>
> Annie:
>
> Could you advise me on the best size for the table.  We've
> found a model in the Demco catalog that comes if five sizes:
> 48x30, 60x24, 60x30, 72x30 and 72x36.  We're inclined to go
> with the 72x36 but want to first check if this would be too big.
> This model is height-adjustable from 24 - 34" in 1" increments,
> so we thought this would give the greatest flexibility.
>
> Thanks -
>
> Eric
>
> On 16 Nov 2005 at 14:55, Annie Brown wrote:
>
> > Oh, Eric thank you so much.. You can order the table and when it
> > comes give me a call and bring it to APLS or we can come and pick it
> > up... thanks a million...Annie
> >
> > -----Original Message-----
> > From: ekidwell@huntingdon.edu [mailto:ekidwell@huntingdon.edu]
> > Sent: Wednesday, November 16, 2005 2:43 PM
> > To: abrown@apls.state.al.us
> > Subject: Council Meeting
> >
> >
> > Annie:
> >
> > I attended the AlaLA Council meeting today but wasn't able to stay
> > through the entire meeting as yesterday I found out about a campus
> > meeting I had to attend.  Unfortunately, by the time I had to leave
> > Council they had yet to get to committee reports so I asked Tim to
> > give the report from our committee.
> >
> > On another matter, I have spoken with the faculty and staff here at
> > the Huntingdon Library and we would like to contribute a reading
```

2

**EXHIBIT 18**

Brown, Annie

| | |
|---|---|
| From: | Brown, Annie |
| Sent: | Wednesday, November 16, 2005 3:38 PM |
| To: | Mitchell, Rebecca |
| Subject: | Bayou |

Becky, talked with Ada and the City Hall has put a table in the library that she says can be used as a reference table.  so now she only need us to bring one table and the 12 chairs... I also talked with Steve Chew @ ALLA and he has a check for Ada from school librarians.  I called Ada and gave her Steve number so that she can call him and tell him where to mail the check.  She was very excited.  I will call Michelle and see if maybe we can pick up the one table a little sooner.  thanks, Annie

**EXHIBIT 19**

Brown, Annie

| | |
|---|---|
| **From:** | Brown, Annie |
| **Sent:** | Wednesday, November 16, 2005 3:46 PM |
| **To:** | Mitchell, Rebecca |
| **Subject:** | furniture |

Becky, just spoke with Michelle about tables..She is checking to see if she can let one of them go on Friday along with chairs, will call me in the morning.  thanks, Annie

EXHIBIT 20

**Brown, Annie**

| | |
|---|---|
| From: | Brown, Annie |
| Sent: | Thursday, November 17, 2005 9:44 AM |
| To: | Mitchell, Rebecca; Payne, Mary |
| Subject: | table furniture |

Just talked with Michelle from Lewis Cooper Memorial, says that she will not be able to let tables go until city workers put her new furniture up; and as of today the library is on "hold".  We will not be able to pick up table on Friday, November 18, 2005. She will keep us posted.... thanks,  Annie

EXHIBIT 21

**Brown, Annie**

| | |
|---|---|
| **From:** | Mitchell, Rebecca |
| **Sent:** | Monday, December 12, 2005 4:41 PM |
| **To:** | Brown, Annie |
| **Subject:** | RE: BLB - |

Thanks, I'll be out of the office tomorrow and Wednesday, I'll get with Harry on Thursday and try to make arrangements.

Becky

-----Original Message-----

| | |
|---|---|
| **From:** | Brown, Annie |
| **Sent:** | Monday, December 12, 2005 4:39 PM |
| **To:** | Mitchell, Rebecca |
| **Subject:** | BLB - |

Becky, the children furniture ordered for BLB by Eric Kidwell @ Huntingdon College is in.  He wants someone to pick it up from over there along with three-bin carts in primary colors and a couple of new dvds to go along with the videos that they are donating...They will be there until the 19th of Dec. and will be closed for the holidays..His e-mail address is ekidwell@huntingdon.edu...thanks, Annie

1

**EXHIBIT 22**

**Brown, Annie**

| | |
|---|---|
| From: | Mitchell, Rebecca |
| Sent: | Thursday, November 17, 2005 2:49 PM |
| To: | Brown, Annie |
| Subject: | RE: Mose Hudson Tapia |

The tentative date now is Tuesday for us to rent a truck to take all of the furniture available to Bayou La Batre.

-----Original Message-----
| | |
|---|---|
| From: | Brown, Annie |
| Sent: | Thursday, November 17, 2005 12:59 PM |
| To: | Payne, Mary |
| Cc: | Mitchell, Rebecca |
| Subject: | RE: Mose Hudson Tapia |

Does this mean that we are traveling on Tuesday? Please advise...Annie

-----Original Message-----
| | |
|---|---|
| From: | Payne, Mary |
| Sent: | Thursday, November 17, 2005 9:09 AM |
| To: | Division Heads |
| Cc: | Ralya, Kelyn |
| Subject: | Mose Hudson Tapia |

Internet access is set to be installed at the Bayou La Batre library on Tuesday the 22nd.

Mary M. Payne
Head, Information Technology
6030 Monticello Drive
Montgomery, Al  36130
334-213-3938
334-213-3993 (fax)
mpayne@apls.state.al.us

EXHIBIT 23

## Brown, Annie

| | |
|---|---|
| **From:** | Mitchell, Rebecca |
| **Sent:** | Monday, November 21, 2005 10:25 AM |
| **To:** | Brown, Annie |
| **Subject:** | RE: Mose Hudson Tapia |

That's up to you, John, Mary and Julie will be leaving here at 8:00 in the morning.
Harry, Kelyn, Tony, Rufus and I will be leaving here at 7:00 in the morning. We will be taking all the furniture that is available, installing shelving and taking books that are processed.

Becky

> -----Original Message-----
> **From:** Brown, Annie
> **Sent:** Monday, November 21, 2005 8:35 AM
> **To:** Mitchell, Rebecca
> **Subject:** RE: Mose Hudson Tapia
>
> good morning Becky, do you want me to go on this trip? thanks, .Annie
>
> > -----Original Message-----
> > **From:** Mitchell, Rebecca
> > **Sent:** Thursday, November 17, 2005 2:49 PM
> > **To:** Brown, Annie
> > **Subject:** RE: Mose Hudson Tapia
> >
> > The tentative date now is Tuesday for us to rent a truck to take all of the furniture available to Bayou La Batre.
> >
> > > -----Original Message-----
> > > **From:** Brown, Annie
> > > **Sent:** Thursday, November 17, 2005 12:59 PM
> > > **To:** Payne, Mary
> > > **Cc:** Mitchell, Rebecca
> > > **Subject:** RE: Mose Hudson Tapia
> > >
> > > Does this mean that we are traveling on Tuesday? Please advise...Annie
> > >
> > > > -----Original Message-----
> > > > **From:** Payne, Mary
> > > > **Sent:** Thursday, November 17, 2005 9:09 AM
> > > > **To:** Division Heads
> > > > **Cc:** Ralya, Kelyn
> > > > **Subject:** Mose Hudson Tapia
> > > >
> > > > Internet access is set to be installed at the Bayou La Batre library on Tuesday the 22nd.
> > > >
> > > > Mary M. Payne
> > > > Head, Information Technology
> > > > 6030 Monticello Drive
> > > > Montgomery, Al 36130
> > > > 334-213-3938
> > > > 334-213-3993 (fax)
> > > > mpayne@apls.state.al.us

1

EXHIBIT 24

**Brown, Annie**

| | |
|---|---|
| From: | Payne, Mary |
| Sent: | Monday, November 21, 2005 4:21 PM |
| To: | Hare, Julie; Tran, John |
| Cc: | Mitchell, Rebecca; Lensch, Harry; Brown, Annie; Ralya, Kelyn |
| Subject: | Tuesday |

I hope to be at APLS by 7:15 am.  If you riding with me, be here then and we will leave for Bayou La Batre.

Mary

Mary M. Payne
Head, Information Technology
6030 Monticello Drive
Montgomery, Al  36130
334-213-3938
334-213-3993 (fax)
mpayne@apls.state.al.us

**EXHIBIT 25**

**Brown, Annie**

| | |
|---|---|
| **From:** | Mitchell, Rebecca |
| **Sent:** | Wednesday, November 30, 2005 4:49 PM |
| **To:** | ALL APLS STAFF |
| **Subject:** | Thursday, December 1st |

On Thursday, Julie, Harry, Kelyn and I will be traveling to Bayou La Batre for their official reopening.  In my absence, Hulen Bivins will be the "go to" person again for any questions, problems, or last minute travel approvals.  I'll be back in the office on Friday.

Rebecca

**EXHIBIT 26**

## Brown, Annie

| | |
|---|---|
| **From:** | taraholman@aol.com |
| **Sent:** | Thursday, May 24, 2007 1:58 PM |
| **To:** | rmitchell@apls.state.al.us |
| **Cc:** | abrown@apls.state.al.us |
| **Subject:** | My United States |
| **Attachments:** | my united states timeline.wps |

Dear Becky,

I was asked to create a timeline for AHF's grant request to APLS for the My United States training last year. My boss and I decided that we would like to have a documented history for our board members.
Here is what I remember of the events. I have also forwarded a copy to Annie Brown for her records.
I hope you are doing well. Please call me if you have any questions.

Thanks,
Tara

AOL now offers free email to everyone. Find out more about what's free from AOL at **AOL.com**.

**This message has been scanned for viruses and dangerous content by MailScanner, and is believed to be clean.**

**My United States Timeline**

1. I was contacted by Rebecca Mitchell at APLS regarding some possible grant money that might be available for our upcoming My United States training.

2. Ms. Mitchell asked that I send her a request by e-mail on what the funds would be spent on.

3. I sent an e-mail request to Ms. Mitchell and told her the funding would cover the training expense for 10 librarians in the state to attend the My United States training.

4. The request was approved.

5. Ten librarians were scheduled to attend the training. I had two drop out the morning of the training.

6. The training was held.

7. I called Annie Brown about the correct way to invoice for the funds. She and I had worked together in the past on several Motheread projects. She referred me back to Ms. Mitchell.

8. I then sent an invoice to APLS on August 28, 2006 in the amount of $3,600.00 for the eight librarians who attended the training.

9. I received an e-mail on September 11, 2006 from Ms. Mitchell stating that the request for the funds had not been properly requested. The funds would not be available until after October.

10. I then received an e-mail from Ms. Mitchell on November 2, 2006 that AHF would have to go through the Board of Adjustments to obtain the grant money.

11. I contacted the Board of Adjustments and obtained the necessary papers. I sent the paperwork in on November 7, 2006.

12. I called the Board of Adjustments in January and was told that APLS had not sent in the necessary paperwork back to the Adjustment office.

13. I then called APLS and spoke to Harry Lensch.

14. Mr. Lensch called me back and said the paperwork had been sent.

15. I called the Board of Adjustments several weeks ago and the request had gone to their board and would be paid in a timely manner. We received the grant money on May 14, 2007.

**EXHIBIT 27**

MEMORANDUM
June 14, 2006


To:    Annie Brown, Jim Smith, Kim Owen, Chris Bowman, Hulen Bivins, Kelyn Ralya
From:  Rebecca Mitchell
Subj:  Consultant assignment by district and duty

Attached is a copy of the division of the state into library districts and duties for each
consultant and reporting format. We will begin this process on July 1, 2006 will official
kickoff on October 1, 2006. This is both an old and new concept. It is new in that many
of you were not a part of APLS when this method was used back in the 80's. It is old in
that it is a process that has been used before both here and in other states. The purpose is
to provide closer ties between our role as the state library and the role of the public
libraries in their communities.

The reports will be due to me by the 10th of each month.

State Consultant Areas:  2007

| Name: | Counties |
|---|---|
| Kelyn Ralya | Lauderdale; Colbert; Limestone; Morgan; Lawrence; Franklin; Northwest (Lamar, Marion, Franklin); Fayette |
| | Pickens; Tuscaloosa; Greene; Hale: Bibb; Sumter; Perry; Dallas; Marengo; Lowndes; Wilcox |
| Jim Smith | Choctaw; Clarke; Washington; Mobile (county) Baldwin; Escambia; Monroe; Conecuh; Butler |
| Chris Bowman | St. Clair; Shelby; Horseshoe(Coosa, Elmore, Tallapoosa, Lee); Chambers Chilton; Autauga; Macon; Russell |
| Kim Owen | Blount; Jackson; DeKalb; Marshall; Cheaha (Clay, Cherokee, Cleburne, Randolph, Talladega); Talladega (town); Etowah; Sylacauga; Calhoun |
| Annie Brown | Crenshaw; Covington; Coffee; Pike; Bullock; Barbour; Dale; Henry; Geneva; Houston |
| Hulen Bivins | Mobile Public; Montgomery County |
| Rebecca Mitchell | Huntsville-Madison County; Jefferson County |

## CONSULTANTS/SPECIALITIES/DISTRICTS
## 2006-2008

| | | |
|---|---|---|
| LSTA/Grants/Collections | Kelyn Ralya | District |
| E-Rate/Automation Systems | Kim Owen | District |
| Youth and Children | Chris Bowman | District |
| Trustees/Special Projects/Friends | Annie Brown | District |
| Long Range Plans/Audits/CE | Jim Smith | District |
| Bookmobiles/Outreach Services | New Consultant | District |
| Adult Services | New Consultant | District |
| State Aid/Laws | Hulen Bivins | Mobile (city), Montgomery |
| Advocacy/PR/Admin | Rebecca Mitchell | Huntsville, Jefferson County |

## OTHER CONSULTANTS FOR SPECIAL AREAS

| | |
|---|---|
| Blind & Physically Handicapped | Tim Emmons/Fara Zaleski |
| Administrative/Personnel/Budget | Harry Lensch |
| Reference/Online Resources | Al Craig/Katie Ray |
| Interlibrary Loan | Judy Shepard |

Acquisition/Cataloging          Janet Hamilton/Ruth Evans

IT                              Mary Payne/staff

## LIAISONS IN STATE TO ASSIST WITH:

Foundations                     Shirley Spears/Sue Murrell

Disaster Plan                   Spencer Watts/Bonnie Lee/John Paul Myrick

Building/Construction           Keep in house up-to-date list of recent building
                                Projects

## WHAT IS EXPECTED FROM EACH CONSULTANT IN THEIR REGION:

Visit every library twice a year, call, email, or write the quarters you don't visit

Reporting forms:  Folder on each of your libraries, get familiar with their official file, 5
year plan (date due), stats filed, history, board members, community profile, local
government, grants applied for...

Summary report yearly on each library

You will keep your counties for 2 fiscal years.  Bone up on your area of expertise, be
prepared to assist other consultants, be prepared to do small and large group
presentations.  Keep a record of all who attend

We will have monthly or quarterly meetings as a group.

**EXHIBIT 28**





ALABAMA
PUBLIC LIBRARY
SERVICE

REBECCA S. MITCHELL
Director

July 17, 2006

ADMINISTRATIVE MEMORANDUM #06-08

TO:          Library Administrators

FROM:     Rebecca S. Mitchell, Director  *RSM*

RE:          APLS consultants divided across Alabama

In an effort to increase the relationship between your local library and APLS and to give you a stable and direct contact person at the state level, I have divided the State into 10 regions. Each region will have 1 consultant assigned to it. Below is a table showing what counties are in which region and the consultant responsible for each region. This new process will be discussed further at the July 27 Administrator's Meeting.

| REGION | COUNTIES | CONSULTANT |
|---|---|---|
| 1 | Lauderdale, Colbert, Limestone, Morgan, Lawrence, Northwest *Walker, Winston* (Lamar, Marion, Franklin), & Fayette, *Cullman* | Kelyn Ralya (334) 213-3976 kralya@apls.state.al.us |
| 2 | Pickens, Tuscaloosa, Greene, Hale, Bibb, Sumter, Perry, Dallas, Marengo, Lowndes, & Wilcox | APLS Staff |
| 3 | Choctaw, Clarke, Washington, Mobile (county), Baldwin, Escambia, Monroe, Conecuh, & Butler | Jim Smith (334) 213-3907 jsmith@apls.state.al.us |
| 4 | Blount, Jackson, DeKalb, Marshall, Cheaha (Clay, Cherokee, Cleburne, Randolph, Talladega), Talladega (town), Etowah, Sylacauga, & Calhoun | Kim Owen (334) 213-3936 kowen@apls.state.al.us |
| 5 | St. Clair, Shelby, Horseshoe (Coosa, Elmore, Tallapoosa, Lee), Chambers, Chilton, Autauga, Macon, & Russell | Chris Bowman (334) 213-3978 cbowman@apls.state.al.us |
| 6 | Crenshaw, Covington, Coffee, Pike, Bullock, Barbour, Dale, Henry, Geneva, & Houston | Annie Brown (334) 213-3917 abrown@apls.state.al.us |
| 7 | Huntsville-Madison County | Rebecca Mitchell (334) 213-3901 rmitchell@apls.state.al.us |
| 8 | Jefferson County | Rebecca Mitchell |
| 9 | Montgomery County | Hulen Bivins (334) 213-3974 hbivins@apls.state.al.us |
| 10 | Mobile Public | Hulen Bivins |

6030 MONTICELLO DRIVE • MONTGOMERY, ALABAMA 36130-6000 • 334/213-3900 • 800/723-8459 • FAX 334/213-3993

— **EXHIBIT 29** —



**HUNTINGDON**
COLLEGE

March 8, 2007

Mrs. Annie Brown
Public Library Consultant
Alabama Public Library Service
6030 Monticello Drive
Montgomery, Alabama  36130

Dear Annie:

I am delighted to inform you that by unanimous consent you are our Librarian of the Year award winner for 2007.  The Beta Kappa Chapter of Beta Phi Mu each year selects an outstanding librarian to receive this award.  You certainly qualify in every respect.
We received a very strong letter of support for your nomination for this award from your former co-worker, Kim Wilson Owen.  We greatly appreciated her letter of support.

We invite you to attend the Beta Kappa Chapter Librarian of the Year Award Luncheon on Wednesday, April 18th, 2007, from 12:30 to 2:30 p.m. at the ALLA Convention in Mobile.  Since you are our honored guest, your luncheon will be paid for by the chapter.

We ask you to make a few brief remarks in accepting this award.  It can be on a topic of your own choosing as long as it is related to the field of librarianship.  After your address, we will have the initiation ceremony of new initiates into the Beta Kappa Chapter of Beta Phi Mu.  A brief business meeting for the chapter will follow our formal luncheon and program.

Again, we are delighted that you are our Librarian of the Year award winner and all of us heartily congratulate you.  Annie, it is people like you who make all of us feel proud to be members of the library profession.

Sincerely yours,

*Nordis J. Smith*

Mrs. Nordis J. Smith, President
Beta Kappa Chapter of Beta Phi Mu

EXHIBIT 30

## Brown, Annie

**From:**   Brown, Annie
**Sent:**   Wednesday, April 16, 2008 12:36 PM
**To:**     Mitchell, Rebecca
**Subject:** Ashland City Library

Hello Becky, I received a copy of the request from Tina Nolen in reference to an event taking place tomorrow with the Writer of Nothing but the People and former Governor Patterson; She is asking for us to assist her.    I would like your permission to attend; I have completed my assignment for the convention and will assist Crystal on Friday.  Thanks, Annie

*Annie L. Brown*
Alabama Public Library Service
Library Consultant
6030 Monticello Drive
Montgomery, Alabama 36130
(334) 213-3917 Voice
(800) 723-8459 Ext: 917
(334) 213-3961 Fax

Rebecca Never responded &
Hulen Poimens Went to the event.
Initially when Judy Shepard asked
Hulen for permission to attend; according
to Judy Shepard, Hulen said that she
could go but Annie can't —
" This happen on 4/16/08

4/16/2008

Attn: Rebecca Mitchell, Alabama Public Library Service
From : Tina Nolen, Ashland City Library


Rebecca,

Good morning, We have an event tomorrow at our Courthouse with the writer of
Nothing but the People and Former Governor Patterson. I know this is late notice.
I would love for Judy my consultant and Annie Brown to help if they could with
this event.  It begins at ten. Here is the flyer on the event attached.

Thanks
Tina Nolen
Ashland City Library



April 17, 10 am

## Lecture and Book Signing with Warren Trest and John Patterson

Clay County Courthouse

Warren Trest and former Alabama Governor John Patterson will appear at the Clay County Courthouse to speak about Trest's recent biography of the former governor, Nobody But the People. E-mail or phone for more information.

*Free opened to public*

Contact: Ashland City Library

354-3427

Link to http://www.authorwarrentrest.com for more information on the book.

# FREEDOM COURT REPORTING

**EXHIBIT B** 4

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5     CASE NUMBER:  2:07-CV-841-MHT-WC

6     ANNIE LUCAS BROWN,

7               Plaintiff,

8               vs.

9     ALABAMA PUBLIC LIBRARY SERVICE,

10              Defendant.

11

12    BEFORE:

13              SARA MAHLER, Commissioner.

14

15    APPEARANCES:

16              DEBORAH HILL BIGGERS, ESQUIRE, 113

17    East Rosa Parks Avenue, Tuskegee, Alabama

18    36083, appearing on behalf of the Plaintiff.

19              R. AUSTIN HUFFAKER, JR., ESQUIRE,

20    of RUSHTON, STAKELY, JOHNSTON & GARRETT, 184

21    Commerce Street, Montgomery, Alabama 36104,

22    appearing on behalf of the Defendant.

23              ALSO PRESENT:  REBECCA MITCHELL

## FREEDOM COURT REPORTING

5

1                I, SARA MAHLER, CCR, a Court

2        Reporter of Wetumpka, Alabama, acting as

3        Commissioner, certify that on this date, as

4        provided by the Federal Rules of Civil

5        Procedure and the foregoing stipulation of

6        counsel, there came before me at the offices

7        of Rushton, Stakely, Johnston & Garrett, 284

8        Commerce Street, Montgomery, Alabama 36104,

9        beginning at 1:00 p.m., Annie Lucas Brown,

10       witness in the above cause, for oral

11       examination, whereupon the following

12       proceedings were had:

13                ANNIE LUCAS BROWN,

14       being first duly sworn, was examined and

15       testified as follows:

16                COURT REPORTER:   Usual

17       stipulations?

18                MR. HUFFAKER:   Yes.

19                     EXAMINATION

20       BY MR. HUFFAKER:

21            Q.    Ms. Brown, would you state

22       your full name for the Record, please.

23            A.    Annie Laura Mason Lucas Brown.

## FREEDOM COURT REPORTING

54

1    operations managers today?

2          A.     Janet Hamilton and today Fara

3    Zaleski.

4          Q.     When you moved from a Library

5    Operations Manager to a consultant, who took

6    your old position?

7          A.     No one that I know of.

8          Q.     Is that position unfilled?

9          A.     My old position, no.

10         Q.     Who's performing those

11   responsibilities?

12         A.     They took the duties and

13   responsibilities from me as Library

14   Operations Manager.

15         Q.     All right.  What duties and

16   responsibilities were taken from you?

17         A.     My supervision and the

18   authority to coordinate continuing education

19   and supervising the consultants.

20         Q.     When you were a Library

21   Operations Manager, tell me each and every

22   duty and responsibility that you had.

23         A.     I'll try to recall them.

## FREEDOM COURT REPORTING

55

1    Supervising the consultants; continuing

2    education -- coordinate continuing education

3    programs; assisting with the LSTA federal

4    grants; applications and reviewing; doing

5    budget requests; E-Rate was in our division,

6    overseeing the E-Rate program; and

7    coordinating any other special project

8    assigned by the director to our division.

9         Q.      Those were your duties and

10   responsibilities during the time in which

11   you were the Library Operations Manager?

12        A.      Those were some of them.  I

13   just can't recall all of the things.

14        Q.      Which division were you in?

15        A.      Network development and

16   planning.

17        Q.      Okay.  What is the purpose or

18   goal or function of that division?

19        A.      Was to plan continuing ed

20   training for the public library directors of

21   the state; assist them with completing

22   applications for the federal program for the

23   LSTA, which is Library Service Technology

## FREEDOM COURT REPORTING

100

1      Q.      What has Judy Shepard told

2  you?

3      A.      She told me nothing, but that

4  she just feels sorry for the way that I've

5  been treated and that she knows that I've

6  been treated unfair.

7      Q.      What has she seen, to the

8  extent you know, as to how you've been

9  treated?

10     A.      Well, she knows that I can't

11 get supplies to do my work.

12     Q.      And what else?

13     A.      She knows that -- You made me

14 forget.

15           She knows that she received a

16 reprimand around the same time that I

17 received one, but she maintained her

18 supervisory responsibilities and I didn't.

19     Q.      Okay.  What else?

20     A.      She is white and I'm black.

21     Q.      I think I asked that question

22 earlier, but just so we're clear, she's

23 white or Caucasian?

# FREEDOM COURT REPORTING

101

1          A.      She's Caucasian, a white

2    American.

3          Q.      She did receive a reprimand;

4    is that correct?

5          A.      That's correct.

6          Q.      And you said she did not have

7    her supervisory responsibilities removed?

8          A.      No, she didn't.

9          Q.      Do you know whether she

10   actually had any other responsibilities

11   removed?

12         A.      I don't know of any others at

13   the time.

14         Q.      Have you ever read the

15   reprimand that she received?

16         A.      I did read it.

17         Q.      What were the circumstances in

18   which she showed it to you?

19         A.      When we were discussing -- we

20   were just talking about the way the both of

21   us had been treated.

22         Q.      How has she been treated as

23   she's told you?

## FREEDOM COURT REPORTING

107

1      A.      She knows them better than I

2   do.

3      Q.      How would she know them better

4   than you?

5      A.      Because she is around staff

6   more that know -- that say things, that

7   know.

8      Q.      Okay.  What has she told you

9   about her observations and complaints and

10  experiences there?

11     A.      Well, one experience is our

12  travel.  How they have gotten -- some of

13  them have gotten paid for their travel trips

14  from home to the airport and some of them

15  have gotten comp time when I wasn't allowed

16  to have comp time and when I wasn't paid

17  from home to the airport.

18     Q.      You're going to have to

19  explain that to me a little bit more.

20     A.      We were traveling.  And, for

21  instance, if I lived in Tuskegee, so if my

22  flight left at seven, that means I have to

23  leave home by 5:30.  So you would get travel

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

108

1    from -- because that would be the beginning

2    of your workday from home -- from Tuskegee

3    to Montgomery Airport, when you come back

4    and turn in your travel report, expense

5    report.

6         Q.    So that you're on the clock,

7    so to speak?

8         A.    Yes.

9         Q.    And you have not been on the

10   clock from your travel from Tuskegee to the

11   Montgomery Airport when you travel out of

12   town?

13        A.    I wasn't paid like some of

14   them was paid.

15        Q.    Tell me what trips you were

16   not paid for.

17        A.    I didn't get paid for the last

18   trip I took to Virginia.  I didn't get paid

19   from Tuskegee to Montgomery.  I got paid for

20   the parking at the airport, but not the

21   mileage.

22        Q.    Any other trips?

23        A.    From Minnesota, when I went to

## FREEDOM COURT REPORTING

109

1    Minnesota in --

2            Q.      Okay.  Any others?

3            A.      I'd have to go back and look.

4            Q.      Have you filed a complaint

5    about that?

6            A.      No.

7            Q.      To whose attention have you

8    brought that to?

9            A.      Well, I was already told by

10   Ms. Mitchell, the director, that I wasn't

11   going to get travel from Tuskegee to the

12   airport.  That was a year or so more, might

13   have been more.

14           Q.      Did she tell you why?

15           A.      No.

16           Q.      Ms. Bowman, is she one of the

17   folks that has actually received payment or

18   time for traveling from home to the airport?

19           A.      She did.

20           Q.      Where does Ms. Bowman live?

21           A.      In Auburn.

22           Q.      Do you know what trips she has

23   taken and what she was paid for travel to

## FREEDOM COURT REPORTING

110

1    drive from Auburn to Montgomery?

2              A.      I don't know what she was

3    paid.

4                      And then the prepayment of

5    trips for other staff where -- that took

6    trips.  The agency prepaid for those staff

7    members, I never was given the opportunity

8    to.

9              Q.      When Ms. Bowman traveled, did

10   she fly out of Montgomery or out of the

11   Atlanta or out of the Auburn-Opelika --

12             A.      She flew out of Montgomery.

13             Q.      And she's told you she

14   actually got paid for driving?

15             A.      Yes.

16             Q.      Who is her direct supervisor?

17             A.      Well, Mr. Bivens is now.

18             Q.      Any other employees that

19   you're aware of that has been paid to

20   travel?

21             A.      Two employees, they were

22   prepaid for their travel to Utah.

23             Q.      Who was that?

1          IN THE UNITED STATES DISTRICT COURT

2            MIDDLE DISTRICT OF ALABAMA

3                 NORTHERN DIVISION

4

5   ANNIE LUCAS BROWN,           )
                                 )
6        Plaintiff,              )
                                 )  CASE NO.:
7   VS.                          )  2:07-cv-841-MHT
                                 )
8   ALABAMA PUBLIC               )  DEPOSITION OF:
    LIBRARY SERVICE,             )  REBECCA MITCHELL
9                                )
         Defendant.              )
10

11          S T I P U L A T I O N S

12       IT IS STIPULATED AND AGREED, by and

13   between the parties through their respective

14   counsel, that the deposition of:

15              REBECCA MITCHELL

16   may be taken before Frances P. Looney,

17   Commissioner and Notary Public, State at

18   Large, at the law offices of R. Austin

19   Huffaker, Jr., 184 Commerce Street,

20   Montgomery, Alabama 36101, on the 30th day of

21   January, 2008, commencing at approximately

22   9:15 a.m.

23

1  pursuant to the Alabama Rules of Civil

2  Procedure and the foregoing stipulation of

3  counsel, there came before me on the 30th day

4  of January, 2008, at the law office of Mr. R.

5  Austin Huffaker, 184 Commerce Street,

6  Montgomery, Alabama 36104, commencing at

7  approximately 9:15 a.m., REBECCA MITCHELL,

8  witness in the above cause, for oral

9  examination, whereupon the following

10  proceedings were had:

11                    REBECCA MITCHELL,

12  being first duly sworn, was examined and

13  testified as follows:

14                         EXAMINATION

15  BY MS. BIGGERS:

16  Q.  Good morning.

17  A.  Good morning.

18  Q.  Would you please state your full name for

19      the record?

20  A.  Okay.  My full legal, name is Rebecca Marie

21      Sledge Manley Sledge Buckner Mitchell.  I go by

22      professionally Rebecca Sledge Mitchell.

23  Q.  Sledge, S-l-e-d-g-e?

```
 1          training by ILMS for chief operating officers so

 2          that we're aware of what services the federal

 3          government provides, advocacy training.  These

 4          are not necessarily the official titles.  But

 5          that's the gist.  Security of the library

 6          dealing with violence in the workplace.  These

 7          are not necessarily the titles, but the subject

 8          matter behind them.

 9     Q.   Is that basically all you can recall?

10     A.   That's all I can recall.

11     Q.   Now, I guess in June of 2006, can you

12          describe for me the organizational structure

13          of the Alabama Public Library Service?

14     A.   I'm not sure what you're asking me.

15     Q.   You were the director.  Did you have an

16          Assistant Director?  How was the

17          organizational structural regarding to the

18          staffing?  You understand my question now?

19     A.   I do now.  The head of the structure is the

20          Board of Trustees.  I report directly to the

21          Board of Trustees.

22     Q.   How many members are on the Board of

23          Trustees?
```

1    A.   Seven members.

2    Q.   And how are they appointed?

3    A.   Appointed by the Governor, one for each

4         congressional district.  They must have resided

5         in the district State Code says a certain number

6         of years.  I would have to look at the State

7         Code to give you those years.

8    Q.   Okay.

9    A.   But they are the head of the organization.  I

10        answer directly to them.  Under me would have

11        been an Executive Secretary, the Assistant

12        Director, the Confidential Assistant to the

13        Board.

14   Q.   That's a Confidential Assistant to the Board

15        of Trustees and not to you?

16   A.   To the Board of Trustees.

17   Q.   So does that person report to you or to the

18        Board of Trustees?

19   A.   Both.  And then without looking at the structure

20        I cannot tell you at that particular point in

21        time who reported beyond that to whom.

22   Q.   Can you tell me what other employees were

23        employed in June of 2006 other than the

```
 1        Director, Assistant Director, and

 2        Confidential Assistant?

 3            MR. HUFFAKER:  Employees by name or

 4        classifications?

 5   Q.   Classifications.

 6   A.   Operations managers.

 7   Q.   Is that the same term that was used during

 8        Ms. Brown --

 9   A.   Library operations manager.

10   Q.   How are they divided up?

11   A.   There were four.

12   Q.   And who do they report to?

13   A.   I would have to look at the organizational chart

14        at that particular time you're asking me about.

15   Q.   Generally, who would they report to?

16   A.   Again, I would have to look at the

17        organizational chart at that point to show who

18        they would have reported to.

19   Q.   Well, who could they have reported to?

20   A.   They could have reported to myself, the

21        Assistant Director.  That would be it.  That

22        would have been who they would have reported to,

23        either myself or the Assistant Director.
```

Frances P. Looney, CSR, RPR

```
 1   Q.   How would the decision be made as to which
 2        of you the library operations managers would
 3        report to?
 4   A.   I would have made the decision.
 5   Q.   How do you decide?
 6   A.   Based on the overall plan that I had for the
 7        library, the agency and where I wanted to go.
 8   Q.   Now, is this plan a written plan?
 9   A.   The organizational structure was drawn out, yes.
10   Q.   By you or the Board of Trustees or whom?
11   A.   By me with approval of the Board of Trustees.
12   Q.   And the one that you're referring to now,
13        when was that organizational structure
14        prepared?
15   A.   I'd have to look at the dates.
16   Q.   Has it changed since then?
17   A.   Yes.
18   Q.   We were talking about in June of 2006?
19   A.   Yes.
20   Q.   Now, do you recall how many library
21        operations managers there were in June of
22        2006?
23   A.   Four.
```

1    Q.  Did they work at any or were they assigned

2        to any particular division?

3    A.  Yes.

4    Q.  Can you describe those divisions for me?

5    A.  Blind and physically handicapped, reference and

6        inter-library loan, technical services which

7        would have been cataloging and acquisitions, and

8        network planning and development, NDP.

9    Q.  Tell me what the blind and physically

10       handicapped services division, what their

11       duties and responsibilities were.

12    A.  We're the state -- we are designated by the

13       federal government as the state library for the

14       blind and physically handicapped patrons of our

15       state or citizens of our state.  It is their

16       responsibility to work with those patrons and

17       provide them material, reading material,

18       informational material, information on the

19       latest adaptive technology to be able to enhance

20       their life styles so that despite their

21       disabilities they are part of the mainstream of

22       the state.

23    Q.  Would these employees work directly with the

```
 1        blind and handicapped throughout the state
 2        or would they interface with local
 3        librarians who serve as this?
 4   A.   Both.
 5   Q.   And I believe the other divisions are for
 6        reference and interface loans?
 7   A.   Inter-library loan.
 8   Q.   Inter-library loan?
 9   A.   Yes, ma'am.
10   Q.   What was this division's duties and
11        responsibilities?
12   A.   Reference being answering for the public, for
13        state employees, for in-house staff, or for
14        other public libraries questions that they
15        needed answers to that perhaps they did not have
16        that initial information at their finger tips.
17        Inter-library loan is when you lend or borrow
18        materials from another library for your staff,
19        your patrons, whomever.
20   Q.   That's throughout the whole State of
21        Alabama?
22   A.   It can be nationwide or worldwide.
23   Q.   And the third one, technical services?
```

1  A.  Technical services is the division that would

2      purchase materials and buy materials, books,

3      DVDs, audios, magazines, newspapers and the

4      cataloging or the signing of those materials and

5      entering into an electronic cataloging system so

6      that they can be readily available to whoever

7      needs them.

8  Q.  And network planning and development?

9  A.  That would be professional librarians that help

10     200 plus public librarians in the state with any

11     needs that they would have pertaining to the

12     operations of their library.  And it would be

13     developing programs that would enhance the

14     public libraries' ability to do their jobs.  And

15     that is their main responsibility.

16  Q.  Back in June of 2006 do you recall who was

17     the library operations manager for blind and

18     physically handicapped?

19  A.  Fara Zaleski.

20  Q.  Spell Fara for her first.

21  A.  F-a-r-a Z-a-l-e-s-k-i.  I was never good at

22     spelling out loud anyway.

23  Q.  And does Ms. Zaleski supervise any

```
 1          employees?

 2    A.    She supervised the employees in that division.

 3    Q.    And approximately how many are in that

 4          division?

 5               MR. HUFFAKER:  Are today or were in June

 6          2006?

 7    Q.    I'm talking about June of '06.

 8    A.    Trying to remember.  Eight I believe.

 9    Q.    Are they all consultants?

10    A.    No.

11    Q.    What positions do these eight people consist

12          of?

13    A.    Two warehouse workers, two secretarial

14          positions, three professional librarians along

15          with Ms. Zaleski being a professional.  I have

16          left out somebody.  Who?  No, that should be

17          eight.

18    Q.    Two warehouse?

19    A.    I counted Ms. Zaleski in the eight.  That's

20          where the eight came from.

21    Q.    So she actually supervises seven?

22    A.    Right.

23    Q.    The second division that you mentioned
```

1     reference and inter-library loan?

2  A.  Correct.

3  Q.  Back in June of 2006 who was the library

4     operations manager for that division?

5  A.  Judy Shepard, S-h-e-p-a-r-d.

6  Q.  And how many people did Ms. Shepard

7     supervise back then?

8  A.  Five or six.

9  Q.  And what were the job descriptions for these

10    five or six individuals?

11  A.  Three or four library clerks, two professional

12    librarians.  They were Librarian II on the merit

13    scale.

14  Q.  And the technical service division who was

15    the library operations manager for that

16    division back in June of '06?

17  A.  Janet Hamilton, no unusual spelling.

18  Q.  How many persons did Ms. Hamilton supervise?

19  A.  Possibly five.

20  Q.  And what were the job titles of these five

21    persons?

22  A.  Three would have been Library Clerks, two would

23    have been Librarians II.

```
 1    Q.   And the last division, network planning and
 2         development, who held that position?
 3    A.   Ms. Annie Brown.
 4    Q.   And just for the record, who held the
 5         position of Executive Secretary back in June
 6         of 2006?
 7    A.   LaTonya Moore.
 8    Q.   Who held the position of Assistant Director?
 9    A.   Huland Bevins.
10    Q.   Who held the position of Confidential
11         Assistant?
12    A.   Harry Lensch, L-e-n-s-c-h.
13    Q.   And for the record, what is race of LaTonya
14         Moore?
15    A.   Black.
16    Q.   Huland Bevins?
17    A.   White.
18    Q.   Harry Lensch?
19    A.   White.
20    Q.   Fara Zaleski?
21    A.   White.
22    Q.   Judy Shepard?
23    A.   White.
```

```
 1        Transportation of the work environment at
 2        APLS since you have been the director?
 3   A.   Two.
 4   Q.   When did those two occur?
 5   A.   One was Ms. Brown.
 6   Q.   That was the one in '03?
 7   A.   '03/'04, somewhere in that time frame.  And then
 8        the one in 2007 with Kim Owen.
 9            (Plaintiff's Exhibit 29, letter, marked
10             for identification)
11   Q.   Ms. Mitchell, I want to show you now what I
12        have marked as Plaintiff's Exhibit 29.  And
13        this is the December 3rd, 2007, letter to
14        the Executive Board of Alabama Public
15        Library Service from LaTonya Moore.  And I'm
16        going to ask you is this the document that
17        you recall seeing from LaTonya Moore
18        complaining about the work environment at
19        the Alabama Public Library Service?
20   A.   To the best of my recollection, yes.
21   Q.   Does not Ms. Tonya Moore, who happens to be
22        black, in the second paragraph indicate that
23        her departure from the agency earlier this
```

```
 1        year was precipitated by feelings of racial

 2        bias and hostility that I expressed to you

 3        the agency director and to several members

 4        of the executive board to no avail?

 5   A.   That's what it states.

 6   Q.   And does not it indicate that in paragraph 3

 7        that LaTonya Moore, African American

 8        employee of Alabama Public Library Service,

 9        supervisory roles were removed from her in

10        October 2006?

11   A.   She was doing that under a temporary.  That was

12        not a part of her original supervisory duties as

13        executive secretary.

14   Q.   That's not my question?

15   A.   She states they were removed.

16   Q.   And given to a white female?

17   A.   That's what she states.

18   Q.   And does not she further indicate that when

19        she attempted to bring her concerns to the

20        attention of two board members of the

21        Alabama Public Library Service that she was

22        confronted with acts of retaliation?

23   A.   That's what she states.
```

```
 1    Q.   Does she not indicate on the second page in

 2         the first full paragraph that on several

 3         occasions she had come to you to express

 4         concerns about Harry which I assume is Harry

 5         Lensch and you advised her she just had to

 6         learn to ignore what Harry and his people

 7         were doing or saying?

 8    A.   I had no firsthand knowledge of what he was

 9         saying or what his people were saying.  And I

10         stressed to her that she worked for me and that

11         I was the only person she should be concerned

12         with.

13    Q.   Ms. Mitchell, if Harry or his people were

14         making inappropriate comments to LaTonya

15         Moore, wouldn't you have firsthand knowledge

16         of what they were saying and make those

17         comments in front of you?

18    A.   Possibly.

19    Q.   Any reasonable person would or would not

20         make inappropriate comments about a black

21         employee or discriminatory comments about a

22         black employee in front of his or her

23         supervisor?  Would that be reasonable?
```

```
 1   A.  That would be subjective on my part to answer.
 2   Q.  No.  I'm just saying in the scheme of
 3       things, would it be reasonable for someone
 4       to overtly make racially discriminatory
 5       comments against another employee in front
 6       of a supervisor?
 7           MR. HUFFAKER:  Object to the form.
 8   Q.  You can answer the question.
 9   A.  Again, subjective.
10   Q.  That's not subjective.
11   A.  Yes, it is.  It depends on the circumstances.
12       It depends on the environment and the
13       relationship between people that work within a
14       given organization.
15   Q.  Ms. Mitchell, you said you've have extensive
16       training --
17   A.  Yes, ma'am.
18   Q.  -- as a supervisor, manager, or director?
19   A.  Yes, ma'am.
20   Q.  And you're telling me that it is appropriate
21       under any circumstances to make racially
22       discriminatory comments by one employee
23       against another minority employee?
```

Frances P. Looney, CSR, RPR

1   A.  That is not what I said.

2   Q.  Well, that's what I asked you.  Under what

3       circumstances would it be reasonable for

4       that to occur?

5          MR. HUFFAKER:  Let me object to the form.

6       If you want to give her a specific instance of a

7       comment.

8   Q.  No, I don't need to.  My question is are

9       there any circumstances that are racially

10      offensive, discriminatory comment is

11      appropriate made by one employee against a

12      minority employee?

13  A.  No.

14        MR. HUFFAKER:  Object.  That's fine.

15  Q.  Is it not a fact that Ms. LaTonya Moore in

16      the first full paragraph of this December

17      3rd, 2007, letter indicates that she had

18      informed you, Ms. Mitchell, of a racial

19      comment made to her by a former subordinate

20      that had just been promoted and given

21      Ms. LaTonya Moore's supervisory duties and

22      that the same employee had instructed some

23      of her subordinates not to associate with

```
 1        certain other staff members which was

 2        breeding an air of contention throughout the

 3        agency.  And your response to that was to

 4        tell her to simply ignore it?

 5   A.   I had no firsthand knowledge of whether that

 6        conversation took place or not.  And I told her

 7        if she felt that uncomfortable, then my

 8        suggestion was to ignore it.

 9   Q.   So is it your position that unless you have

10        firsthand knowledge of offensive, racially

11        discriminatory actions, then they're to be

12        ignored?

13   A.   No, ma'am.

14   Q.   Well, why did you tell Ms. Moore that?

15   A.   Because she and the person involved in this

16        particular case were in a personal disagreement

17        one-upmanship mode.

18   Q.   Let me ask you this.  Did you ever even

19        investigate whether there was any validity

20        to Ms. Moore's allegation?

21   A.   Yes.

22   Q.   How did you investigate it?

23   A.   I confronted the other employee.  And she
```

```
 1          MR. HUFFAKER:  Are you talking about the
 2     amended charge?
 3          MS. BIGGERS:  No.
 4  Q.  Do you remember receiving any kind of
 5     correspondence or seeing -- let me put it
 6     that way, let me rephrase it.  Do you
 7     remember seeing any correspondence from the
 8     US Equal Employment Opportunity Commission
 9     that it had determined that evidence
10     obtained during its investigation
11     established reasonable cause to believe a
12     violation of the statute has occurred in
13     regard to Ms. Brown's EEO charge?
14  A.  Yes, I did see that.
15  Q.  Ms. Mitchell, are you familiar with an
16     Alabama Public Library Service employee by
17     the name of Felicia Bates?
18  A.  Yes.
19  Q.  Can you tell me who Felicia Bates is?
20  A.  Felicia Bates worked at the agency as an ASA
21     which is in layman's term secretary the latter
22     part of '07 for a very, very brief period of
23     time.
```

1    Q.   And what was her race?

2    A.   Black.

3    Q.   You say a very, very short period of time,

4         did she leave or resign, quit?

5    A.   She went to another department.

6    Q.   Do you know why?

7    A.   No.

8    Q.   Did she ever express any concerns about a

9         hostile or racially discriminatory work

10        environment at Alabama Public Library

11        Service during her tenure?

12   A.   No.

13   Q.   Do you remember a Jacqueline Barnes?

14   A.   Yes.

15   Q.   What is her race?

16   A.   Black female.

17   Q.   Was she employed with Alabama Public Library

18        Service?

19   A.   Yes.

20   Q.   In what capacity?

21   A.   As an ASA.

22   Q.   That acronym stands for?

23   A.   It's Administrative Secretarial Assistant or

```
 1        something along those line.  But an ASA is a

 2        secretary.

 3   Q.   How long was she employed with the Alabama

 4        Public Library Service?

 5   A.   I think three years.  It was more than one.  I

 6        think it was three.

 7   Q.   Is she still working for the Alabama Public

 8        Library Service today?

 9   A.   No.

10   Q.   Did she resign, fired, what?  How did she

11        leave the service?

12   A.   She transferred to the secretary of state's

13        office.

14   Q.   And do you know why she transferred?

15   A.   She had been at the secretary of state's office

16        prior to coming to work for us.  She did not

17        like Nancy Worley.  She came to us to get away

18        from Ms. Worley according her own conversation

19        with me.  When Beth Chapman was elected, they

20        offered her a position back at the state house

21        doing what she had been -- I think it was as a

22        supervisory capacity over the people that were

23        doing what she was doing originally.
```

Frances P. Looney, CSR, RPR

Q. Now, did she get a promotion when she came
   over to you, or do you know?

A. When she came to us know, no.  It was a lateral
   transfer.

Q. Other than the fact that she returned to her
   previous employer, you have no knowledge as
   to whether or not she left the Alabama
   Public Library Service because of any racial
   discriminatory actions in employment there
   perpetrated against her meaning --

A. I have no knowledge of anything.

Q. Did she ever complain to you?

A. No.

Q. Beverly Davis, can you tell me who Beverly
   Davis is?

A. Beverly Davis was a library clerk that worked
   for the agency long enough to -- longer than 25
   years because she had her 25 years, but was not
   the traditional in her '60s.  She was much
   younger than that.  She retired and left state
   service.

Q. Prior to her retiring and leaving state
   service, did she not get married while she

| | | |
|---|---|---|
| 1 | | was still employment at Alabama Public |
| 2 | | Library Service? |
| 3 | A. | The last year she was with us she got married. |
| 4 | Q. | Is it not a fact that her husband lived out |
| 5 | | of state? |
| 6 | A. | That's what I believe. |
| 7 | Q. | Her race is black; is that correct? |
| 8 | A. | Her race is black. |
| 9 | Q. | Did she not ask you for a -- now, she had |
| 10 | | been working 25 years for the Alabama Public |
| 11 | | Library Service; is that correct? |
| 12 | A. | Yes, ma'am. |
| 13 | Q. | Did she not make a request of you for to |
| 14 | | take a leave of absence to go to Texas to |
| 15 | | visit her husband for a brief period of |
| 16 | | time. |
| 17 | A. | Yes.  She requested a leave of absence.  Because |
| 18 | | of the amount of time she had been employed at |
| 19 | | the library she came in late in the afternoon |
| 20 | | with Judy Shepard her supervisor, asked if she |
| 21 | | could go.  I did not think to ask her if she had |
| 22 | | enough leave accrued to cover it.  Told her that |
| 23 | | I had no problems with her taking 30 days off or |

```
 1        however much.  Then the next day when we checked

 2        her leave, she did not have but about three days

 3        leave.  According to state personnel I cannot

 4        give without going through certain hoops with

 5        state personnel leave without pay to an

 6        employee.  But if they take it, take leave

 7        without pay, the term is they "abandon their

 8        job".  So in order for her to keep her job, she

 9        was going to have to return before her leave

10        status was up.

11   Q.   Let me make sure I understand this.  Judy

12        Shepard was her supervisor?

13   A.   Correct.

14   Q.   She and Judy Shepard -- and Judy Shepard

15        concurred with her request of you?

16   A.   Correct.

17   Q.   Her meaning Beverly Davis?

18   A.   Right.

19   Q.   To take a leave of absence I thought you

20        said; is that correct?

21   A.   Correct.

22   Q.   Now, leave of absence, do you have to have

23        enough leave days to take a leave of
```

```
 1        absence?
 2   A.   You have to have sick or annual leave built up.
 3        You have to be on the payroll to take a leave
 4        whether it's annual leave for vacation or you
 5        want to go shopping or whatever.  You have to
 6        have leave built up.  With the amount of time
 7        she had been at the agency and with her
 8        supervisor coming in and making that request, my
 9        assumption was that she had the hours.
10   Q.   Let me ask you this.  Did you ask her during
11        that conference whether or not she had the
12        adequate time to cover?
13   A.   No.  I did not specifically ask her.
14   Q.   Did you check with your -- where would that
15        be?  Would that be in your own business
16        office, that information?
17   A.   That would be in personnel, correct.
18   Q.   Of your agency?
19   A.   Yes.
20   Q.   Did you inquire of personnel in the Alabama
21        Public Library Service to determine if you
22        could grant that request prior to telling
23        her she could take it?
```

```
 1   Q.   Are you aware of the fact that a letter of

 2        reprimand was issued to Judy Shepard?

 3   A.   I heard Ms. Brown testify to it.

 4   Q.   You don't have to sign off on appraisals?

 5   A.   On appraisals I do, yes.

 6   Q.   If it had been reflected on her appraisal

 7        and you signed off on it, you just don't

 8        recall?

 9   A.   I just don't recall.

10   Q.   Did Judy Shepard supervise employees back

11        August 1st, 2005, to August 1st, 2006?

12   A.   Yes.

13   Q.   After she received her reprimand were her

14        supervisory duties and responsibilities

15        removed from her?

16   A.   No.

17   Q.   Was she removed as a library operations

18        manager in 2005 following her August 1st,

19        2006, appraisal?

20   A.   No.

21            MS. BIGGERS:  If we can just take a

22        break, maybe we can determine, Ms. Mitchell,

23        if we are concluded.
```

```
 1                        (BREAK)

 2            (Plaintiff's Exhibit 34, letter, marked

 3                for identification)

 4    BY MS. BIGGERS:

 5    Q.  Ms. Mitchell, I want to show you what I have

 6        marked for identification purposes

 7        Plaintiff's Exhibit 34.  It's a March 8th,

 8        2007, letter to Ms. Brown from Ms. Nordis J.

 9        Smith advising her that she was Librarian of

10        the Year for 2007?

11    A.  Uh-huh.

12    Q.  Are you aware of this honor that was

13        bestowed on Ms. Brown?

14    A.  Yes.  It was an honor bestowed on her by the

15        Beta Kappa Chapter of Beta Phi Mu which is an

16        honorary library organization.  They give their

17        awards at our annual Alabama Library Association

18        convention each year.  Annie was nominated I

19        believe by Ms. Kim Owen from what I understand.

20        And that's supposition.  It does say here she

21        was nominated for it.  She was chosen.  And she

22        was inducted into Beta Kappa during the April of

23        '07 convention which was in Mobile.
```

```
 1    Q.   Is that a recognition of outstanding

 2         service, statewide honor?  Is that a

 3         statewide honor I guess I'm asking?

 4    A.   It is a -- from what I understand it is a

 5         honorary society award.  There are a number of

 6         awards given during the state convention by

 7         different groups.  And that is one of the groups

 8         that gives awards.

 9    Q.   Did the Alabama Public Library Service do

10         anything to recognize or support Ms. Brown

11         in this acknowledgment of her service by

12         Beta Kappa Chapter?

13    A.   I informed the board.  But at the time this was

14         all going on I was in the midst of battling

15         cancer.

16    Q.   In March of 2007?

17    A.   Yes, ma'am.  I was diagnosed in March and was

18         going through all the procedures leading up to

19         immediate surgery May the 1st.

20    Q.   Who was acting on your behalf?

21    A.   I was at the organization until the day before

22         my surgery.

23    Q.   When was that?
```

1    A.   May 1st, 2007.

2    Q.   So you said you passed this information on

3         to the board, but I guess I got lost in what

4         happened after that.

5    A.   I don't know what they did at the May meeting

6         which would have been the meeting they would

7         have had after this event.  I don't know what

8         they did.  I was not there.

9    Q.   Did you and any of the employees do

10        anything, take her to lunch, or do anything

11        to say congratulations for this esteemed

12        honor?

13   A.   I don't know what the other staff members did.

14        And as I said I was in midst of battling with

15        cancer.  And, no, I did not.

16   Q.   That was my question whether you did or

17        whether you delegated to someone else to do

18        it in your absence?

19   A.   Again I was battling cancer.

20   Q.   So the answer is no?

21   A.   I did not do anything.

22   Q.   Nor did you delegate to anyone else?

23   A.   I did not do anything.

1          MS. BIGGERS:  Thank you.  That's it.

2                    END OF PROCEEDINGS

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1                C E R T I F I C A T E

 2

 3      STATE OF ALABAMA            )

 4                                  )

 5      MONTGOMERY COUNTY           )

 6

 7           I hereby certify that the above and

 8      foregoing matter was taken down by me in

 9      stenotype and was thereto reduced to computer

10      print under my supervision, and that the

11      foregoing represents a true and correct

12      transcript of said matter.

13           I further certify that I am neither of

14      counsel nor of kin to the parties to the

15      action, nor am I in anywise interested in the

16      result of the said cause.

17

18

19      _____

20      FRANCES P. LOONEY, COMMISSIONER

21      ABCR NO. 81

22

23      My commission expires 12.27.2009.
```

Frances P. Looney, CSR, RPR

**EXHIBIT D**

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:07-CV-841-MHT-WC


ANNIE LUCAS BROWN,

            Plaintiff(s),

            vs.

ALABAMA PUBLIC LIBRARY SERVICE,

            Defendant(s).


      S T I P U L A T I O N

      IT IS STIPULATED AND AGREED by

and between the parties through their

respective counsel, that the deposition

of JUDITH SHEPARD may be taken before

TAMIE J. STORY, Commissioner, at the

offices of RUSHTON, STAKELY, JOHNSTON &

GARRETT, 184 Commerce Street, Montgomery,

Alabama, on the 16th day of May, 2008.

      IT IS FURTHER STIPULATED AND

AGREED that the signature to and the

FREEDOM COURT REPORTING

**Page 2**

1  reading of the deposition by the witness
2  is waived, the deposition to have the
3  same force and effect as if full
4  compliance had been had with all laws and
5  rules of Court relating to the taking of
6  depositions.
7      IT IS FURTHER STIPULATED AND
8  AGREED that it shall not be necessary for
9  any objections to be made by counsel to
10  any questions except as to form or
11  leading questions, and that counsel for
12  the parties may make objections and
13  assign grounds at the time of the trial,
14  or at the time said deposition is offered
15  in evidence, or prior thereto.
16      IT IS FURTHER STIPULATED AND
17  AGREED that the notice of filing of the
18  deposition by the Commissioner is waived.
19
20
21
22
23

**Page 3**

1                INDEX
2  EXAMINATION BY:        PAGE NUMBER:
3  Mr. Huffaker           6, 239
4  Ms. Biggers            198, 242
5  EXHIBITS:
6  Defendant's 1 -        13
7    Subpoena
8  Defendant's 2 -        61
9    Notice of Suspension
10  Defendant's 3 -        71
11    Letter
12  Defendant's 4 -        173
13    Letter
14  Defendant's 5 -        178
15    Letter
16  Defendant's 6 -        185
17    Letter
18  Defendant's 7 -        192
19    Letter
20  Defendant's 8 -        195
21    Letter
22  Plaintiff's 1 -        200
23    Letter

**Page 4**

1      IN THE UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4
5  CASE NUMBER: 2:07-CV-841-MHT-WC
6
7  ANNIE LUCAS BROWN,
8      Plaintiff(s),
9      vs.
10  ALABAMA PUBLIC LIBRARY SERVICE,
11      Defendant(s).
12
13  BEFORE:
14      TAMIE J. STORY,  Commissioner
15  APPEARANCES:
16      MS. DEBORAH HILL BIGGERS,
17  Attorney at Law, 113 East Rosa Parks
18  Avenue, Tuskegee, Alabama 36083,
19  appearing on behalf of the Plaintiff.
20      RUSHTON, STAKELY, JOHNSTON &
21  GARRETT, by Mr. Austin Huffaker and Mr.
22  T. Grant Sexton, 184 Commerce Street,
23  Montgomery, Alabama 36195, appearing on

**Page 5**

1  behalf of the Defendant.
2      HASKELL, SLAUGHTER, YOUNG &
3  REDIKER, LLC, by Mr. C. McDowell Crook,
4  Jr., 305 South Lawrence Street,
5  Montgomery, Alabama 36014, appearing on
6  behalf of Judith Shepard.
7  ALSO PRESENT:
8      Annie Lucas Brown
9
10      ***************
11
12      I, TAMIE J. STORY, a Court
13  Reporter of Birmingham, Alabama, acting
14  as Commissioner, certify that on this
15  date, as provided by the Federal Rules
16  of Civil Procedure and the foregoing
17  stipulation of counsel, there came
18  before me at the offices of RUSHTON,
19  STAKELY, JOHNSTON & GARRETT, 184
20  Commerce Street, Montgomery, Alabama,
21  beginning at 9:35 a.m., JUDITH SHEPARD,
22  in the above cause, for oral
23  examination, whereupon the following

2 (Pages 2 to 5)

FREEDOM COURT REPORTING

Page 6

1    proceedings were had:
2
3         JUDITH SHEPARD,
4    being first duly sworn, was examined
5    and testified as follows:
6
7         THE REPORTER:  Usual
8    stipulations?
9         MR. HUFFAKER:  Yes.
10        MS. BIGGERS:  Yes.
11        MR. CROOK:  Yes.
12
13   Q.    Would you state your full
14   name for the record, please, ma'am?
15        A.   Judith R. Shepard.
16        Q.   Mrs. Shepard, I know I've
17   met you before.  My name is Austin
18   Huffaker.  I represent the Alabama
19   Public Library Service in connection
20   with the lawsuit that Ms. Annie Brown
21   has filed.  You do understand that;
22   correct?
23        A.   Yes.

Page 7

1         Q.   And is it also correct that
2    you are a current employee of the APLS?
3         A.   Yes.
4         Q.   And you are here today
5    represented by counsel; is that
6    correct?
7         A.   Yes.
8         Q.   And that's due to an
9    ongoing employment dispute that you
10   have with the APLS of your recent
11   suspension; is that right?
12        A.   Yes.
13        Q.   And it's my understanding
14   that that dispute is going to be before
15   a hearing officer in mid June; is that
16   right?
17        A.   Yes.
18        Q.   And you intend to be
19   represented by counsel then; is that
20   correct?
21        A.   Yes.
22        Q.   Have you ever given a
23   deposition before?

Page 8

1         A.   No.
2         Q.   I'm going to ask you some
3    questions today about Ms. Brown and
4    your employment at the APLS, her
5    employment at the APLS.  It is my
6    understanding that there are going to
7    be certain topics that are going to
8    be off the table today, and we will just
9    have to address those as we get there.
10   Okay?
11        A.   Uh-huh (nodding head).
12        Q.   Some of the questions, if I
13   ask a question that you don't
14   understand or you want me to re-ask it
15   or rephrase it, you please let me know.
16   Okay?
17        A.   Uh-huh (nodding head).
18        Q.   And when you answer a
19   question, if you can answer it verbally
20   with a "Yes" or "No" instead of a nod
21   of the head --
22        A.   Instead of a nod or using
23   my hands --

Page 9

1         Q.   She can't take all that
2    down, so if I ask you a question and
3    you give me a nod of the head or a
4    "Uh-huh" or "Huh-uh," I'm probably
5    going to point at her (indicating), and
6    that means you need to answer verbally.
7    Okay?
8         A.   Okay.
9         Q.   Where do you currently
10   live, Mrs. Shepard?
11        A.   30 Tecumseh Drive,
12   Montgomery, Alabama 36117.
13        Q.   Are you currently married?
14        A.   Yes, I am.
15        Q.   What's your husband's name?
16        A.   James Crenshaw Shepard, Jr.
17        Q.   What does he do for a
18   living?
19        A.   He's retired.
20        Q.   Retired from what?
21        A.   A French teacher; a French
22   professor.
23        Q.   At what school?

3 (Pages 6 to 9)

FREEDOM COURT REPORTING

Page 14

1   that as well; is that correct?
2       A.   Yes.
3       Q.   My deposition subpoena
4   requests that you bring certain
5   documents with you today. Did you
6   bring any with you?
7       A.   I brought one (indicating).
8       Q.   And tell me what this
9   document is that you brought with you.
10      A.   That is a fax from Tina
11  Nolen, the director of the Ashland City
12  Public Library. She asked that Annie
13  Brown and I come to her library to help
14  her with a program that she was giving
15  in honor of former Governor John
16  Patterson.
17      Q.   And what happened with this
18  request?
19      A.   I asked Mr. Hulen Bivins --
20  I took the request to Mr. Bivins, and
21  he said "Annie Brown can't go."
22      Q.   Did he say why?
23      A.   "It's not her district, do

Page 15

1   you want to go?" And I said, "Well,
2   Annie was invited to go." "If she
3   can't go, do you want to go," and I
4   said "It's fine, I need to cancel or
5   change a doctor's appointment, but
6   other than that, I can go."
7       Q.   And is it correct that this
8   is not in Annie Brown's district?
9       A.   Annie doesn't have any
10  districts anymore. She's all over the
11  state with E-rate.
12      Q.   Is that a "Yes," that's not
13  her district?
14      A.   Yes.
15      Q.   Did you go to this
16  conference?
17      A.   No, because when I got
18  back, I had a message from Mr. Bivins
19  that he was going.
20      Q.   And did he go?
21      A.   Yes, he did.
22      Q.   And what is the handwriting
23  that there's on the bottom?

Page 16

1       A.   It said "Not allowed to go,
2   Hulen Bivins."
3       Q.   Do you have any other
4   documents responsive to the subpoena?
5       A.   No, I don't.
6       Q.   Do you have an E-mail
7   account at your house?
8       A.   Yes, I do.
9       Q.   What's your E-mail address?
10      A.   JRShepard@Mindspring.com.
11      Q.   Do you have any E-mails at
12  your -- on your E-mail account to and
13  from Rebecca Mitchell, Annie Brown,
14  anyone else at the APLS?
15      A.   What I have is E-mails I
16  sent to myself at home relating to my
17  position and things that have been done
18  to me at APLS.
19      Q.   And through what periods of
20  time do those E-mails date?
21      A.   Probably back to 2004.
22      Q.   Why did you bring -- not
23  bring copies of those today?

Page 17

1       A.   Because they were not about
2   Annie.
3       Q.   Who were they about?
4       A.   They were about me.
5       Q.   Any other individuals at
6   the APLS?
7       A.   Well, the whole staff.
8   There was all staff memos that went to
9   everybody.
10      Q.   Did some of these concern
11  or relate to Rebecca Mitchell?
12      A.   They were -- no. They were
13  memos that she had -- well, they were
14  memos that she had sent or Hulen Bivins
15  had sent or Harry Lensch had sent.
16      Q.   Category Number 8 on that
17  subpoena, what does that tell you to
18  bring with you today?
19      A.   E-mails, memos, reports,
20  reprimands, affidavits.
21      Q.   Concerning or relating to
22  whom?
23      A.   Rebecca Mitchell.

5 (Pages 14 to 17)

FREEDOM COURT REPORTING

Page 18

1    Q.    And who else?
2    A.    Hulen Bivins and Harry
3    Lensch.
4    Q.    And you do have documents
5    at your address that would be
6    responsive to that request?
7    A.    So do you (nodding head).
8    Q.    The question is:  Do you?
9    A.    Yes, I do.
10   Q.    Do you have any E-mails
11   that concern or relate to Annie Brown?
12   A.    Not that I know of.
13   Q.    Do you have any
14   correspondence, any letters, any memos
15   or reports concerning Annie Brown?
16   A.    No.
17   Q.    Have you given any
18   affidavits?
19   A.    No.
20   Q.    Have you ever spoken with
21   Ms. Biggers; Deborah Biggers?
22   A.    Yes.
23   Q.    How many times have you

Page 19

1    spoken with her?
2    A.    Twice.
3    Q.    When was the most recent
4    time you spoke with her?
5    A.    This week.
6    Q.    When this week?
7    A.    One night this week.  I'm
8    sorry, I don't remember which night it
9    was.
10   Q.    Was this in person or via
11   telephone call?
12   A.    Via telephone.
13   Q.    Did she call you at home or
14   at work?
15   A.    At home.
16   Q.    What time of day was it?
17   A.    At night.
18   Q.    How long did the telephone
19   call last?
20   A.    Fifteen or twenty minutes,
21   I guess.  I don't really know.
22   Q.    Anyone else on the
23   telephone call other than you and Ms.

Page 20

1    Biggers?
2    A.    No.
3    Q.    What did she ask you?
4    A.    Just about -- about the --
5    she told me about the deposition and
6    asked me what I could say about a
7    couple of things that happened.
8    Q.    What exactly  -- Did she
9    give you any topics that she was going
10   to ask you about?
11   A.    I don't know that she gave
12   me topics, she asked me -- well, I
13   guess they were topics  -- about some
14   books that were given to a Catholic
15   school.
16   Q.    What else did she ask you
17   about?
18   A.    About calling the
19   Governor's office or state personnel.
20   Q.    What else?
21   A.    And about the Bayou La Batre
22   library.
23   Q.    What else?

Page 21

1    A.    I think that's all.
2    Q.    What did you tell her?
3    A.    She asked what I knew about
4    the books given to the Catholic school,
5    and I said not very much, that as a --
6    what I understood was that a box of
7    books had been given to a small
8    Catholic school in Tuskegee.  And she
9    asked if I saw anything wrong with
10   that, and I said, well, not really; we
11   have been weeding our collection and
12   both Huntingdon, which is a Methodist
13   school, and Faulkner University, which
14   is a Church of Christ school, had been
15   out to look at our collection of weeded
16   books and had taken -- I don't know
17   about Huntingdon, but I know that
18   Faulkner University had taken thousands
19   of dollars worth of books, so I didn't
20   see any reason why a little Catholic
21   school in Tuskegee couldn't get a box
22   of books from us.
23   Q.    What else did you tell her?

6 (Pages 18 to 21)

FREEDOM COURT REPORTING

Page 22

1      A.   That's all about that. And
2   what else -- what about Bayou La Batre,
3   is that what -- she asked me what I knew
4   about Bayou La Batre, and I said I had
5   heard Ms. Mitchell say that Annie was not
6   doing her job, but that I was removed
7   from all of that because of -- what I
8   was doing about Bayou La Batre was
9   selecting books and talking with the
10  librarian about the replacement of the
11  books that she had lost because of
12  Hurricane Katrina.
13     Q.   What else did you tell her
14  about the Bayou La Batre matter?
15     A.   I -- just that Rebecca was
16  not pleased, I think. Now, I think I
17  found out that they had scheduled some --
18  I think I told her that I had heard that
19  they had scheduled some trips to Bayou La
20  Batre when Annie was off, out of town, or
21  something.
22     Q.   Were you involved in the
23  Bayou La Batre project at all?

Page 23

1      A.   Only in the fact that I was
2   selecting books. I was on the phone with
3   the librarian, but I've never been to
4   Bayou La Batre.
5      Q.   You never made any trips
6   down there?
7      A.   No, huh-uh (shaking head).
8      Q.   You weren't involved in the
9   planning for that trip?
10     A.   No.
11     Q.   You weren't involved in
12  deciding who went down there and when?
13     A.   No.
14     Q.   Did you send any of your
15  subordinates down there?
16     A.   No.
17     Q.   Anything else you discussed
18  with Ms. Biggers during this telephone
19  call about the Bayou La Batre trip?
20     A.   Not that I can think of.
21     Q.   What did you tell Ms.
22  Biggers about the phone call to the
23  Governor's office?

Page 24

1      A.   She asked me if I had ever
2   phoned the Governor's office, and I
3   said yes. And then she asked me about
4   phoning the Governor's office about
5   travel, and I said I had never had any
6   problem getting my travel money back
7   except one time when I mistakenly left
8   the price of a glass of wine on a
9   receipt and it was sent back to me, and
10  I had to take that off and resubmit the
11  form.
12     Q.   Did you tell her anything
13  else?
14     A.   No. I told her that I
15  didn't know that it was wrong to call
16  any department of state government,
17  that I had been working for the state
18  for over thirty years and I picked up
19  the phone any time I wanted to and
20  called the state government.
21     Q.   Did you tell her anything
22  else?
23     A.   Huh-uh (shaking head), not

Page 25

1   that I can remember.
2      Q.   Did you answer all the
3   questions that Ms. Biggers had for you?
4      A.   I guess I did. I don't
5   remember telling her that I would not
6   -- you know, I don't remember saying I
7   can't answer that.
8      Q.   Did you tell Ms. Biggers
9   that you couldn't answer any questions
10  because of your ongoing suspension
11  matter?
12     A.   I don't know that -- I
13  don't think so.
14     Q.   Did Ms. Biggers ask you if
15  you would be willing to sign an
16  affidavit in this case?
17     A.   No.
18     Q.   Did Ms. Biggers ask you for
19  any documents?
20     A.   No.
21     Q.   When was the other time you
22  spoke with Ms. Biggers?
23     A.   Oh, gosh, I don't know. It

7 (Pages 22 to 25)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 26

1  was -- you'd have to -- when I talked
2  to you the first time, sometime around
3  that time.
4       Q.   And when was it you spoke
5  with me?
6       A.   I don't --
7       Q.   What did she ask you the
8  first time?
9       A.   I don't really remember.
10  It was, I think, about -- basically,
11  about the same thing.
12       Q.   Well, tell me what you do
13  recall.
14       A.   What? That she called and
15  talked and that -- I simply don't
16  remember the specifics of the
17  conversation.
18       Q.   Was that a telephone
19  conversation?
20       A.   Yes, it was.
21       Q.   How long did that
22  conversation last?
23       A.   I have no idea. It was at

Page 27

1  night.
2       Q.   Have you spoken with Ms.
3  Annie Brown in the last month?
4       A.   Oh, sure.
5       Q.   Did you discuss with her
6  this lawsuit?
7       A.   Only that -- this, that I
8  was going to be deposed.
9       Q.   Did you discuss with her
10  what you could tell us about problems
11  you may have had with Rebecca Mitchell
12  or --
13       A.   No.
14       Q.   -- or Hulen Bivins or Harry
15  Lensch?
16       A.   No.
17       Q.   Have you and Annie sent any
18  E-mails to and from each other about
19  the status of this lawsuit?
20       A.   No.
21       Q.   Have you discussed with
22  Annie Brown at all about any settlement
23  negotiations that may have been ongoing

Page 28

1  in this lawsuit?
2       A.   I -- she told me that way
3  back when this started, she said she
4  had tried to work with them, and then
5  sometime or another she said that now
6  they want to settle.
7       Q.   What exactly did she tell
8  you about that?
9       A.   Just that she was -- that
10  her lawyer was working with y'all to
11  see about a settlement.
12       Q.   Did she give you any type
13  of statements about how much was being
14  discussed?
15       A.   I think she had told me
16  what she wanted.
17       Q.   And what did she tell you?
18       A.   That she -- she wanted --
19  if she left, she wanted the money that
20  she would get if she continued to work,
21  she didn't want to lose anything. And
22  she signed up for the drop program.
23       Q.   So she discussed some

Page 29

1  statements that may have been made
2  between the attorneys about the drop
3  program?
4       A.   I don't know what
5  statements were made between the
6  attorneys, but I know that she signed
7  up for the drop program, and she's got
8  another year or so and that she wants
9  that money.
10       Q.   Have you communicated at
11  all with Kim Owens in the past six
12  weeks to two months?
13       A.   I don't -- I told -- I told
14  her -- just encouragement. I told her
15  that -- somehow I knew, and I don't --
16  I honest to God don't know, that she
17  was going to be deposed, and I think I
18  just encouraged her.
19       Q.   Encouraged her to do what?
20       A.   To tell the truth like she
21  always does.
22       Q.   Have you sent her any
23  E-mails about the status of the

8 (Pages 26 to 29)

FREEDOM COURT REPORTING

Page 30

1  lawsuit?
2      A.  I've sent -- no.
3      Q.  Have you sent her any
4  E-mails about me?
5      A.  No.
6      Q.  You've not sent any E-mails
7  to Kim Owen discussing any meetings you
8  may have had with me or the status of
9  the lawsuit?
10     A.  Huh-uh (shaking head).
11     Q.  Are you sure about that?
12     A.  I'm positive.
13     Q.  Have you discussed or sent
14  any E-mails with Ms. Annie Brown about
15  any meetings you may have had with me?
16     A.  No.
17     Q.  Have you ever read the
18  reprimand that Annie Brown received?
19     A.  No.
20     Q.  As we sit here today,
21  you've never ever read it?
22     A.  Huh-uh (shaking head).
23     Q.  Is that a no?

Page 31

1      A.  Yes -- no -- yes, that's a
2  no; no, I have not.
3      Q.  Do you have any E-mails,
4  documents, correspondence, or memos
5  concerning Robert Schremser?
6      A.  No.
7      Q.  Is that "No"?
8      A.  That's a "No."
9      Q.  Have you ever received any
10  letters from Mr. Schremser?
11     A.  No.
12     Q.  Since he was terminated
13  from the APLS, have you spoken with Mr.
14  Schremser?
15     A.  Yes.
16     Q.  When have you spoken with
17  him?
18     A.  He met me and Christine and
19  Annie for lunch one day and gave --
20  returned Christine's daddy's book about
21  his experience in Vietnam.
22     Q.  When was that?
23     A.  I have no idea.  I would

Page 32

1  assume it was a few -- sometime after
2  he was fired because he still had
3  Annie's -- Christine's book.
4      Q.  Is that the only time
5  you've spoken with Mr. Schremser?
6      A.  No.
7      Q.  When else have you spoken
8  with him?
9      A.  I spoke with him concerning
10  my suspension -- after my suspension.
11  After I was suspended, I spoke with
12  him.
13     Q.  So you spoke with him
14  within the last three or four weeks?
15     A.  Uh-huh (nodding head), yes,
16  yes.
17     Q.  Was this in person or via
18  telephone?
19     A.  Phone.
20     Q.  Did you call him or did he
21  call you?
22     A.  He called me.
23     Q.  Tell us what exactly you

Page 33

1  two discussed.
2      MR. CROOK:  Just don't go
3  into the details.
4      A.  I told him that I had been
5  suspended, and he was very upset and
6  very sorry, and I told him that I might
7  need him as a witness.
8      Q.  All right.  What exactly
9  would he be a witness to?
10     A.  To what's involved in that
11  suspension.
12     Q.  What's involved in that
13  suspension?
14     MR. CROOK:  (Shaking head).
15     A.  A bunch of lies and
16  untruths concerning me.
17     Q.  Well, tell me exactly what
18  was said between you and Mr. Schremser.
19  I want to know everything that was
20  discussed.
21     MR. CROOK:  Just don't go
22  into any details.
23     THE WITNESS:  Okay.

9 (Pages 30 to 33)

FREEDOM COURT REPORTING

Page 78

1  about the treatment of Annie Brown
2  since September 7, 2007.
3          MR. CROOK: You can answer
4  that.
5      A.  I don't remember the dates,
6  I don't know the dates, and this may
7  have happened -- I don't know when this
8  happened, but she was -- this may have
9  been before this letter (indicating),
10  but she was in charge of the
11  consultants, and then suddenly she
12  wasn't.
13          Her -- she was -- she had
14  a district -- I don't remember the
15  district number, and she was the
16  consultant for that district and she
17  was removed from -- her consulting
18  duties were taken away from her.
19      Q.  Do you know when that was?
20      A.  No. Sometime this spring, I
21  think, in 2008. I don't know.
22      Q.  So sometime in 2008, she
23  had her consulting duties removed?

Page 79

1      A.  Uh-huh (nodding head).
2      Q.  Is that a "Yes"?
3      A.  Yes, I'm sorry.
4      Q.  Do you know why that was?
5      A.  No.
6      Q.  Why is that a complaint that
7  you would have or an observation that you
8  would have?
9      A.  Because her district
10  librarians really liked her, she was very
11  good at what she did, and the person that
12  they put in her place had never been a
13  consultant, had been in charge of the
14  blind and physically handicapped for
15  years and years and years and was not
16  used to working with libraries.
17      Q.  Have you had your consulting
18  duties removed?
19      A.  Since the suspension
20  (nodding head).
21      Q.  When was that exactly?
22      A.  April 22nd.
23      Q.  What duties were you given?

Page 80

1      A.  After that, I was moved back
2  to a position in reference.
3      Q.  Had you had that position
4  before?
5      A.  Not exactly the position. I
6  had been -- before the letter was
7  written, I was in charge of reference.
8      Q.  What letter was written?
9      A.  The letter of -- the
10  September 7th letter (indicating).
11      Q.  Do you believe your
12  suspension has anything to do with Annie
13  Brown?
14          MR. CROOK: You can answer
15  that.
16      A.  Yes.
17      Q.  So we're clear, you're
18  willing to answer questions about Annie
19  Brown since September 7, 2007, but
20  you're not willing to answer any
21  questions about yourself?
22      A.  Yes.
23          MR. CROOK: (Nodding head).

Page 81

1      Q.  You said that Ms. Brown was
2  in charge of consultants and then she was
3  not?
4      A.  Uh-huh (nodding head), yes.
5      Q.  Do you mean her supervisory
6  responsibilities were removed?
7      A.  Yes.
8      Q.  Do you know the circumstances
9  under which those were removed?
10      A.  No.
11      Q.  How do you know that her
12  supervisory responsibilities were
13  removed?
14      A.  Because they had a full staff
15  meeting and announced that she -- that
16  Hulen Bivins would be in charge of the
17  consultants.
18      Q.  What happened exactly at the
19  staff meeting?
20      A.  They made that announcement,
21  and I don't remember what else, but that
22  Hulen Bivins would be in charge of the
23  consultants.

21 (Pages 78 to 81)

FREEDOM COURT REPORTING

Page 82

1  Q.  Nothing else was said during
2  that staff meeting about that?
3  A.  It could have been, but I
4  don't remember.
5  Q.  What other complaints can
6  you tell me about concerning Annie
7  Brown since September 7, 2007?
8  A.  I have watched Mr. Bivins
9  ignore her, just come in and walk right
10 past her and exclude her from things.
11 Q.  And how exactly has he
12 ignored her?
13 A.  By walking right past her and
14 not speaking or telling her things.
15 Q.  Like what?
16 A.  Things that the people who
17 work with public libraries in the state
18 need to know.
19 Q.  Like what?
20 A.  Like the dates or when
21 there's going to be a -- the legislative
22 meeting or what programs that we need to
23 be planning or that sort of thing.

Page 83

1  Q.  Has he ignored you?
2  A.  Well, it's sort of hard to
3  say whether I'm ignoring him or he's
4  ignoring me.
5  Q.  In your mind, has he ignored
6  you?
7  A.  Yes.
8  Q.  Has he ignored other
9  individuals there at the APLS?
10 A.  I don't know.
11 Q.  Anybody else complain to you
12 about him ignoring them?
13 A.  People don't -- nobody has
14 complained to me about him ignoring
15 them.
16 Q.  Has anyone else at the APLS
17 had their supervisory responsibilities
18 removed?
19 A.  Not that I know of.
20 Q.  Have you ever had your
21 supervisory responsibilities removed?
22 A.  Yes.
23 Q.  Do you know when that was?

Page 84

1  A.  Yes.  Two weeks after I wrote
2  this letter.
3  Q.  Do you know why that was?
4  A.  I know the reason that was
5  given and I know the reason why I
6  think.
7  Q.  What was the reason that
8  was given?
9  A.  That I volunteered to be a
10 consultant, that I -- and that I would be
11 in charge of state-wide training.
12 Q.  What is the reason that you
13 think?
14 A.  Because that's a complete
15 lie.  I did not volunteer to be a
16 consultant.
17 Q.  Any other complaints about
18 Ms. Brown for that time period?
19 A.  Not that I can remember
20 -- wait a minute.  I don't know if it was
21 this time period, but she was doing a
22 workshop for E-rate and she needed some
23 notebooks to put the E-rate material in,

Page 85

1  and Mr. Bivins said she couldn't have
2  them.
3  Q.  When was that?
4  A.  I don't really know when it
5  was.  The notebooks were a big --
6  stupid.
7  Q.  Is this something that you
8  overheard Mr. Bivins say or is this
9  something that Ms. Brown told you about?
10 A.  Ms. Brown was trying to get
11 her workshop up on E-rate.  It's a very
12 complicated procedure that I hope I
13 never have to understand.  And she had
14 a lot of material that she wanted to
15 give to the librarians, and she asked
16 for these black notebooks.  And she had
17 to use big clips bigger than that
18 (indicating), I think, because she was
19 denied the notebooks.
20 Q.  Again, my question is:  Is
21 this something you overheard Mr. Bivins
22 say or was this something Ms. Brown told
23 you?

22  (Pages 82 to 85)

FREEDOM COURT REPORTING

Page 90

1  know I have the right to write you, but I
2  have feared reprisal because of the way
3  people are now being treated at the
4  APLS." Well, what way are people being
5  treated at the APLS?
6      A.  They were -- they have been
7  given reprimands -- unfair reprimands;
8  they have been treated harshly having
9  to move equipment and supplies and
10 books without help. Several of them
11 left the agency because of the way they
12 were treated.
13     Q.  Okay. You told me earlier
14 that staff had been demoralized.
15     A.  Uh-huh (nodding head), yes.
16     Q.  What staff?
17     A.  The entire agency.
18     Q.  Did that include you?
19     A.  Yes.
20     Q.  Can you give me some other
21 names?
22     A.  Let me start. Jackie Barnes,
23 Tonya Moore, Beverly Davis, Dorothy

Page 91

1  Baker, Rufus Brown, Christine Bowman,
2  Jackie Pinkard, Ruth Evans, Janet
3  Hamilton, Al Craig. There were several
4  people in the business office that left
5  because of the way they were treated. I
6  can't remember their names now.
7      Q.  When you say "staff was
8  demoralized," was that your observation
9  or is that what these individuals were
10 telling you?
11     A.  This is my observation when I
12 walk around and I see people, the way
13 they look, and I see things that have
14 happened to them and I have heard things
15 that were said to them.
16     Q.  And what's been said to
17 them?
18     A.  Well, I've heard the way Mr.
19 Bivins talks to people, he belittles
20 them, he is sarcastic, he treats them
21 like they don't know what they're talking
22 about, that sort of thing.
23     Q.  Has he belittled you?

Page 92

1      A.  In the reprimand (nodding
2  head), he most certainly has.
3      Q.  Other than the reprimand,
4  has he belittled you?
5      A.  Well, he ignores me and he's
6  been sarcastic.
7      Q.  He has been sarcastic with
8  you before?
9      A.  Oh, yes.
10     Q.  You also told me that
11 individuals had been treated terribly.
12     A.  Uh-huh (nodding head), yes.
13     Q.  Who's been treated terribly
14 and how were they treated?
15     A.  Beverly Davis eventually
16 retired. She -- Beverly worked for the
17 agency for over twenty years, never been
18 any problem to anybody, steady, a really
19 nice person. She made a horrible mistake
20 which she didn't realize at the time.
21 She got married to somebody who turned
22 out not to be the kind of person he
23 should have been, and she had a lot of

Page 93

1  problems because of that.
2          Mr. Bivins proceeded to tell
3  her how she should conduct her marriage
4  and what she should do in very belittling
5  tones.
6      Q.  Was it belittling tones or
7  things he actually said?
8      A.  He told her she ought to get
9  a divorce, that she couldn't take time
10 off to go and settle this. We had a --
11 she came to me -- I was her supervisor at
12 the time, and he (sic) came to me -- she
13 came to me with a letter requesting a
14 leave of absence. She -- and she said
15 that she had to find out about this
16 marriage and see if she could make this
17 marriage work.
18         And I told her that we would
19 -- that I would write a letter, a note to
20 Becky saying that we would manage without
21 her if she wanted to take, I don't
22 remember the time, a month or so off to
23 see if she could settle this, because in

24 (Pages 90 to 93)

FREEDOM COURT REPORTING

Page 182

1  right?
2     A.  Yes.
3     Q.  Have you ever been
4  reprimanded or warned for giving
5  misleading answers to questions posed
6  by the director of the APLS?
7     A.  Not unless you want to count
8  all of that stuff about the videos.
9     Q.  How about in direct questions
10 posed to you by the director of the APLS?
11    A.  Ask me that again.
12    Q.  How about direct questions
13 posed to you by the --
14    A.  What about direct
15 questions?
16    Q.  Have you ever given -- have
17 you ever been disciplined for giving any
18 misleading answers to questions posed by
19 the director of the APLS?
20    A.  Not that I know of (shaking
21 head).
22    Q.  Have you ever been
23 disciplined for refusing to answer

Page 183

1  specific questions posed to you by the
2  director of the APLS?
3     A.  Not yet.
4     Q.  Do you anticipate refusing
5  answering questions?
6     A.  God knows what's coming next.
7     Q.  What has Ms. Brown told you
8  about her reprimand?
9     A.  Nothing.
10    Q.  She hasn't said a word to you
11 about it?
12    A.  I knew she had one, but I
13 didn't know anything about it.
14    Q.  How did you know about it?
15    A.  She told me.
16    Q.  What has she told you about
17 the travel reimbursement issue?
18    A.  She was having trouble
19 getting her travel money.
20    Q.  Did she tell you how she
21 paid for her travel?
22    A.  Huh-uh (shaking head), no.
23    Q.  Did you have your supervisory

Page 184

1  responsibilities removed at some point?
2     A.  Yes, I did.
3     Q.  When was that?
4     A.  About two weeks after I
5  wrote this letter to the board.
6     Q.  You did not have your
7  supervisory responsibilities removed as
8  a result of your reprimand?
9     A.  No.
10    Q.  Was your performance
11 appraisal docked because of the
12 reprimand?
13    A.  Yes, seven points.
14    Q.  Is that a state policy?
15    A.  Yes.  But it obviously can
16 be changed because they changed
17 Dorothy's.
18        MR. HUFFAKER:  Move to strike
19 as nonresponsive.
20    Q.  Were you assigned to APLS
21 consultant status at some point?
22    A.  Yes.
23    Q.  Do you know why that was?

Page 185

1     A.  Well, I assume it was two
2  weeks -- because it was two weeks after
3  my letter to the board.  And since I
4  was not asked about it, I was told that
5  I would do it, I assume that they
6  wanted to get me out of the building.
7     Q.  What is the discussion that
8  you had with Mr. Bivins about serving in
9  a consultant capacity?
10    A.  What do you mean what is
11 the discussion?
12    Q.  Did you and Mr. Bivins have
13 some sort of discussion at some point?
14    A.  He gave me a memo -- he gave
15 me whatever you call it, telling me that
16 that would be my temporary assignment,
17 then I wrote him a response to that, and
18 I sent that response to the board, to the
19 Governor, and to the state personnel.
20
21    (Whereupon, Defendant's Exhibit 6
22    was marked for identification and
23    same is attached hereto.)

47  (Pages 182 to 185)

FREEDOM COURT REPORTING

Page 198

1    MR. HUFFAKER: I'm going to
2  tender the witness at this point. I do
3  reserve the right to come back and depose
4  her again once we address the issues
5  about questions that I wanted to ask that
6  she's been instructed not to answer and
7  to follow back up with the documents that
8  I requested pursuant to the subpoena.
9    MR. CROOK: Okay.
10
11    (Whereupon, a brief recess was
12    taken.)
13
14  EXAMINATION BY MS. BIGGERS:
15    Q.    Good afternoon, Mrs.
16  Shepard.
17    A.    Hello.
18    Q.    My name is Deborah Biggers,
19  and I represent Ms. Annie Brown in this
20  litigation which is the subject of this
21  deposition today. If there's any
22  question that I ask that you don't
23  understand, please let me know, and

Page 199

1  I'll be glad to rephrase it.
2    A.    Okay.
3    Q.    Otherwise, I'll assume you
4  understood the question when you
5  provided me with your response.
6    A.    Thank you.
7    Q.    First I want to go to a
8  question that was raised on your direct
9  examination when you were asked if I had
10  spoken with you by telephone.
11    A.    Yes.
12    Q.    And I believe you responded
13  yes; is that correct?
14    A.    Right.
15    Q.    At any time during my
16  telephone conversations with you, did I
17  ever ask you to say anything but the
18  truth?
19    A.    No.
20    Q.    I also want to refer you to
21  what I have marked for identification
22  purposes as Plaintiff's Exhibit 1.
23

Page 200

1    (Whereupon, Plaintiff's Exhibit 1
2    was marked for identification and
3    same is attached hereto.)
4
5    Q.    And that's a document that
6  you brought to this deposition --
7    A.    Right.
8    Q.    -- today.
9    Can you describe again what
10  this document is; Plaintiff's Exhibit 1?
11    A.    Tina Nolen, Director of
12  Ashland City Public Library, called Annie
13  and wanted to know if Annie and I could
14  come and help her with a big program that
15  she was having the next day. She was
16  having former Governor John Patterson
17  there to autograph his books, and
18  apparently there was going to be a
19  luncheon and there would be a lot of
20  people there, and she needed help.
21    Q.    Although the letter or memo
22  is not dated, I see a date at the top
23  where it was faxed --

Page 201

1    A.    Right.
2    Q.    -- April 16, 2008 --
3    A.    Right.
4    Q.    -- is that correct?
5    A.    Yes.
6    Q.    I believe you testified that
7  Mr. Bivins told you that you could go; is
8  that correct?
9    A.    He never said -- he said, "Do
10  you want to go?" He said -- he
11  immediately looked at it, and he said
12  "Annie Brown can't go," he said, "Do you
13  want to go?" And I said, "Yes, it's
14  fine, all I need to do is cancel or
15  change a doctor's appointment."
16    Q.    And did Mr. Bivins
17  specifically state why Ms. Brown could
18  not attend?
19    A.    Well, he said -- he said,
20  "It's not her district," and I said, "But
21  she was invited."
22    Q.    Have any other white
23  consultants or library operations

51 (Pages 198 to 201)

FREEDOM COURT REPORTING

Page 202

1   managers gone to events at public
2   libraries throughout the state that
3   weren't in their district?
4       A.  I'm sure they -- yes.
5       Q.  Did you have a response to
6   Mr. Bivins when he said that Ms. Brown
7   could not go because the library was not
8   in her district?
9       A.  I said "But Tina asked that
10  she come."
11      Q.  Do you believe that Mr.
12  Bivins' refusal to allow Ms. Brown to
13  attend this event at Ashland City Library
14  was related to the fact that Ms. Brown is
15  black?
16      MR. HUFFAKER:  Object to the
17  form.  Pure speculation.
18      Q.  You can answer.
19      A.  I don't know.
20      Q.  I believe you also testified
21  under direct examination that there were
22  some discussions during our telephone
23  conversation about some books that Ms.

Page 203

1   Brown had given to a Catholic school.
2       A.  Uh-huh (nodding head).
3       Q.  Can you tell me, were these
4   excess books?  Can you describe for me
5   what these books were?
6       A.  I'm not really sure what they
7   were.  They were either books that had
8   been discarded from our collection or
9   they were publisher's books that come to
10  our agency automatically.  I don't know
11  which they were.
12      Q.  Okay.  Can you tell me,
13  what is the general procedure for
14  handling books that are discarded from
15  your collection?
16      A.  We can take them, pull the
17  ones we want for specific libraries,
18  libraries can come and take them, select
19  them and sign off on how many -- how many
20  books they take.  We just need --
21  apparently for inventory, they just need,
22  you know, like they took six books or
23  four videos or whatever.

Page 204

1       Q.  So these books that are
2   discarded from your collection are
3   generally distributed to other libraries
4   throughout the state?
5       A.  They're distributed to other
6   libraries.
7       Q.  And the Catholic school
8   which Ms. Brown donated some library
9   books, was that a Catholic school in
10  the State of Alabama?
11      A.  I think it was in Tuskegee.
12      Q.  And what's the other
13  category of books?
14      A.  I don't know what you call
15  them, but publishers usually of
16  children's books, the publishers --
17  they're overstocks, I think, that
18  publishers send because they haven't
19  sold them, and they're saved there to
20  give to libraries.
21      Q.  So when you say they are
22  saved, they're to give to libraries?
23      A.  Uh-huh (nodding head).  They

Page 205

1   are put in a place, and like when I went
2   to Dutton, which is a new library, then I
3   went and picked a box of books to take.
4       Q.  All right.  And what you
5   just described is APLS' policy
6   regarding these books?
7       A.  As far as I know (nodding
8   head).
9       Q.  So if Ms. Brown -- if the
10  books that Ms. Brown gave to the
11  Catholic school in Tuskegee were
12  publishers' overstocks, what she did,
13  was that consistent with APLS' policy
14  regarding those books?
15      A.  They could be given away to
16  any school as far as -- or library as
17  far as I know.
18      Q.  So to answer my question --
19      A.  Yes.
20      Q.  -- what she did was, in
21  fact, consistent with APLS' policy?
22      A.  Yes.
23      Q.  You also testified under

52  (Pages 202 to 205)

FREEDOM COURT REPORTING

Page 206

1    direct examination that Ms. Brown had a
2    workshop that she had to do --
3        A.   Yes.
4        Q.   -- on E-rate --
5        A.   Yes.
6        Q.   -- and Mr. Bivins would not
7    let her use some notebooks; is that
8    correct?
9        A.   Yes.
10       Q.   And did this occur around
11   in August of 2007?
12       A.   I don't know.
13       Q.   Could it have been?
14       A.   It was last year.  I don't
15   know really when it was.
16       Q.   Now, were these notebooks
17   that were already in stock?
18       A.   Yes.  They were gift
19   notebooks.
20       Q.   So it did not necessitate
21   the APLS to incur any expenses to go
22   and buy notebooks?
23       A.   No.  It saved them money.

Page 207

1        Q.   And I believe you testified
2    that even -- that you had used some of
3    these notebooks in the past; is that
4    correct?
5        A.   Yes.  In fact, they came to
6    me initially.
7        Q.   Where are these notebooks
8    generally kept?
9        A.   In storage, and I don't --
10   there's so many nooks and crannies there,
11   I don't really know exactly where they
12   are.
13       Q.   But they're kept on-site?
14       A.   Right.  The last time I got
15   some, Jim Smith got them; the other
16   consultant I was working with got them.
17       Q.   And what is Jim Smith's
18   race?
19       A.   White.
20       Q.   And you testified that
21   he was able to use some of these
22   notebooks?
23       A.   Yes.

Page 208

1        Q.   And you also testified that
2    Mr., I think, Bivins had said that APLS
3    employees steal supplies --
4        A.   Yes.
5        Q.   -- when you were talking
6    about the pens?
7        A.   Yes.
8        Q.   Was this in reference to pens
9    that had to be purchased, like purchase
10   orders to buy pens?
11       A.   We have a supply room, and
12   when you need supplies, there's usually
13   one person in each department who gets up
14   a list of supplies and takes it to -- I
15   guess, now to him and he approves it.
16   And so that's how you get them if you run
17   out of pens or paper or tape or folders
18   or whatever.
19       Q.   So when you were asking about
20   some pens, my question is:  Was it as a
21   result of a submission of a list to
22   purchase pens or were they to use pens
23   that were already there in stock?

Page 209

1        A.   I'm assuming they were in
2    stock.
3        Q.   Well, when Mr. Bivins claimed
4    that he was not going to purchase any
5    pens, were these new pens?
6        A.   I don't know.  I didn't hear
7    him claim he was not going to purchase,
8    what I heard was we were not getting any
9    more supplies because we stole them, and
10   that was from his secretary's mouth
11   directly.
12       Q.   So you didn't know whether
13   she meant whether or not they weren't
14   going to purchase anymore?
15       A.   Well, they buy -- they keep a
16   stock of supplies there, and I guess they
17   buy them when they run out.  I don't
18   really -- that's not something I've ever
19   had to deal with.
20       Q.   I believe you listed some
21   personnel divisions --
22       A.   Uh-huh (nodding head).
23       Q.   -- about -- in response to

53 (Pages 206 to 209)

FREEDOM COURT REPORTING

Page 210

1  the question as to who was stealing the
2  -- Mr. Bivins' secretary said that were
3  stolen.
4      A.   Uh-huh (nodding head).
5      Q.   Can you tell me what those
6  divisions were again?
7      A.   They were the divisions
8  that he supervised, and that would be
9  information services, which existed at
10 that time and --
11     Q.   Let me ask you a question.
12     A.   Uh-huh (nodding head).
13     Q.   Was Ms. Brown in that
14 division or the library operations
15 manager for that division?
16     A.   You know, I don't know
17 whether she was still answering to Becky
18 or whether Hulen was supervising her by
19 that time. I really -- I can't remember
20 those -- I don't know exactly when that
21 -- I mean, I remember it, I remember, but
22 I don't remember the date.
23     Q.   All right.

Page 211

1          MS. BIGGERS:  The long
2  letter, is that Defendant's Exhibit 3?
3          MR. HUFFAKER:  The long
4  letter?
5          MS. BIGGERS:  The long letter
6  that you questioned --
7          MR. HUFFAKER:  Yes, it's
8  Number 7.
9      Q.   Mrs. Shepard, during your
10 direct examination, you indicated that
11 you felt that the employees at APLS had
12 been given unfair reprimands. Do you
13 recall that?
14     A.   Right.
15     Q.   Was Ms. Brown one of the
16 individuals that you felt was -- had
17 received an unfair reprimand?
18          MR. HUFFAKER:  Object to the
19 form, but you can answer.
20     A.   I don't know what was in Ms.
21 Brown's reprimand, but I know that the
22 reprimand I received and the reprimand
23 Dorothy received were totally unfair and

Page 212

1  wrong.
2      Q.   What's Dorothy's full name?
3      A.   Dorothy Baker.
4      Q.   And what is Dorothy Baker's
5  race?
6      A.   Black.
7      Q.   Is Dorothy Baker still
8  employed with APLS?
9      A.   Yes, she is.
10     Q.   In what capacity?
11     A.   She's a library technician.
12     Q.   But she's not an operations
13 manager?
14     A.   No.
15     Q.   And you also testified
16 about some individuals you thought were
17 treated unfairly.
18     A.   Uh-huh (nodding head).
19     Q.   And one was -- is that
20 Tonya or Latonya Moore?
21     A.   Tonya Moore.
22     Q.   What's her race?
23     A.   Black.

Page 213

1      Q.   And is she currently
2  employed with APLS?
3      A.   No.
4      Q.   Did she leave voluntarily?
5      A.   Well, she took another job
6  because she was not happy with the way
7  things were.
8      Q.   All right. I believe you
9  also testified about an APLS employee,
10 Beverly Davis?
11     A.   Yes.
12     Q.   What is Beverly Davis'
13 race?
14     A.   Black.
15     Q.   Ms. Davis, I believe you
16 testified that she had asked initially to
17 go and visit her husband in Texas --
18     A.   Uh-huh (nodding head).
19     Q.   -- is that correct?
20     A.   Uh-huh (nodding head), yes.
21     Q.   And she was approved to go?
22     A.   Ms. Mitchell gave her
23 verbal approval to go.

54  (Pages 210 to 213)

FREEDOM COURT REPORTING

Page 214

1    Q.   All right.  And did Ms.
2  Davis leave in reliance upon Ms.
3  Mitchell's approval?
4    A.   Yes, she did.
5    Q.   And I believe you testified
6  that Mr. Bivins came back the next day
7  and found out about it?
8    A.   The next day or so, I don't
9  know, yes.
10    Q.   And do you know what Mr.
11  Bivins' actions were in response to Ms.
12  Davis' leave?
13    A.   He came to me and asked me if
14  I had a phone number for Beverly in
15  Texas.  And I said yes, and he said he
16  was going to call her and tell her if she
17  wanted her job, she'd better come back.
18  And I said, "Rebecca gave her
19  permission," and he said, "She did not."
20    Q.   All right.  Do you know if
21  Mr. Bivins called Beverly Davis and told
22  her to be back the next day if she wanted
23  to keep her job?

Page 215

1    A.   As far as I know, he did
2  (nodding head).
3    Q.   I believe you also testified
4  that a Mr. Rufus Brown had been treated
5  unfairly.  Do you know his race?
6    A.   Black.
7    Q.   And what was his job
8  description?
9    A.   He was a maintenance man.  I
10  don't know any of the specifics of that.
11    Q.   All right.  You also
12  testified that Mr. Hulen Bivins belittles
13  people.  Did you ever have an occasion to
14  hear of him belittling Ms. Brown; Annie
15  Brown?
16    A.   Not verbally, but I saw him
17  walk by her and ignore her.
18    Q.   All right.  And do you
19  think that was reasonable under the
20  circumstances that you observed?
21    A.   I thought it was rude.  It
22  wasn't right.
23    Q.   Did you see him walk by and

Page 216

1  speak to white librarian operations
2  managers at APLS?
3    A.   They were consultants
4  (nodding head).
5    Q.   He spoke to them?
6    A.   Yes.
7    Q.   Did you ever hear Mr. Bivins
8  be sarcastic to Ms. Brown?
9    A.   I don't remember any
10  specific examples, but he was (nodding
11  head).
12    Q.   I believe you also mentioned
13  Dorothy Baker, and I believe you
14  testified she's black; is that correct?
15    A.   Right.
16    Q.   Did you ever see Mr. Bivins
17  mistreat Ms. Baker because of her race?
18    MR. HUFFAKER:  Object to the
19  form.  Calls for speculation.
20    A.   I think that the fact that he
21  made Dorothy and Beverly move all those
22  videos was -- I don't -- was -- he was
23  trying to hurt them, belittle them.

Page 217

1    Q.   All right.  And does APLS
2  employ maintenance people or other
3  personnel who could perform such moving
4  tasks?
5    A.   Yes.
6    Q.   You also mentioned a Jackie
7  Barnes?
8    A.   Yes.
9    Q.   What is the race of Jackie
10  Barnes?
11    A.   Black.
12    Q.   What did you ever observe Mr.
13  Bivins do that was inappropriate to
14  Jackie Barnes because of her race?
15    A.   I never saw --
16    MR. HUFFAKER:  Object to the
17  form.  Calls for speculation.
18    Q.   You can answer.
19    A.   I did not see him do
20  anything.  She told me that she was not
21  happy there and that she didn't like the
22  way he -- the things he said or did.
23    Q.   Did she ever tell you

55 (Pages 214 to 217)

FREEDOM COURT REPORTING

Page 218

1    anything specific about what he said?
2        A.    Only about the pens, but
3    nothing relating directly to her.
4        Q.    All right.  You also
5    testified that Latonya Moore, who is
6    black --
7        A.    Uh-huh (nodding head).
8        Q.    -- had her duties and
9    responsibilities removed; is that
10   correct?
11       A.    I don't remember saying
12   that.
13       Q.    Well, did she?
14       A.    They changed what she did,
15   but I don't really know the specifics of
16   it.
17       Q.    Have you ever heard Mr. Harry
18   Lensch make any inappropriate or racist
19   comments to Ms. Annie Brown?
20       A.    No.
21       Q.    What about Rebecca Mitchell
22   make any racial slurs or inappropriate
23   comments to Ms. Brown because of her

Page 219

1    race?
2        A.    No.
3        Q.    Have I mentioned the names
4    of all of the black or African American
5    employees that you are aware of that
6    have been mistreated by APLS?
7        A.    I don't know (laughing).
8        Q.    We've talked about Latonya
9    Moore, Beverly Davis, Rufus Brown, Annie
10   Brown, Dorothy Baker, Jackie Barnes.
11       A.    There was a young woman named
12   -- I think it was -- I'm not sure of the
13   spelling, Chante who left, and then there
14   was another young woman, Felecia.
15       Q.    What do you know about Chante
16   and her mistreatment at APLS?
17       A.    It's strictly rumor, that
18   they got mad at her because she left and
19   put something ugly in her file.
20       Q.    When you say "she left," how
21   long was she employed?
22       A.    I don't know.
23       Q.    Do you know where she was

Page 220

1    employed; in what division?
2        A.    She was in the division that
3    Harry Lensch supervises.
4        Q.    Did you ever have any
5    conversation with Chante about why she
6    left?
7        A.    No.
8        Q.    What about Felecia, whose
9    division was she in?
10       A.    The same one.
11       Q.    And she's black?
12       A.    Uh-huh (nodding head).
13             MR. HUFFAKER:  Is that a
14   "Yes"?
15       A.    Yes, she's black.
16       Q.    When you say "same division,"
17   the division that was under Hulen Bivins'
18   supervision?
19       A.    No, Harry Lensch's.
20       Q.    Harry Lensch's?
21       A.    Yes.
22       Q.    Do you have any knowledge
23   about why Felecia left?

Page 221

1        A.    Once again, only hearsay.
2        Q.    What was that?
3        A.    Mr. Bivins said something
4    when he was told that she went to
5    school at Alabama State, he said
6    something about "I guess you have an
7    athletic scholarship" or something like
8    that.
9        Q.    Do you know how long Felecia
10   was employed there?
11       A.    Two weeks.
12       Q.    Do you know where she's
13   employed now?
14       A.    I think she went back to
15   revenue.
16       Q.    Do you know if Felecia
17   complained to Rebecca Mitchell about
18   these comments made?
19       A.    No, no.  This is hearsay
20   from different people, and I don't have
21   any idea.
22       Q.    Are you familiar with a
23   Ronald Barnes?

56 (Pages 218 to 221)

FREEDOM COURT REPORTING

Page 222

1    A.   Yes.
2    Q.   Was he employed at APLS?
3    A.   Yes.
4    Q.   In what capacity, if you
5  know?
6    A.   I think it was a library --
7  he was a library technician.
8    Q.   What was his race?
9    A.   Black.
10   Q.   And did he leave?
11   A.   Yes.
12   Q.   Do you know why he left
13 APLS?
14   A.   Once again, this is hearsay.
15 He had been very sick, had to have some
16 surgery, and they told him if he ran out
17 of sick leave or leave after that, then
18 he would be fired.  And he ran out of
19 leave and just didn't come back to work.
20   Q.   Do y'all have a sick bank?
21   A.   No.
22   Q.   Do you have any kind of
23 procedures where one employee can loan

Page 223

1  another employee leave?
2    A.   I think that's a state -- I
3  think within state government there is
4  that procedure, and I -- it's been done
5  before, but I don't really -- in fact, it
6  may have been done when he had that
7  surgery, but I don't know the details of
8  it or the specifics.
9    Q.   Do you know of any white
10 employees who ran out of leave for
11 whatever reason while they were out sick
12 and they were not terminated or told that
13 they would be terminated?
14   A.   No.  I mean, well, wait a
15 minute.  Things may have happened
16 before -- in the past before all these
17 people were here.
18   Q.   Mrs. Shepard, I'm going to
19 show you what has been marked for
20 identification purposes as Defendant's
21 Exhibit 4, and I believe you testified
22 that that was an employee reprimand that
23 you received --

Page 224

1    A.   Yes.
2    Q.   -- is that correct?
3    A.   Yes.
4    Q.   And the date of that
5  reprimand is February 27, 2006; is that
6  correct?
7    A.   Yes.
8    Q.   In that reprimand -- And
9  this is a reprimand from Mr. Hulen
10 Bivins?
11   A.   Yes, it is.
12   Q.   In that reprimand, did Mr.
13 Bivins accuse you in Paragraph 1 of
14 showing inattention to your job resulting
15 in a failure to perform your job thus
16 causing a disruptive influence?
17   A.   Well, that's what it says,
18 but I don't really know what that means.
19   Q.   Okay.  On Page 2 of your
20 reprimand, did Mr. Bivins accuse you of
21 insubordination in Number 2?
22   A.   Yes -- I guess -- yes.
23   Q.   Isn't it a fact that he

Page 225

1  accused you of being insubordinate on
2  two occasions in the next paragraph?
3    A.   Because of -- yes.
4    Q.   Now, did you have your --
5  strike that.
6         Did you supervise any
7  employees during the time you received
8  this February 27, 2006 reprimand?
9    A.   Yes, I did.
10   Q.   And at that time, were you
11 considered a library operations manager?
12   A.   Yes, I was.
13   Q.   After receiving this
14 reprimand, did any of your supervisory
15 responsibilities -- were they removed?
16   A.   No.
17   Q.   You are aware that Ms. Annie
18 Brown received a reprimand on July 25,
19 2006 later that year?
20   A.   I didn't -- no, I didn't
21 know.  I didn't know the date or
22 anything.
23   Q.   But you are aware that she

57  (Pages 222 to 225)

FREEDOM COURT REPORTING

| | Page 226 |
|---|---|
| 1 | received a reprimand? |
| 2 | A.   Yes, that's about it. |
| 3 | Q.   Are you aware that her |
| 4 | supervisory responsibilities were removed |
| 5 | upon receipt of this reprimand? |
| 6 | A.   I did not know that that's |
| 7 | when her -- I knew that her supervisory |
| 8 | experience -- whatever the word -- were |
| 9 | removed, but I did not know -- at that |
| 10 | time, I did not know it was as a result |
| 11 | of a reprimand. |
| 12 | Q.   Do you know who was given her |
| 13 | supervisory responsibilities following |
| 14 | its removal in July of 2006? |
| 15 | A.   Hulen Bivins. |
| 16 | Q.   And he's a white male; is |
| 17 | that correct? |
| 18 | A.   Yes. |
| 19 | Q.   Do you know a Janet |
| 20 | Hamilton? |
| 21 | A.   Yes, I do. |
| 22 | Q.   What is her race? |
| 23 | A.   White. |

| | Page 227 |
|---|---|
| 1 | Q.   And is she a library |
| 2 | operations manager? |
| 3 | A.   Yes, she is. |
| 4 | Q.   Are you aware that Ms. |
| 5 | Hamilton received a reprimand for putting |
| 6 | diesel fuel in the agency -- when I say |
| 7 | agency, I mean, APLS' van? |
| 8 | A.   Some -- some car, yes, I'm |
| 9 | aware. |
| 10 | Q.   Are you aware of that? |
| 11 | A.   Yes, I am. |
| 12 | Q.   And does Ms. Hamilton |
| 13 | supervise employees? |
| 14 | A.   Yes, she does. |
| 15 | Q.   Did this reprimand occur on |
| 16 | July 21, 2007; around that time in 2007? |
| 17 | A.   It was in the summer, because |
| 18 | she was in one of the cars that didn't |
| 19 | have air conditioning, I think. |
| 20 | Q.   And were her supervisory |
| 21 | responsibilities removed? |
| 22 | A.   No. |
| 23 | MR. HUFFAKER:  Let's go off |

| | Page 228 |
|---|---|
| 1 | the record. |
| 2 | |
| 3 | (Whereupon, a discussion was held |
| 4 | off the record.) |
| 5 | |
| 6 | Q.   And did that action result |
| 7 | in severe damage to the agency's van? |
| 8 | A.   I don't -- it was fixed. |
| 9 | Q.   But it had to be fixed? |
| 10 | A.   Yes. |
| 11 | Q.   Mrs. Shepard, in looking at |
| 12 | Defendant's Exhibit 3, which is your |
| 13 | September 7, 2007 -- |
| 14 | A.   Letter. |
| 15 | Q.   -- letter -- |
| 16 | A.   Okay. |
| 17 | Q.   -- to Mrs. Donald Dickey -- |
| 18 | A.   Donna Dickey, yes. |
| 19 | Q.   -- right, I see that you sent |
| 20 | a copy to Governor Bob Riley. |
| 21 | A.   Right. |
| 22 | Q.   Did you receive any kind of |
| 23 | reprimand for sending this letter to the |

| | Page 229 |
|---|---|
| 1 | Governor? |
| 2 | A.   No. |
| 3 | Q.   I also see that what has been |
| 4 | marked as Defendant's Exhibit 8, which is |
| 5 | your October 4, 2007 letter to Hulen |
| 6 | Bivins regarding your temporary change of |
| 7 | duties -- |
| 8 | A.   Yes. |
| 9 | Q.   -- I see you also sent a copy |
| 10 | of this letter to the Governor? |
| 11 | A.   Yes, I did. |
| 12 | Q.   Did you receive any kind of |
| 13 | disciplinary action or reprimand for |
| 14 | sending this letter to the Governor? |
| 15 | A.   No. |
| 16 | Q.   Has the Alabama Public |
| 17 | Library Service ever issued any kind of |
| 18 | policy, written or verbal, prohibiting |
| 19 | your employees from checking on their |
| 20 | out-of-state travel with the Governor's |
| 21 | office? |
| 22 | A.   No. |
| 23 | Q.   Even though you testified |

58 (Pages 226 to 229)

FREEDOM COURT REPORTING

| Page 230 | Page 232 |

Page 230

1  that you have not contacted the
2  Governor's office about your out-of-state
3  travel, have you had an occasion to call
4  the Governor's office about anything else
5  other than these letters that I've just
6  questioned you about (indicating)?
7      A.   No.
8      Q.   Do you know if anyone else
9  has ever called the Governor's office,
10  specifically white employees, to check on
11  their travel --
12      A.   No.
13      Q.   -- being processed?
14      A.   No.
15      Q.   You're unaware if they
16  have?
17      A.   I am not aware.
18      Q.   Have you taken out-of-state
19  travel?
20      A.   Yes, not recently.
21      Q.   All right. Approximately how
22  long does it generally take your
23  out-of-state travel to be processed, if

Page 231

1  you can recall?
2      A.   I don't remember there
3  being any really long delay. I think I
4  got my money back in time to pay my
5  credit card bills.
6      Q.   When you say that, within
7  how long?
8      A.   Like a month, three weeks,
9  something like that.
10      Q.   You also testified under
11  direct examination about a phrase in one
12  of these letters, master's degree in --
13      A.   Lingering stupidity.
14      Q.   -- lingering stupidity.
15      A.   Yes.
16      Q.   And who are those comments
17  attributed to?
18      A.   Harry Lensch.
19      Q.   Do you have any kind of
20  understanding what Mr. Lensch was
21  referring to when he said master's degree
22  in lingering stupidity?
23      A.   Mr. Lensch doesn't like

Page 232

1  librarians.
2      Q.   All right.
3      A.   He's doesn't know what a
4  library does or is supposed to do.
5      Q.   So are you saying he was
6  referring to librarians who had a
7  master's degree in library services?
8      A.   Yes.
9      Q.   Do you believe, based on
10  your observations of Harry Lensch, that
11  he's a racist?
12          MR. HUFFAKER: Object to the
13  form. Calls for speculation.
14      A.   Yes.
15      Q.   Based on your observations of
16  Rebecca Mitchell at work, do you believe
17  that she's a racist?
18      A.   No.
19      Q.   Based on your observations of
20  Mr. Hulen Bivins in the workplace, do you
21  believe that he's a racist?
22          MR. HUFFAKER: Same
23  objection.

Page 233

1      Q.   You can answer.
2      A.   Yes.
3      Q.   Now, Mr. Bivins, what is his
4  current position?
5      A.   Assistant director.
6      Q.   How much influence does --
7  strike that.
8          Ms. Rebecca Mitchell, she's
9  the director?
10      A.   Yes.
11      Q.   How much influence, in your
12  opinion, does Mr. Bivins have on the
13  director, Rebecca Mitchell?
14          MR. HUFFAKER: Object to the
15  form. You can answer.
16      A.   Almost total.
17      Q.   How long have you worked with
18  Ms. Brown; Annie Brown?
19      A.   I think since the late
20  80's, I think.
21      Q.   And what is Ms. Brown's
22  current job title?
23      A.   I don't know. I mean, I

59  (Pages 230 to 233)

FREEDOM COURT REPORTING

Page 234

```
1   don't know what mine is.  She's in charge
2   -- she's in charge of E-rate.
3       Q.  Do you know if she's
4   considered a consultant or a library
5   operations manager?
6       A.  Well, I mean, our job
7   title, according to state personnel, is
8   library operations manager, but that's
9   never been a term that's been used at
10  APLS.  You've always had like head of
11  something or something like that.
12      Q.  All right.  Now, you
13  testified that your supervisory
14  responsibilities at some point were
15  removed; is that correct?
16      A.  Yes.
17      Q.  Were they removed after you
18  took -- had this reprimand of February
19  27, 2006, were they immediately removed?
20      A.  No.
21      Q.  Were they not removed until
22  what year?
23      A.  Until I wrote that letter to
```

Page 235

```
1   the board February whatever.
2       Q.  September 7th --
3       A.  September 7th.
4       Q.  -- 2007?
5       A.  Yes.
6       Q.  Almost a year-and-a-half
7   later, your supervisory responsibilities
8   were removed after your reprimand?
9       A.  Yes.
10      Q.  What is Ms. Brown's
11  reputation among librarians across the
12  state?
13      A.  Oh, it's wonderful.
14      Q.  Can you be more specific?
15  What's your basis for concluding that?
16      A.  She was named librarian of
17  the year last year, which is a very, very
18  high honor.
19      Q.  How do you get to be named
20  librarian of the year?
21      A.  You're nominated by your
22  peers and voted on.
23      Q.  Is that the highest --
```

Page 236

```
1       A.  Yes.
2       Q.  -- honor you can receive by
3   your peers --
4       A.  Yes, I think so.
5       Q.  -- in the state?
6       A.  I would say so.
7       Q.  Did the agency do anything
8   to acknowledge Ms. Brown's selection of
9   librarian of the year for 2007?
10      A.  No.  Well, now, after -- on
11  the listserv after all the librarians
12  kept writing in and congratulating Annie
13  and told her how proud they were and how
14  happy they were for her, I think Ms.
15  Mitchell sent out some little E-mail
16  saying -- you know, to congratulate her,
17  but that's all.
18      Q.  It was just a personal E-mail
19  from her --
20      A.  Uh-huh (nodding head).
21      Q.  -- congratulating Ms. Brown?
22      A.  Uh-huh (nodding head).
23      Q.  But the office didn't do
```

Page 237

```
1   anything?
2       A.  No, there was no celebration
3   or agency-wide announcement or anything.
4       Q.  Do you know of any other
5   employees since your tenure at APLS that
6   have been selected librarian of the year?
7       A.  No.
8       Q.  Generally, how is Ms. Brown
9   treated at work by Harry Lensch, if you
10  know?
11      A.  I don't know.
12      Q.  How is Ms. Brown, if you know
13  -- based on your observations, how is she
14  being treated at work by Rebecca
15  Mitchell?
16      A.  I don't know.  I mean, I
17  don't see Ms. Mitchell very much.
18      Q.  All right.  Who supervises
19  Ms. Brown currently?
20      A.  Mr. Bivins -- no, no.  Ms.
21  Mitchell.
22      Q.  Do you know -- was Ms.
23  Brown at any point between 2006 and
```

60 (Pages 234 to 237)

**EXHIBIT E**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

NORTHERN DIVISION


ANNIE LUCAS BROWN,

        Plaintiff,


    VS.              CIVIL ACTION

                      NO. 2:07-CV-841-MHT-WC


ALABAMA PUBLIC LIBRARY SERVICE,

        Defendant.


DEPOSITION OF KIM WILSON OWEN


STIPULATIONS

IT IS STIPULATED AND AGREED, by and
between the parties, through their
respective counsel, that the deposition of
KIM WILSON OWEN may be taken before Scott
Wilmeth, CCR, State of Alabama at Large, at
184 Commerce Street, Montgomery, Alabama, on
May 15, 2008, commencing at 2:14 p.m.

FREEDOM COURT REPORTING

Page 2

```
1        IT IS FURTHER STIPULATED AND
2   AGREED that the reading and signature to the
3   deposition by the witness is waived, said
4   deposition to have the same force and effect
5   as if full compliance had been had with all
6   laws and rules of court relating to taking
7   of depositions.
8        IT IS FURTHER STIPULATED AND
9   AGREED that it shall not be necessary for
10  any objections to be made by counsel as to
11  any questions, except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17       IT IS FURTHER STIPULATED AND
18  AGREED that notice of filing of the
19  deposition by the Commissioner is waived.
20
21
22
23
```

Page 3

```
1              I N D E X
2
3   EXAMINATION BY:             PAGE NO.
4   Mr. Huffaker------------------------ 5
5
6           E X H I B I T S
7
8   DEFENDANT'S EXHIBIT NO.        MARKED
9   1 - Subpoena------------------------ 8
10  2 - E-mail-------------------------- 11
11  3 - E-mail-------------------------- 12
12  4 - E-mail-------------------------- 16
13  5 - E-mail-------------------------- 17
14  6 - 1-25-07 Letter to Mitchell
15      From Owen---------------------- 21
16  7 - 1-25-07 Memo Owen
17      From Bivins-------------------- 21
18  8 - 1-26-07 Letter from Mitchell
19      To Owen------------------------ 23
20  9 - 1-25-07 Receipt of Reprimand---- 23
21  10 - E-mail------------------------- 24
22  11 - Employee Performance----------- 48
23
```

Page 4

```
1   BEFORE:  Scott Wilmeth, CCR, RPR
2      Commissioner
3
4   APPEARING ON BEHALF OF THE PLAINTIFF:
5      Ms. Deborah Hill Biggers
6      Attorney at Law
7      113 East Rosa Parks Avenue
8      Tuskegee, Alabama  36083
9
10  APPEARING ON BEHALF OF THE DEFENDANT:
11     Mr. Austin Huffaker
12     Rushton, Stakely, Johnston & Garrett
13     184 Commerce Street
14     Montgomery, Alabama  36101
15
16  ALSO PRESENT:  Annie Lucas Brown
17
18
19
20
21
22
23
```

Page 5

```
1        I, Scott Wilmeth, CCR, RPR, State
2   of Alabama at Large, acting as commissioner,
3   certify that on this date, in accordance
4   with the Federal Rules of Civil Procedure
5   and the foregoing stipulations of counsel,
6   there came before me at 184 Commerce Street,
7   Montgomery, Alabama, on May 15, 2008, KIM
8   WILSON OWEN, witness in the above cause for
9   oral examination, whereupon the following
10  proceedings were had:
11
12        KIM WILSON OWEN,
13  having been first duly sworn, was examined
14  and testified as follows:
15        THE COURT REPORTER:  Usual
16  stipulations?
17        MR. HUFFAKER:  Yes.
18        MS. BIGGERS:  Yes.
19
20  EXAMINATION BY MR. HUFFAKER:
21  Q.      Would you state your full name
22  for the record, please, ma'am?
23  A.      Kim Wilson Owen.
```

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 26

```
1   to her, are these items that are personal
2   in her life, things that are going on
3   outside of the APLS?
4   A.      Yes.
5   Q.      Nothing to do with the APLS,
6   Annie Brown or Rebecca Mitchell, Hulen
7   Bivins, Harry Lensch?
8   A.      Sort of personal, ugly things,
9   but not pertinent to the facts, I don't
10  think.
11  Q.      Okay.  I do want you to come --
12  send those on when you get back and get a
13  chance, okay?
14  A.      Okay.
15  Q.      How many e-mails are there?
16  A.      I would say a handful, five;
17  two or three, five.
18  Q.      What other --
19  A.      Well, I mean, there may be
20  more, because there are, you know, sort of
21  professional brief or funny sorts of
22  things, but, you know, e-mail forwards
23  that people send each other.
```

Page 27

```
1   Q.      What other employees, current
2   employees at the APLS are you
3   corresponding with by e-mail?
4   A.      I don't believe I'm
5   corresponding with any.  Will Purswell
6   will occasionally send me a forward, one
7   of those, you know, funny forwards that
8   has no content except for a joke or
9   something like that, but I don't think
10  anyone else.
11  Q.      All right.  What other former
12  employees of the APLS are you
13  corresponding with?
14  A.      Teresa Trawick was the
15  president of the Alabama Library
16  Association this past year, so I was
17  working with her as the planning committee
18  chairperson, but our interaction was
19  entirely limited to Library Association
20  business.
21  Q.      All right.  When did you leave
22  your employment at the APLS?
23  A.      January 25th of 2007.
```

Page 28

```
1   Q.      Since that date, how many times
2   have you spoken with Ms. Brown?
3   A.      Up to once a month, I believe.
4   Q.      Have y'all been to eat lunch
5   together?
6   A.      Yes.
7   Q.      During these conversations and
8   meetings with Ms. Brown, have you
9   discussed her lawsuit?
10  A.      Hardly, huh-uh.
11  Q.      Have you discussed her
12  reprimand at the APLS?
13  A.      Since I left APLS?
14  Q.      Yes, ma'am.
15  A.      No.
16  Q.      What is your understanding as
17  to whether she in fact received a
18  reprimand at the APLS?
19  A.      While I was there, she received
20  a reprimand.
21  Q.      Well, what is your
22  understanding as to what that reprimand is
23  about?
```

Page 29

```
1   A.      She -- I did not see the
2   reprimand itself, but in talking about it,
3   by happen -- just by coincidence, I
4   happened to be present at the time that
5   she spoke with the person -- it was
6   regarding her travel check.  Her travel
7   check had been held up, for thousands of
8   dollars that she had invested of her own
9   money to go on a work trip.  And as I
10  understood it, she was asking for that --
11  for information as to where that check
12  was, and the administrative assistants and
13  Mr. Lensch were not helpful to her at all,
14  and she needed that large amount of money
15  to pay that credit card bill.
16          So she -- I cannot remember if
17  someone called her back while I was
18  sitting at her desk and we were having a
19  meeting, but the circumstances outlined in
20  the reprimand were absolutely different
21  from what I remembered from just sitting
22  at her desk, hearing that phone call.
23  Q.      Are these things that she told
```

8 (Pages 26 to 29)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 30

1   you about the reprimand and the
2   circumstances surrounding it?
3   A.     Well, I heard the phone call
4   myself, so when she told me what was in
5   the reprimand, that was completely
6   different from what I had heard for
7   myself.
8   Q.     All right. Did she tell you
9   she had thousands of dollars in travel
10  expenses?
11  A.     I don't know an exact amount,
12  but it was a chunk; less than five.
13  Q.     Did she tell you that these
14  travel expenses were on her credit card?
15  A.     She didn't tell me. She just
16  told me she had spent her money to go on
17  that trip and that she had been waiting a
18  very long time to get that money back and
19  needed it.
20  Q.     Okay. What telephone call did
21  you overhear?
22  A.     I overheard the -- I believe it
23  was the reply call, the call back that she

Page 31

1   received from the person that she had
2   called to see if there was anybody that
3   she could go to. She didn't go over
4   anyone's head, I don't believe, except for
5   the fact that she had asked Mr. Lensch to
6   assist her with this and he had just
7   not -- but she did not intend any
8   disrespect, I don't think. She just
9   thought, "Well, if we can't get an answer
10  here, is there someone from the finance
11  office who might be able to help me?"
12  So -- I'm sorry, I've actually forgotten
13  your original question.
14  Q.     Well, the question was what did
15  you overhear on the telephone call?
16  A.     Just her saying -- I believe
17  she just -- I believe that they were just
18  telling her the status of her check at
19  that time.
20  Q.     Was this a phone call that she
21  had with someone from the governor's
22  office?
23  A.     I don't know. What I do

Page 32

1   remember is that the substance of her
2   reprimand was incorrect. She had not
3   spoken to the people that the reprimand
4   stated that she had.
5   Q.     Do you know what people those
6   were?
7   A.     No, I'm sorry.
8   Q.     Do you know who she was
9   speaking to on the telephone?
10  A.     I don't.
11  Q.     All right. What substance in
12  the reprimand was incorrect as you know
13  it?
14  A.     At the time, I did know the
15  name of the person that she had spoken
16  with, and I did know that the name of the
17  person in the reprimand was incorrect.
18  Q.     All right. Is that the only
19  thing in the reprimand that you can recall
20  was incorrect?
21  A.     Yes, unfortunately, that's the
22  only factual thing.
23  Q.     Okay. Was the name of the

Page 33

1   person she had called?
2   A.     Oh, now I remember. This is
3   not a factual thing, but I believe the
4   reprimand also stated that she had brought
5   shame onto the agency or something to that
6   effect, or gone above the agency's head in
7   some inappropriate or insubordinate way.
8   Q.     Did you read the reprimand?
9   A.     I don't remember reading it.
10  She may have read it to me.
11  Q.     Did Ms. Brown tell you about
12  any phone conversation or meeting she had
13  with Rebecca Mitchell about the phone
14  call?
15  A.     I do not remember that.
16  Q.     Did Ms. Brown tell you about
17  the phone call she had with Cheryl Fondon
18  from the governor's office?
19  A.     Is that the person?
20  Q.     Well, I'm just asking you the
21  question, if you know.
22  A.     I'm sorry, I don't remember the
23  names.

9 (Pages 30 to 33)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 46

1   other than at the APLS?
2   A.      I don't think so.
3   Q.      You first came to APLS when,
4   again?
5   A.      November of 2005.
6   Q.      What was your position?
7   A.      A consultant for the -- well,
8   it changed.  Everything changed so quickly
9   from the time that I arrived.  I don't
10  know if I'm allowed to corroborate with
11  Annie while I talk about it, but when I
12  came on board, was I -- I don't even
13  remember if I was a consultant at that
14  time.  I believe that I was.  And we sort
15  of functioned as a unit, the networking
16  development and planning unit, and we
17  worked together on some projects and
18  separately on some projects in order to
19  support the public libraries of Alabama.
20  Q.      So you came in as a consultant
21  in a particular division?
22  A.      Yes.
23  Q.      And it was the networking

Page 47

1   division?
2   A.      Networking development and
3   planning.
4   Q.      And what were your
5   responsibilities in that division as a
6   consultant?
7   A.      Well, Annie was my supervisor,
8   and Annie had considerable programming
9   already going on to assist librarians in
10  Alabama, so I would -- my job was to
11  assist her with that programming, whether
12  it was continuing education, programming
13  for the librarians or accepting telephone
14  calls from librarians on specific
15  questions or needs that they might have.
16  I would have to look back over my -- I do
17  have evaluations and such, if you would
18  like me to bring those as well.
19  Q.      You have your evaluations
20  during your time you were there at the
21  APLS?
22  A.      Yes, I do.
23  Q.      Those evaluations would have

Page 48

1   been performed by Ms. Brown?
2   A.      Yes.
3   Q.      You would have had an
4   evaluation in August of 2006, August,
5   September, somewhere in there?
6   A.      If I remember right, we sat
7   down early in my employment to go over my
8   responsibilities, and then at either three
9   months or six months we sat down together
10  again to appraise how I had met my
11  obligations or my responsibilities, and we
12  talked about ways in which I was doing
13  well and ways in which I could improve.
14  Q.      Okay.  How many formal
15  performance appraisals did you have?
16  A.      Two.  Well, it may have been as
17  many as three.  But in June following my
18  employment in November, Annie was -- she
19  lost her supervisory position.  And if I
20  remember right, I reported to Rebecca
21  Mitchell at that time.
22          (Whereupon, Defendant's Exhibit
23          Number 11 was marked for

Page 49

1           identification.)
2   Q.      (By Mr. Huffaker) Exhibit 11,
3   is that a copy of one of the performance
4   appraisals by Ms. Brown?
5   A.      Yes, that is her signature,
6   yeah, 4-18.
7   Q.      Was that during that period of
8   time in which she was your immediate
9   supervisor?
10  A.      Uh-huh.
11  Q.      Is that a yes?
12  A.      Yes, sir.
13  Q.      What score did she give you?
14  A.      I am not sure what the maximum
15  score -- oh, I see, I see.  She gave me a
16  27.5.  I am not sure how that relates to
17  the highest.
18  Q.      That would be a 27.5 out of 40?
19  A.      Out of 32, 27.5 out of 32.
20  Q.      Out of 32?
21  A.      Yes, if I count my -- if I
22  count the points that she evaluated me on.
23  She has evaluated me on one, two, three,

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 50

1 four, five, six, seven, eight points and
2 given me the scores that she has given me,
3 so my total was 27.5 out of 32.
4 Q.    Was there any disagreement by
5 you as to the score assigned by Ms. Brown?
6 A.    I don't believe so. We had a
7 very good communication between us
8 regarding what we as a department needed
9 to accomplish and what individuals were
10 expected to accomplish.
11 Q.    Did you have any supervisory
12 responsibilities over other folks?
13 A.    At that time, no.
14 Q.    How about any time during your
15 employment there?
16 A.    No, no, no, never at APLS. I
17 had supervised 12 to 14 people in
18 Prattville.
19 Q.    What was the mission of the
20 APLS, as you understood it?
21 A.    To support public libraries
22 across Alabama, regardless of their size,
23 regardless of their location, to provide

Page 51

1 them with continuing education resources
2 for their staff, to appropriately evaluate
3 the merits of grant applications and
4 disburse LSPA funding, to monitor how LSPA
5 funding was used in carrying out those
6 grants, to be available to consult with
7 those library staff from a volunteer
8 person with a high school education to a
9 Ph.D. public library director in a big
10 Alabama city. We were there to support
11 libraries in towns from population 700 to
12 the size of Huntsville. And so anything
13 that we could do to support library staff
14 and improve services to the Alabama tax
15 payer is what -- that was our
16 responsibility.
17 Q.    When you were a consultant in
18 the networking --
19 A.    Networking development and
20 planning.
21 Q.    Is there a short form for that
22 division, like ND?
23 A.    We did say, "NDP."

Page 52

1 Q.    Okay. When you were a
2 consultant in the NDP division, who else
3 worked in that division?
4 A.    Christine Bowman.
5 Q.    Was she also a consultant?
6 A.    Yes, she had a specific -- her
7 specific -- and Annie can correct me at
8 any time. Christine was specifically the
9 children's consultant, children's services
10 consultant, so she would specifically
11 offer assistance with children's
12 programming for librarians who were in
13 charge of children's programming.
14 Q.    And that compares to your
15 responsibilities, which were to what,
16 exactly?
17 A.    Well, my responsibilities
18 changed. Was I supposed to -- well, let
19 me look here and see. Okay. It's on my
20 evaluation. Orient new public library
21 directors, be available to consult with
22 librarians and library boards and --
23 that's it, management consultant. That

Page 53

1 was my original purpose for being hired at
2 APLS, to be a management consultant.
3 Q.    And what does that mean, to be
4 a management consultant?
5 A.    To consult regarding budgeting,
6 personnel, helping them to educate their
7 boards, so that their boards could carry
8 out their responsibilities. Let's see,
9 special projects as assigned by the
10 director or by Annie Brown. And then, of
11 course, sort of nonmanagement
12 responsibilities, such as representing
13 APLS at functions and establishing
14 contacts with other organizations to
15 create partnerships.
16 Q.    You said your responsibilities
17 changed at some point. How did they
18 change?
19 A.    They did. I believe I was
20 still to be responsible for these -- well,
21 my responsibility for the E-rate program,
22 I suddenly became responsible for the
23 entirety of assistance by APLS for the

14 (Pages 50 to 53)

Page 54

1  E-rate program, which is a pretty
2  extensive set of responsibilities by
3  itself. It can be a job in itself, and at
4  certain times during the year is a job in
5  itself.
6  Q.     Who had that job?
7  A.     Kalen (phonetic spelling)
8  Ralya.
9  Q.     Do you know why the job
10 responsibilities were changed from her to
11 you?
12 A.     I do not. And I also noticed
13 at that time, not that it mattered too
14 much, but I also noticed at that time that
15 I had been hired as a management
16 consultant, but Kalen still had management
17 consultant on her job title as well.
18 Q.     What other responsibilities
19 changed?
20 A.     Sometime around -- I should
21 have brought my date book. Sometime
22 around the time that -- sometime between
23 this evaluation and maybe the next couple

Page 55

1  of three or four months, I suddenly
2  reported to Mrs. Mitchell, and we also
3  suddenly were to divide up the state into
4  territories. And in addition to our other
5  responsibilities, we were to travel to
6  that particular area of the state to visit
7  those libraries and assist them with
8  anything that we could.
9         So my part of the state -- I
10 was pleased to be able to choose my part.
11 I chose the northeast part of the state.
12 That was the area I wanted and that's what
13 I got. So in addition to the E-rate work
14 and the consulting and the assistance with
15 planning continuing education, I also had
16 to travel.
17 Q.     So for one, your supervisor
18 changed from Ms. Brown to Ms. Mitchell; is
19 that right?
20 A.     Yes. And then later it changed
21 to Mr. Bivins. Ms. Mitchell met with us
22 and she said, "I am supervising all of you
23 now," meaning myself, maybe Jim Smith was

Page 56

1  in that meeting, Annie Brown, Christine
2  Bowman.
3  Q.     Who did those other individuals
4  report to before that changed to Ms.
5  Mitchell?
6  A.     I do not know who Mr. Smith
7  reported to. I cannot remember.
8  Q.     You said that you were given
9  some territories in northeast Alabama; is
10 that right?
11 A.     Yes, that was my territory.
12 Q.     Do you know why that happened,
13 why --
14 A.     Oh, I picked it. Oh, why did
15 they suddenly decide we would travel? I
16 believe at that time, Mr. Bivins had been
17 appointed or was filling the position of
18 assistant director, acting assistant
19 director. I don't know when he became
20 official. But his idea was that we did
21 need to be out in the field, visiting
22 libraries on a regular basis. And I had
23 no problem with that. I was happy to do

Page 57

1  that, except for concern about managing my
2  other responsibilities as well.
3  Q.     That helped further the mission
4  of the APLS, in getting out in the field
5  with the libraries?
6  A.     Yes.
7  Q.     Who else was given assignments
8  for specific geographical areas or
9  libraries besides yourself?
10 A.     Annie Brown, Christine Bowman,
11 I believe even Jim Smith was given and
12 Kalen Ralya was also expected to visit.
13 That's all the names that I can remember.
14 There may be one more. I believe we had
15 five or six territories.
16 Q.     Were any of those individuals
17 library operations managers?
18 A.     Annie.
19 Q.     Did Ms. Mitchell have an
20 assigned geographical area?
21 A.     She said that she and Mr.
22 Bivins would take care of Huntsville and
23 possibly another large metropolitan area

15 (Pages 54 to 57)

FREEDOM COURT REPORTING

Page 78

1  A.     I limited this to -- I limited
2  this document to things I had seen in
3  person, because, you know, as you know, in
4  offices, things get around and people know
5  things, but I knew that it would be best
6  to stick with what I saw for myself.
7  Q.     So the January 14, 2008 e-mail
8  from you to Judy Shepard sets out what you
9  saw?
10  A.     Yes.  And this was the actual
11  brief documentation of abusive incidents,
12  was written at the time that I resigned
13  from APLS, wrote my response to Mr.
14  Bivins' reprimand and send that
15  information to the board.
16  Q.     Okay.  Looking at the e-mail,
17  it says, "In my opinion, systematic
18  abusive language has been used."  Do you
19  see that?
20  A.     Yes.  This was -- now, this
21  particular portion of the e-mail came from
22  me at that time, January 14th, 2008.  And
23  if I remember right, I sent my old

Page 79

1  documents to Judy on the occasion of her
2  being required to speak to some attorney
3  based on my -- the matter of Kim Owen.
4  So, you know, I -- my current employer
5  prefers that her staff stay well clear of
6  the problems at APLS, just stay out of
7  them, but -- so I had really sort of put
8  it out of my head as best that I could,
9  also knowing that communication about it,
10  about any situation would be a compromise
11  of her situation.
12       So I largely put it aside, but
13  in this situation, because Judy had been
14  asked to come and speak with an attorney
15  about my -- the circumstances of my
16  departure or my comments, on January 14th
17  of '08 I wrote the statement, starting
18  with, "Judy, below are two items pasted
19  in," and ending with, "Take care, Judy,
20  and let me know how it goes."
21  Q.     Here's what I want to do.  I
22  want to go through every example, every
23  instance that you're aware of in which you

Page 80

1  observed or heard abusive language,
2  inappropriate comments, bullying, anything
3  that you deemed as discriminatory, whether
4  racially, sexually, any complaints or
5  inappropriate things that you saw and
6  heard at the APLS during your time there.
7  A.     Saw and heard, whether I saw it
8  myself or heard it from others?
9  Q.     And let's put the things that
10  you know firsthand, versus what you may
11  have heard through someone else.
12  A.     Okay.  These are the items that
13  I know of firsthand.
14  Q.     And if there's a document that
15  that sets out some of those things, just
16  point that out to me as we go, okay?
17  A.     This was it.  When I left the
18  agency, I said, "I'm going to set down
19  everything that I saw firsthand."
20  Q.     Okay.  And what you're showing
21  me is a January --
22  A.     Yes, this is page three of five
23  of the Monday, January 14th, 2008 e-mail.

Page 81

1  Q.     Okay.  And it's dated January
2  29, 2007; is that right?
3  A.     Yes.  It went with my response
4  to Mr. Bivins' reprimand and my
5  resignation letter.
6  Q.     So the January 29, 2007 -- is
7  that a letter?
8  A.     When I resigned, I had been
9  thinking for a long time about whether I
10  might write to the board, because I was
11  very distressed and had spoken with Mr.
12  Lensch and Ms. Mitchell about the
13  atmosphere of bullying and the atmosphere
14  of harassment and hostility at APLS, and
15  so I was thinking for quite a long time
16  about whether I should -- in hopes of
17  seeing a remedy for the situation, whether
18  I should write to the board, but I was
19  afraid, because of -- for many reasons, I
20  was afraid.
21       But when I resigned, at that
22  point, I sent copies of my resignation
23  letter, my response to my reprimand, I'm

21 (Pages 78 to 81)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 82

1   not sure if I did send my reprimand, and
2   also this list, limited to things I had
3   seen and heard with my own ears and eyes.
4   All those things went to the board.
5   Q.      So that is actually a letter
6   that went to the board; is that right?
7   A.      Yes, this went with letters. I
8   didn't really -- I don't believe I wrote
9   to the board. I believe I just sent them
10  copies of my resignation letter and my
11  response to Mr. Bivins.
12  Q.      So tell me, exactly what is
13  this January 29, 2007 document?
14  A.      This was a document in which I
15  listed the incidents that I had seen of
16  ugly behavior at APLS by supervisory
17  staff.
18  Q.      Okay. So this is a list of
19  things you have seen and heard firsthand
20  during your entire time at the APLS?
21  A.      Right. And I say at the bottom
22  of my introductory paragraphs, I say,
23  "There are many, many additional

Page 83

1   distressing examples of these problems
2   which contribute to a demoralized and
3   unproductive agency culture that I do not
4   mention because I did not see them in
5   person. I hope the board will receive
6   notification of those incidents as well."
7   Q.      Okay. Those would be things
8   you heard through somebody else?
9   A.      Right, right.
10  Q.      Okay. Well, let's go through
11  this. Workplace bullying, is that what
12  your opinion on the environment was there
13  during your employment?
14  A.      Yes. But when I first started
15  at APLS, I did not see it happening to
16  anyone but to Annie.
17  Q.      Who have you seen were the
18  subject of workplace bullying?
19  A.      Well, let me see what my
20  examples are. I did not go through what
21  workplace bullying is in specific, because
22  that would have made a very long document
23  and I wanted to keep it as much to the

Page 84

1   point as I could. But it's -- workplace
2   bullying is basically removing the
3   resources and authority that people need
4   to do their jobs, hostile comments to
5   people or behind their back. I think
6   those are the two key things that I saw
7   considerable problems with at APLS.
8   Q.      Do you believe that you were
9   subjected to workplace bullying?
10  A.      I noted -- I was shielded. I
11  was shielded by Annie when I first came,
12  because she was my supervisor and so she
13  took the brunt of whatever ugly things
14  were happening, other than -- she couldn't
15  shield me from unreasonable job -- what I
16  felt were unreasonable job tasks. We --
17  she -- we had an attitude that if the work
18  had to be done, the three of us would get
19  it done together and that would be the end
20  of that. So that was the only way that
21  she could not -- she was -- you know, she
22  was a barrier between me and the ugliness
23  that was coming down upon her.

Page 85

1       Then Mrs. Mitchell, I felt that
2   I could speak to her, and I did document
3   that I spoke with her in March of '06 and
4   again in August of '06 regarding what I
5   had noticed. And I had also spoken with
6   Mr. Lensch about -- at the time that I
7   spoke with him, I was -- you know, I
8   thought, "This is lawsuit worthy. The way
9   that you all talk to people is lawsuit
10  worthy." And I wanted to see -- I wanted
11  to see improvement, not just for the
12  morale of the agency, but just -- it
13  wasn't right. It was not right.
14  Q.      The question is, do you believe
15  you were subjected to workplace bullying
16  at any point during your employment at the
17  APLS?
18  A.      Directly, no. Indirectly, yes,
19  because Annie did not have the materials,
20  authority, resources. Her ability to
21  purchase and budget was taken away. We
22  would request supplies and those requests
23  would be denied. I overheard folks

22 (Pages 82 to 85)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 86

1   talking -- well, I overheard Mr. Bivins or
2   Mr. Lensch talking about other employees
3   in such a manner that I guarantee you they
4   talked about me in that manner, but I was
5   not privy to that.
6   Q.     How was that bullying of you
7   indirectly?
8   A.     One of the -- well, I don't
9   have my workplace bullying list, but I
10  believe one of the aspects of bullying is
11  creating a hostile environment by talking
12  badly about somebody behind their back and
13  undermining them with their colleagues.
14  Q.     Did you perceive the APLS to be
15  a hostile work environment as it concerns
16  you?
17  A.     The only thing I can really
18  remember is just trying to keep my
19  attitude good. And I believe I was trying
20  to keep my attitude good so that I could
21  continue to work there, and I believe I
22  was having to try to keep my attitude good
23  because, yes, I -- yes, I believe that

Page 87

1   there was sort of low grade -- I wrote in
2   my resignation letter that I had been
3   largely shielded from that until that
4   point, until I became Mr. Bivins'
5   supervisee.
6   Q.     And then when you did become
7   his supervisee, did you consider yourself
8   as being bullied after that?
9   A.     I considered him to speak to me
10  and others absolutely -- in ways that were
11  absolutely not appropriate for a manager.
12  Q.     Who else have you seen him
13  speak to in an inappropriate, ugly or
14  derogatory fashion?
15  A.     Mr. Lensch.
16  Q.     Who did you see him talk to,
17  though, that you deemed was inappropriate
18  or ugly?
19  A.     Well, I've detailed it here.
20  Q.     Okay. We're back looking at
21  your January 29 --
22  A.     Yes.
23  Q.     Let's just go through this. I

Page 88

1   think that will answer a lot of the
2   questions I have.
3   A.     Okay. And I do have examples
4   that I did not -- I want -- you know,
5   whether this is honest or dishonest or
6   whatever, I took great care to steer clear
7   of saying things that I had heard Mrs.
8   Mitchell say or do in this document, but I
9   do have things that I did hear her say or
10  see her do, but I chose in this document
11  to focus on Mr. Bivins and Mr. Lensch. So
12  we can go through this and then I can --
13  Q.     Okay. Let's go through this.
14  First off, did you ever give anyone at the
15  APLS a pamphlet or a document about
16  workplace bullying?
17  A.     I probably did.
18  Q.     Who would you have given that
19  to?
20  A.     Maybe to Annie or maybe to -- I
21  had -- I was preparing a statement on
22  workplace bullying to give Mrs. Mitchell,
23  because I thought that the most

Page 89

1   appropriate thing for an employee to do
2   was to talk to their supervisor about what
3   they see going on. It's not appropriate
4   to just sit and be a malcontent who is
5   complaining all the time behind the
6   supervisor's back. It's important to make
7   those issues known.
8   Q.     Do you know of a gentleman by
9   the name of Bob Schremser?
10  A.     I do, but I did not work with
11  him.
12  Q.     Okay. Was there any overlap in
13  your employment there?
14  A.     No, no.
15  Q.     How do you know him?
16  A.     He introduced himself. He
17  popped into a listening session that the
18  Montgomery City-County Public Library was
19  having. They had listening sessions and
20  focus groups at each of our library
21  branches, and he stopped in and sort of
22  just in passing, he said, "You know, I
23  took your position, but now I've been

23 (Pages 86 to 89)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 90

1    fired," and, you know, told me some of his
2    woes and we -- we have not had very much
3    contact.
4    Q.      Do you consider the reprimand
5    that you received from Mr. Bivins to be an
6    example of the workplace bullying?
7    A.      I feel like Mr. Bivins, whether
8    intentionally or not, misrepresented my
9    conduct toward him and misrepresented the
10   situation. And I guess you would have to
11   kind of split hairs on whether -- I do
12   feel like his intent was to bully me.
13   Whether his intent was to misrepresent the
14   situation, I do not know.
15   Q.      For the record, you're
16   Caucasian or white; is that correct?
17   A.      I am, I am.
18   Q.      Let's look at point number one
19   here in your letter. It says, "I
20   overheard Mr. Lensch talking to Mr. Bivins
21   in our mail/copy area, accessible to any
22   staff, about inconsequential assholes."
23   Is that right?

Page 91

1    A.      Yes. If I remember right, I
2    probably hesitated to conjecture about
3    that, but if I remember right, Mr. Lensch
4    was saying, "It's management who are
5    giving us the problems. The
6    inconsequential assholes are doing fine."
7    I believe he was talking about the changes
8    that were going on at APLS at that time.
9    Q.      Do you have any idea of who he
10   was referring to?
11   A.      No, I don't. Everybody was an
12   inconsequential asshole to Mr. Lensch.
13   Q.      Would that include yourself?
14   A.      Mr. Lensch kind of used the
15   kind of triangulation method of, you know,
16   "You and I are okay and you and I see
17   things the same way, and we know that all
18   these other idiots are --" so that was his
19   relationship with me early on.
20   Q.      What else did you overhear
21   between Mr. Lensch and Mr. Bivins on that
22   occasion?
23   A.      That was about it at that time,

Page 92

1    because -- I don't know. I just felt like
2    that was so nasty, I needed to step away
3    from it, and my business was done in that
4    area, so it would have been eavesdropping
5    to stay any longer.
6    Q.      When was that?
7    A.      Sometime, I'm guessing, around
8    the time that my department was moved from
9    the front to the back of the building.
10   Q.      Number two, tell me what that's
11   about.
12   A.      I have no idea why Mr. Bivins
13   felt it necessary to be talking about poor
14   staff performance in front of other staff
15   who -- and it was not our business. I
16   have no idea why he was standing there
17   talking about that.
18   Q.      Was that about staff in
19   general?
20   A.      He was talking about the
21   technical services department.
22   Q.      Okay. Was that the department
23   that you worked in?

Page 93

1    A.      No.
2    Q.      Was that the department that
3    Annie Brown worked in?
4    A.      No.
5    Q.      Number three, it says, "Mr.
6    Bivins, talking about the strong work
7    ethic of one of my co-workers, stated
8    there's pills for that." Who was the
9    co-worker?
10   A.      Mr. Jim Smith.
11   Q.      What race is Mr. Smith?
12   A.      White.
13   Q.      What else did Mr. Bivins say
14   during that conversation?
15   A.      I do not remember specifics of
16   the conversation, but it was regarding Mr.
17   Smith's concern that APLS would in fact be
18   legally liable if those LSTA funds were
19   mismanaged or if we did not properly
20   account -- now, Mr. Smith did not tell me
21   these things. I knew them from having
22   dealt with LSTA funds myself, as a public
23   librarian and as an employee at APLS, if

24 (Pages 90 to 93)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 94

1   those funds are not used in accordance
2   with the rules, if the documentation is
3   not there to show that they were spent in
4   accordance with the rules, if they're --
5   if you can't show that it was ethically
6   distributed and ethically used, the agency
7   would have been liable.
8       Q.      Who did he make that comment
9   to?
10      A.      I believe he was just kind
11  of -- he was back in my -- no, this says
12  in the administration area. No, I'm
13  sorry. He was back in my area, maybe
14  during the time that we were moving our
15  offices.
16      Q.      Going on to the next page, that
17  particular paragraph, was it your opinion
18  that if there's a performance issue about
19  an employee, the place to discuss that is
20  in private?
21      A.      With that employee, yes, that
22  is my opinion.
23      Q.      It's in poor taste to discuss

Page 95

1   the performance issues of other employees
2   in front of other staff. Would you agree
3   with that?
4       A.      It's in poor taste and it -- I
5   believe it would be a violation of that
6   employee's privacy and just simply wrong.
7       Q.      So would it be your belief that
8   if you thought an employee was not doing
9   her job, for example, that person should
10  discuss it with that particular employee
11  first?
12      A.      Absolutely, and nobody else.
13      Q.      Would it be inappropriate for
14  that person to discuss that employee's
15  performance issue with someone outside the
16  department, outside the APLS?
17      A.      You mean outside the agency or
18  outside the department?
19      Q.      Outside the agency.
20      A.      That would be an even greater
21  violation of privacy. But it's a morale
22  buster too, because you know when you hear
23  somebody talking that way, that's more

Page 96

1   evidence of that sort of game playing,
2   where, "You and I are okay. We do a good
3   job. We work hard. We know what's going
4   on. But that idiot, he doesn't know
5   what -- they just never do any work."
6   That's abusive.
7       Q.      Number four says, "Mr. Lensch
8   noted that he does not have his Master of
9   lingering stupidity."
10      A.      Yes.
11      Q.      Who did he use that term in
12  front of?
13      A.      I had heard that he had said
14  this to several people, but he actually
15  did say that to me.
16      Q.      Who was he referencing?
17      A.      The old style term for the
18  information science degree is the Master
19  of Library Science, so MLS, Master of
20  lingering stupidity. And I felt that it
21  was completely inappropriate for Mr.
22  Lensch to be making that sort of joke when
23  that was the population that he was

Page 97

1   supposed to be serving and those were his
2   colleagues as well.
3       Q.      You go on to say in that
4   paragraph, it says, "On several other
5   undocumented occasions, Mr. Lensch had
6   talked to me about the poor performance of
7   other staff."
8       A.      That's correct.
9       Q.      Did you think that was
10  inappropriate?
11      A.      I did, and I was kind of
12  shocked.
13      Q.      Same reasons as in paragraph
14  number three, about discussing the work
15  performance of other employees?
16      A.      Yes. Not only behind their
17  back, but with other staff who -- my work
18  function had absolutely nothing to do with
19  the complaining that he was doing.
20      Q.      Did that complaint, as set out
21  in paragraph number -- did that have
22  anything to do with you and your work
23  performance?

25 (Pages 94 to 97)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 98

1   A.    Oh, no. Mr. Lensch, at that
2   time, was doing that triangulating:
3   "Kim's cool. She's our new smart
4   employee. And all these other idiots are
5   not in the know."
6   Q.    Did that have anything to do
7   with Ms. Annie Brown, that you're aware
8   of?
9   A.    Well, what was interesting --
10  the one thing I'm thinking of, actually,
11  was interesting to me is that it was
12  regarding a task that Annie was supposed
13  to coordinate, and they had taken the task
14  away from her and he was complaining about
15  the poor management of the task by the
16  folks who had been given the task, how
17  they had failed to -- may I have a
18  restroom break?
19        MR. HUFFAKER:  Absolutely.
20  We've been going awhile.
21        (Whereupon, a recess was
22        taken.)
23  Q.    (By Mr. Huffaker) Ms. Owen, we

Page 99

1   were talking about Mr. Lensch's use of the
2   term "Master of lingering stupidity."
3   A.    Yes.
4   Q.    Is that a term that you've
5   heard other folks use before?
6   A.    No.
7   Q.    Who else has he used that term
8   in reference to?
9   A.    If I understood him correctly,
10  which you can't always conjecture what
11  somebody is thinking, he was taking a
12  swipe at anybody who had that Master of
13  Library Science. That was an ugly -- that
14  was a way to denigrate that degree, which
15  he does not have.
16  Q.    That was going to be my next
17  question. Does he have that Master of
18  Library Science?
19  A.    No, he -- I don't believe he
20  worked with libraries in any capacity.
21  Q.    Is that called an MLS degree?
22  A.    In the olden days it was MLS.
23  And my degree from 1996 is called a Master

Page 100

1   of Information Science.
2   Q.    Where did you go to school?
3   A.    University of Tennessee.
4   Q.    When did you get out?
5   A.    Pardon me?
6   Q.    When did you get out?
7   A.    '97 -- I'm sorry, '96.
8   Q.    From undergrad?
9   A.    I got out of undergrad in '91.
10  I worked in community mental health case
11  management for two years and I started
12  back to -- actually, I started graduate
13  school. That did not work out. I worked
14  in community mental health and I went back
15  to school, I believe, in the fall of '95
16  and finished the Masters in December of
17  '97.
18  Q.    Who else at the APLS had MLS
19  degrees that you're aware of?
20  A.    Annie, Judy Shepard, Janet
21  Hamilton, Mr. Bivins, Mrs. Mitchell. Mr.
22  Mr. Smith, I'm sure he did. I never heard
23  him talk about it. Christine Bowman, I

Page 101

1   believe, did also. I can't -- I would
2   have to -- oh, the folks down in the
3   Library For the Blind and Physically
4   Handicapped would have had. My colleague,
5   Tim Emmonds had one. I'm certain Sarah
6   Fileski (phonetic spelling) had one; the
7   reference staff, Mr. Craig; Katie and --
8   what was that other lady's name? Anyway,
9   anybody -- any of the consultants or
10  reference staff would have had that
11  Masters degree.
12  Q.    Was this a requirement for the
13  consultant position?
14  A.    I believe it was.
15  Q.    Would that have been a
16  requirement for the library operations
17  manager position?
18  A.    Oh, yes.
19  Q.    Looking at the last sentence in
20  that particular paragraph, it says Mr.
21  Lensch had talked to you about the poor
22  performance of other staff. What other
23  staff did he talk to you about?

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 102

1   A.      This is on --
2   Q.      This is paragraph four, the
3   very last sentence.
4   A.      Yes, yes. I was talking about
5   that when we split up. I do not -- the
6   one occasion that I remember for certain
7   was in the -- in reference to the Bayou La
8   Batre recovery, where the Bayou La Batre
9   library had been demolished in the
10  hurricane and Annie Brown had been
11  assigned to head up that recovery effort.
12  I don't know all of the details about it,
13  but I did witness and hear for myself the
14  way that Annie suddenly was left out of
15  the loop on that project. And in the
16  case -- in this particular and
17  undocumented occasion, he was angry
18  because someone who was now handling it,
19  since they took it away from Annie, had
20  done it wrong.
21  Q.      Do you know who that person was
22  that it was handed to?
23  A.      It was either -- well, I think

Page 103

1   I -- I believe he was either talking about
2   Mary, I don't remember her last name, but
3   she was the head of IT or Kalen Ralya.
4   Q.      Mary Payne?
5   A.      Uh-huh.
6   Q.      And was he complaining about --
7   A.      He did not name names, but I
8   just -- because those were the two people
9   that I knew were supposed to be -- I just
10  guessed.
11  Q.      Okay. Did he complain about
12  Mary Payne's performance on that project?
13  A.      At that time, I don't know.
14  Q.      Was that about the time you
15  started your employment there at the APLS?
16  A.      It was pretty early.
17  Q.      So what exactly did he say
18  about Ms. Brown's performance that you're
19  aware of?
20  A.      Now, I never heard Mr. Lensch
21  say anything about her performance, if I
22  can remember right. The people I heard
23  talking negatively about Ms. Brown were

Page 104

1   Ms. Mitchell and Mr. Bivins.
2   Q.      All right. What did they tell
3   you about her performance on that project?
4   A.      Oh, now, I don't know what they
5   told me about the project, I'm sorry. I
6   heard them speaking negatively about her.
7   I do not -- the only reference to her on
8   that project that I know of is when I
9   started work at APLS, Mrs. Mitchell, Kalen
10  Ralya and Mary Payne were headed out for
11  Bayou La Batre, and Annie was supposed to
12  be on that trip, and Kalen and Mary were
13  in a hurry to get out of the building
14  quickly, before Annie arrived, and Mrs.
15  Mitchell said, "I'll tell her." And so
16  that was kind of a -- it was kind of a --
17  it felt ugly and sneaky.
18  Q.      Do you know why Ms. Payne and
19  Kalen wanted to get out of the building
20  quickly?
21  A.      If I understood right, that was
22  Annie's project and she was supposed to be
23  included on those trips, so either they

Page 105

1   were -- I just don't know. Why would they
2   be sneaking out of the building before
3   Annie arrived?
4   Q.      You don't have any personal
5   knowledge one way or another as to why
6   they went out of the building when they
7   did and in the fashion that they did, do
8   you?
9   A.      I'm just trying to separate in
10  my head what might be sort of guesswork on
11  my part and whether I have ever heard
12  anything factual from anyone, and I cannot
13  at this time think of anything factual.
14  Q.      You said you had heard Ms.
15  Mitchell talk about Ms. Brown?
16  A.      What I heard from Ms. Mitchell,
17  on the first day that I reported to work
18  was that Annie Brown would be my
19  supervisor, but that we did not know for
20  how long. And so at that time, I felt
21  like that comment could be taken several
22  different ways, one of which was that it
23  was kind of a nasty thing to say to a

27 (Pages 102 to 105)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

|  | Page 106 |
|---|---|

1   supervisee about her supervisor, one of
2   which might have been that there were
3   simply structural reorganizations going on
4   or -- you know, I just did not know. That
5   was very odd.
6   Q.      Well, what she told you was
7   that Ms. Brown would be your supervisor,
8   but she didn't know how long?
9   A.      And she kind of had a -- it's
10  so hard -- her body language, to me, was
11  disparaging.
12  Q.      Was there any type of
13  structural reorganization during your time
14  there?
15  A.      Well, it never stopped. It was
16  nonstop. I worked with Annie, in the
17  manner documented on that evaluation that
18  you gave me a copy of. We moved to the
19  back of the building. She lost her
20  supervisory responsibilities, just all
21  kind of -- we got the territories -- just
22  things were constantly in flux, chaos.
23  Q.      What else have you heard Ms.

|  | Page 107 |
|---|---|

1   Mitchell say about Ms. Brown?
2   A.      I will rack my brain and see if
3   anything else factual comes up. The only
4   other -- the other negative thing I
5   remember actually came from Mr. Bivins,
6   who felt it necessary to let me know
7   something to the effect that Annie was not
8   a very good supervisor and that they had
9   her under observation and if I had any
10  trouble with her, to let him know.
11  Q.      When did he tell you that?
12  A.      Really early in my employment.
13  Q.      Did you ever hear him say
14  anything else about her?
15  A.      Not that I can remember. If I
16  had known then what I know now, I would
17  have paid more attention.
18  Q.      What do you know now?
19  A.      Just the ongoing climate of
20  harassment and the fact that I would have
21  to walk away from my job which I loved and
22  the fact that I would be basically
23  harassed out of my job by that nasty

|  | Page 108 |
|---|---|

1   environment and that incompetent
2   supervision.
3   Q.      Were you harassed out of your
4   job?
5   A.      I feel that I was. It came to
6   a head at that time -- at the time when he
7   and I had that interaction, but there were
8   other sort of indirect things that he was
9   doing to make working there more and more
10  and more unpleasant and unworkable, so,
11  yes, I do.
12  Q.      And when you say, "he," you're
13  talking about Mr. Bivins?
14  A.      Mr. Bivins, yeah.
15  Q.      Did you hear him say any other,
16  what you thought were inappropriate
17  statements about Ms. Brown?
18  A.      He came to -- I saw him make a
19  statement to her -- let's see, I don't
20  know if I noted it here. Oh, yes, number
21  nine. He came to the door of the office
22  that Annie worked in, in the front of the
23  building, and I happened to be in the

|  | Page 109 |
|---|---|

1   office meeting with her at that time. And
2   he was sort of making smart remarks about
3   the requirement for her to, you know, move
4   boxes and that sort of thing as we moved
5   to the back, and so that was something
6   that he said to her in front of me.
7   Q.      Anything else that you can
8   recall?
9   A.      That he said about her?
10  Q.      That you --
11  A.      About Annie?
12  Q.      That you deemed inappropriate
13  or rude, derogatory?
14  A.      Not that I can think of.
15  Q.      How about --
16  A.      If it hits the top, I'll --
17  Q.      If anything comes to mind, you
18  jump in, okay?
19  A.      I will, I will.
20  Q.      Anything else that you heard
21  Ms. Mitchell say about Ms. Brown that was
22  rude, insensitive, derogatory,
23  inappropriate?

28 (Pages 106 to 109)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

| Page 110 |
|---|
| 1    A.      Again, I will have to just sort |
| 2  of see if something sifts to the top. But |
| 3  it was pretty clear to me -- I mean, I |
| 4  just was pretty shocked by the initial, |
| 5  "We don't know how much longer she's going |
| 6  to be your supervisor," and the initial, |
| 7  you know, sending two of my co-workers |
| 8  giggling off to Bayou La Batre without |
| 9  Annie, like, "Hee-hee, we're going without |
| 10  her." |
| 11    Q.      Why were individuals going down |
| 12  to Bayou La Batre?  What was the purpose |
| 13  of that trip? |
| 14    A.      To do the same sorts of things |
| 15  that Annie would have been doing, as far |
| 16  as recovering or rebuilding or relocating |
| 17  that library, which Annie has done for |
| 18  many libraries across the state of |
| 19  Alabama. |
| 20    Q.      Was this your first day of |
| 21  work? |
| 22    A.      Yes, it was. |
| 23    Q.      So the day that you saw Ms. |

| Page 111 |
|---|
| 1  Payne and Ms. Ralya? |
| 2    A.      Ralya, R-a-l-y-a. |
| 3    Q.      Go down to Bayou La Batre was |
| 4  the first day of your employment at APLS? |
| 5    A.      It was. |
| 6    Q.      So that was that Monday? |
| 7    A.      Yes, if I started on a Monday, |
| 8  yeah. |
| 9    Q.      Do you know whether that trip |
| 10  had been scheduled for later that week? |
| 11    A.      After the fact, I believe I |
| 12  understood from Annie that she had -- that |
| 13  they had changed it without tell her or |
| 14  that she had requested a change and they |
| 15  had ignored that request. |
| 16    Q.      Do you know whether Ms. Brown |
| 17  had requested that she stay behind to help |
| 18  orient you for your new job? |
| 19    A.      That may have been the reason |
| 20  for her request that the trip be on a |
| 21  different day. |
| 22    Q.      Do you know whether Ms. Brown |
| 23  was at work the preceding Friday? |

| Page 112 |
|---|
| 1    A.      I do not know. |
| 2    Q.      How about the preceding |
| 3  Thursday? |
| 4    A.      I do not know. |
| 5    Q.      Do you know what plans had been |
| 6  made for Ms. Brown's attendance at the |
| 7  Bayou La Batre trip? |
| 8    A.      No, I only understood that she |
| 9  was the coordinator of that project, and |
| 10  if I understood correctly -- I spoke with |
| 11  her briefly before I started, and if I |
| 12  remember right, she was kind of excited to |
| 13  have me come down there with her to share |
| 14  in that work.  You know, that's something |
| 15  that is pretty typical of what Annie has |
| 16  done for libraries across the state, is be |
| 17  present when significant moves or |
| 18  renovations or other projects take place. |
| 19  That's one of her -- |
| 20    Q.      Do you know whether Ms. Brown |
| 21  refused to go down to Bayou La Batre |
| 22  because she had to lift some books? |
| 23    A.      That -- I don't know, but that |

| Page 113 |
|---|
| 1  is not in character at all.  Annie will |
| 2  lift books all day long if you ask her to. |
| 3    Q.      Are you aware of any complaints |
| 4  that Mary Payne has voiced about Ms. |
| 5  Brown's cooperation on the project? |
| 6    A.      No, unless something comes |
| 7  to -- sifts to the top. |
| 8    Q.      We've talked about Mr. Bivins |
| 9  and Ms. Mitchell.  What inappropriate, |
| 10  rude, derogatory comments or statements |
| 11  have you heard Mr. Lensch make about Ms. |
| 12  Brown that we've not already talked about? |
| 13    A.      He did not -- I do not remember |
| 14  him saying -- I do not remember Mr. Lensch |
| 15  saying anything ugly about Ms. Brown |
| 16  specifically. |
| 17    Q.      Let's look at number five on |
| 18  your list there. |
| 19    A.      Okay. |
| 20    Q.      It says, "Mr. Bivins on several |
| 21  occasions patronizingly called my |
| 22  co-worker, his supervisee, 'darlin,' 'his |
| 23  little walkabout,' and his 'Australian.'" |

29 (Pages 110 to 113)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 122

1    Q.      Did you ask for flex time ever?
2    A.      I didn't need it. My child
3    care situation did not warrant that I
4    should ask for it, but my child care
5    situation did warrant that if I was
6    expected to be gone from home for 36 or 48
7    hours and I -- that I would make the very
8    most productive use of that 36 or 48 hours
9    that I could for the agency and be able to
10   take the time worked, not the time spent
11   away from home, but the time worked on
12   those trips off at a later time.
13   Q.      Looking at number eight, it
14   says, "Mr. Bivins disrespectfully called
15   my new co-worker, his new supervisee and
16   others in the agency by their last names."
17   A.      Yes. That was not how we
18   talked to each other in the agency. We
19   would call each other by our first names
20   or we might say, Mr. So and So or Ms. So
21   and So.
22   Q.      Who was your new co-worker?
23   A.      Jan Cederquist.

Page 123

1    Q.      And he would call her by her
2    last name?
3    A.      That was one of the things I
4    said in my response to his reprimand:
5    "You're going and you'll take Cederquist
6    with you."
7    Q.      Would he call you by your last
8    name?
9    A.      I don't know that he did. I
10   can't remember. He might have.
11   Q.      Anybody else that you can think
12   of that he called by their last names?
13   A.      I cannot think of a specific.
14   That doesn't mean he didn't. You know, I
15   do have to stress that I had to work very
16   hard to keep my attitude good, so in many
17   cases, part of keeping your attitude good
18   is just sort of letting ugliness roll off,
19   so that you can continue to manage in that
20   situation.
21   Q.      Number nine, I think we've
22   talked about it briefly. It says, "Mr.
23   Bivins, who was not my co-worker's

Page 124

1    supervisor at the time and so had no
2    business talking about it in the first
3    place, harassed my co-worker about the
4    work she was expected to do in the move
5    from our front office to our new back
6    office." Who was the co-worker?
7    A.      Annie Brown.
8    Q.      And what exactly did he say?
9    A.      Something about, "You know, are
10   you ready to move those boxes? Are you
11   ready to move your furniture?" or
12   something to that effect.
13   Q.      Was this said in front of her?
14   A.      Yes.
15   Q.      Who else was there?
16   A.      And myself. Which, A, he was
17   not her supervisor, so he had no business
18   talking to her about her responsibilities;
19   and B, I was in the room, and it was
20   inappropriate for him to engage in that
21   argument with her with her supervisee in
22   the room.
23   Q.      Who would have been the

Page 125

1    appropriate person to engage in that
2    conversation?
3    A.      She reported to Ms. Mitchell at
4    that time, so if Ms. Mitchell wanted Annie
5    to move boxes, Ms. Mitchell should have
6    talked with Annie about moving boxes.
7    Q.      So what was inappropriate about
8    it was the fact that Mr. Bivins had this
9    conversation with her instead of Ms.
10   Mitchell?
11   A.      In front of me, and in what I
12   interpreted to be an ugly and inflammatory
13   tone.
14   Q.      Okay. What was inflammatory
15   about that?
16   A.      Needling her, like, "She's not
17   going to like this, so I'm going to bring
18   it up."
19   Q.      What was her response?
20   A.      I believe she said that she did
21   not plan to move furniture or was not able
22   to move furniture or something to that
23   effect. We talked a lot about the fact

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 126

1    that librarians were being paid librarian
2    salaries to do menial labor and that
3    administrative level staff had been
4    instructed not to assist with those tasks,
5    but to let the librarians do it
6    themselves, so that was sort of the
7    atmosphere surrounding that.
8    Q.      Were there other individuals at
9    the APLS who had the job responsibility to
10   perform the manual labor?
11   A.      I did not keep track of what
12   was going on with that.  I do know -- I
13   think Judy documented in her letter to the
14   board, which I did give you my e-mail copy
15   of it, I believe she did not note that --
16   now, at this time, Annie and Christine and
17   I were the ones doing significant heavy
18   labor, shifting those boxes for the summer
19   library program, and I think that the
20   heavy labor of moving the collection was
21   done at a later time, but also the
22   situation was the same.
23   Q.      How big were these boxes that

Page 127

1    you were shifting?
2    A.      It's not that they were so big.
3    It's that they were very dense.  They were
4    full of -- it was a -- it might have been
5    a box -- well, there might have been
6    bigger boxes, but they were full of very
7    heavy, like, reams and reams of paper
8    products, so they were heavy.
9    Q.      Do you have any idea how much
10   those boxes weighed, on average?
11   A.      I don't know.  20, 30 pounds.
12   Q.      Are there any type of
13   limitations in the job classification of a
14   consultant as to the maximum amount or
15   maximum weight that a consultant could
16   lift?
17   A.      I don't remember anything about
18   that.  I don't think it was part of the
19   job description necessarily at all.
20   Q.      Anything else --
21   A.      Oh, and I apologize for
22   interrupting.  I just want to say that at
23   that point, I was newish in the job, and

Page 128

1    it was my job to say, "Yes, sir, I will
2    move whatever you tell me to move."  And
3    Annie's example to me was that we did what
4    we had to do to get the job done and take
5    care of the libraries, so I wouldn't
6    have -- whatever she told me to do, I
7    would have done.
8    Q.      Do you know where the
9    individuals were who did perform the
10   manual labor at that time?  Were they off
11   doing other things?  Were they there at
12   work?
13   A.      If I remember correctly, the
14   summer library program materials had been
15   handled in such a way that APLS staff did
16   not have to put hands on them at all.
17   They went to the libraries without -- and
18   I could be incorrect.  This was not -- as
19   a cost saving measure, APLS employees were
20   to do this manual labor and this
21   administrative labor to save money, except
22   that they were being paid professional
23   wages to do this manual labor.  So whether

Page 129

1    it was a savings or not --
2    Q.      So what you're saying is they
3    could have paid somebody a whole lot less
4    than you and Ms. Brown and the other
5    individuals to do that stuff?
6    A.      If they wanted to be cheap
7    about the shipping, then they could have
8    been cheap about the shipping and not paid
9    us 20 or 25 or 30 dollars an hour to move
10   and shift boxes, when we could have been
11   assisting public librarians in our state.
12   Q.      Anything else said by Mr.
13   Bivins on that particular occasion that
14   was inappropriate or rude or harassing?
15   A.      No, not that I know of.  I
16   don't know if I -- I don't think I did
17   document this, but I know I had seen Mr.
18   Bivins and Mr. Lensch talking together
19   about other employees.  I cannot give you
20   a specific, but just speaking in a very
21   ugly way about people that I worked with,
22   right in front of me.
23   Q.      Who was it they were talking

33  (Pages 126 to 129)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 130

1  about?
2  A.      I don't remember.  I just
3  remember coming down the hallway and
4  thinking, "Why are they talking that way
5  about their colleagues and why are they
6  talking that way in front of me?"
7  Q.      What were they saying?
8  A.      Oh, just that they were stupid
9  or that they weren't doing what they were
10 supposed to do or something of that
11 nature.
12 Q.      Anything else that you can
13 recall about what they were saying?
14 A.      Not specifically.
15 Q.      All right.  Let's move to
16 number ten.
17 A.      Oh, and I'm sorry, I do want to
18 note that in number nine, I write that
19 that was the occasion of my first talk
20 with Mrs. Mitchell regarding concerns
21 about hostility and bullying in our
22 agency.
23 Q.      Okay.  Tell me about that talk.

Page 131

1  A.      I think probably it had been
2  building for awhile, my concern about it
3  had been building for awhile, but that was
4  the first time that I felt that it was
5  significant enough that I could go and
6  talk to her about it.  And I think I
7  talked to her in terms of it being
8  dangerous for the agency on various
9  levels, in terms of moral and in terms of
10 productivity and in terms, possibly -- I
11 don't know if I told her that it could put
12 the agency in a legal spot or not.
13         And she listened to me very
14 kindly and she said something like, "Oh,
15 that's just his way," or, "You don't have
16 to pay attention to that," or, "Feel free
17 to hit him," or, you know, something along
18 the lines, "Don't take it personally."  So
19 her sense was that that sort of thing was
20 appropriate.
21 Q.      So this was a conversation you
22 had with Ms. Mitchell on August 1, 2006;
23 is that correct?

Page 132

1  A.      This was March 2, 2006.  This
2  was my first --
3  Q.      Oh, okay.
4  A.      March 2, 2006 was the first
5  time that I talked with her about those
6  concerns.
7  Q.      Okay.  And your concern that
8  you were discussing with her was the
9  bullying that you observed?
10 A.      Yes, I put here, "I noted in my
11 work journal an atmosphere of deliberate
12 humiliation, talking behind staff's backs,
13 and threatening language."
14 Q.      What deliberate humiliation did
15 you tell Ms. Mitchell about?
16 A.      I felt like Mr. Bivins was
17 attempting to deliberately humiliate Annie
18 by talking to her about shifting boxes and
19 furniture.
20 Q.      Okay.  Was that the only
21 occasion of humiliation that you discussed
22 with Ms. Mitchell during that particular
23 time?

Page 133

1  A.      At that meeting?  I would not
2  have made a general comment about an
3  atmosphere of deliberate humiliation if I
4  had not seen other incidents, but I did
5  not have any other documented incidents.
6  Q.      What exactly was it Mr. Bivins
7  had said that you believed was
8  deliberately humiliating Ms. Brown?
9  A.      I felt like it was kind of --
10 see, this is all just conjecture on my
11 part.  I felt like he was saying, "Oh,
12 Miss High and Mighty Department Head, even
13 you get to move boxes."  And he even said
14 something about equal work for equal
15 something or other.  To me, it almost
16 sounded like some kind of sideways
17 reference to equal opportunity or equal
18 rights or something like that.
19 Q.      Would it have been humiliating
20 if he had made that statement to a male
21 individual who was a -- who was in a
22 similar or the same position as Ms. Brown
23 at the time?

34 (Pages 130 to 133)

FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

Page 134

1    A.    I feel like it would have,
2    because -- well, partly because of his
3    demeanor.  His demeanor was combative and
4    just -- I don't know how to characterize
5    it.  But also because a male with Ms.
6    Brown's responsibilities and credentials
7    would not be the most cost-effective or
8    appropriate person to be doing that labor
9    either.
10   Q.    And that's the labor that you
11   were doing as well; is that correct?
12   A.    Well, he was talking about
13   moving.  We were doing whatever labor it
14   took to get massive amounts of summer
15   library program materials out to the
16   libraries.
17   Q.    Okay.  Well, what labor was he
18   talking about with respect --
19   A.    Moving our offices from the
20   front of the building to the back.
21   Christine had a large office, because she
22   stored all of the children's materials
23   that she kept on hand for various

Page 135

1    programming and support of the libraries.
2    Annie and I had two small offices.  If I
3    remember right, Christine had a big
4    office, and then Annie's small office and
5    then my small office, and we were all in a
6    line.  And we were moved out of those
7    offices to the back part of the building,
8    above the Library For the Blind and
9    Physically Handicapped.
10   Q.    So where does the manual labor
11   aspect come into that moving?
12   A.    Packing our files, moving our
13   furniture, that -- hauling those boxes of
14   items to -- I think -- you know, I don't
15   think necessarily that carrying our boxes
16   of files and books was that big a deal.  I
17   think it was the furniture moving that was
18   inappropriate.
19   Q.    You moved --
20   A.    We all did.  Christine, Annie
21   and I did.  And if I remember right, Mr.
22   Smith lost his office and moved into our
23   area and he went and got his office.

Page 136

1    Q.    When you say, "Christine,"
2    Christine Bowman?
3    A.    Christine Bowman, yes, the
4    children's consultant.
5    Q.    So did she actually have to
6    move furniture also?
7    A.    I don't remember seeing it with
8    my own eyes, but she was expected to -- I
9    think in the end, after harassing Annie
10   about this, we did get one of our -- we
11   got a maintenance person to move the
12   really big stuff.
13   Q.    Did you have to move furniture?
14   A.    I did not really have
15   furniture.  I had modular stuff that was
16   bolted to the walls.
17   Q.    You say Mr. Smith moved as
18   well?
19   A.    He did.
20   Q.    Did he move furniture?
21   A.    He was -- he did have to move
22   furniture.
23   Q.    What was his position there?

Page 137

1    A.    He was -- I don't think he
2    supervised, but I think he might have been
3    a department head.  I'm not sure.  I'm not
4    sure.  He was the one who was in charge of
5    that library services and technology act
6    money, which was so --
7    Q.    Who else did you see move
8    furniture?
9    A.    On one occasion, I saw Mr.
10   Bivins move furniture, and most of the
11   furniture was moved by Mr. Rufus Brown, I
12   think that was his last name, and Mr. Ron
13   Barnes.
14   Q.    What furniture did you observe
15   Ms. Brown moving?
16   A.    I don't know if I did observe
17   her moving furniture.
18   Q.    Mr. Smith, was he Caucasian or
19   white?
20   A.    Yes.
21   Q.    During this March 2, 2006
22   conversation with Ms. Mitchell, was
23   anybody else present?

35  (Pages 134 to 137)

FREEDOM COURT REPORTING

Page 138

1  A.    I don't think so.
2  Q.    Was this in her office?
3  A.    Yes, it was.
4  Q.    What had happened that brought
5  you to go talk to her on that particular
6  day?
7  A.    On August 1st?
8  Q.    On March 2nd.
9  A.    That was -- I believe that
10  was -- that might have been -- I believe
11  that was the exact day that Mr. Bivins
12  came to talk with Annie.  And as I say, I
13  did not document other events, but I would
14  not have just flown off the handle and
15  marched off to talk to her unless I had
16  had something on my mind for sometime.
17  Q.    You also state that you talked
18  with her about the fact that Mr. Bivins
19  had been talking behind staff's backs?
20  A.    Yes.
21  Q.    Who had he --
22  A.    Well, actually, my sentence
23  says, "I noted in my work journal an

Page 139

1  atmosphere of deliberate humiliation,
2  talking behind staff's backs and
3  threatening language."
4  Q.    So what did you tell Ms.
5  Mitchell about that?
6  A.    If I remember right, I told her
7  that I was very -- oh, I said to her, "I
8  am seeing hostility and --" or something
9  to the effect of hostility and abusive or
10  bullying behavior.
11      And she said, "By Annie?"
12      And I said, "No, by Hulen."
13      And so then I talked to her
14  about that situation and I -- again, as I
15  said a bit earlier, I believe I told her
16  that that hostility -- that hostile
17  environment would, at best, be a problem
18  for morale and productivity, and at worst
19  could put the agency and Mrs. Mitchell in
20  a bad situation.
21  Q.    What examples of a hostile
22  environment did you give to Ms. Mitchell?
23  A.    I do not remember.  But, I

Page 140

1  mean, name calling and such were pretty
2  common.
3  Q.    What name calling --
4  A.    Making fun of people.
5  Q.    What name calling did you tell
6  her about?
7  A.    I'm sorry, I don't remember.
8  And again, I just want to state that when
9  you're in an ugly atmosphere like that,
10  you have to let a lot roll off so that you
11  can continue to do your job.
12  Q.    Well, at that time, what was
13  the ugly atmosphere?
14  A.    The event that prompted me to
15  go see her was Mr. Bivins' conversation
16  with Ms. Brown.
17  Q.    About the lifting and moving of
18  items?
19  A.    Yes, yes, and how she was not
20  above having to do manual labor like
21  everyone else and he -- as if he were
22  trying to take her down a peg.
23  Q.    What examples did you give Ms.

Page 141

1  Mitchell about talking behind staff's
2  backs?
3  A.    On March 2nd -- I believe prior
4  to that point, I had not documented
5  anything.  If I had, it would be in this
6  letter.  I do not remember what examples I
7  gave her.
8  Q.    Were you documenting --
9  A.    Oh, wait.  Yes, I do.  Yes, I
10  do.  Because I remember when I came
11  into -- when I first came to work there,
12  Harry Lensch sat and talked to me at great
13  length about the incompetence at APLS and
14  how people expected to continue to work at
15  APLS for the rest of their lives and it
16  was a -- he didn't use the words "gravy
17  train," but something to the effect of
18  that they were just going to sit behind
19  their desk and coast until it was time to
20  retire, and so I did have examples from
21  very early.
22  Q.    When he told you about this,
23  did he give you the names of any folks

36 (Pages 138 to 141)

ALABAMA STATE PERSONNEL BOARD ALABAMA STATE PERSONNEL DEPARTMENT

ADMINISTRATIVE CODE

## CHAPTER 670-X-4 PROHIBITION OF DISCRIMINATION

TABLE OF CONTENTS

670-X-4-.01 Prohibition Of Discrimination

670-X-4-.02 Affirmative Action

670-X-4-.03 Appeal Rights

670-X-4-.01 **Prohibition Of Discrimination.** Discrimination against any person in recruitment, examination, appointment, training, promotion, retention or any other personnel action, because of race, sex, national origin, age, handicap, or any other nonmerit factor, is prohibited.

Author:

Statutory Authority: Code of Ala. 1975, § 36-26-9.

History: Filed September 29, 1981.

670-X-4-.02 **Affirmative Action.** All agencies having classified employees shall adopt, maintain and actively enforce affirmative action plans to encourage employment of women and minorities at all levels and in all areas of state employment.

Author:

Statutory Authority: Code of Ala. 1975, § 36-26-9.

History: Filed September 29, 1981.

670-X-4-.03 **Appeal Rights.** Any applicant or employee who has reason to believe that he has been discriminated against because of religious or political opinions or affiliations or race, sex, national origin, age, or handicap in any personnel action may appeal to the State Personnel Board. The appellant and the person responsible for the alleged discriminatory

action shall have the right to be heard by the Board or a special hearing agent and to present evidence. If the Board finds after hearing that there was discrimination on any of the above nonmerit factors, it shall order appropriate corrective action and its decision shall be final.

**Author:**

**Statutory Authority:** <u>Code of Ala. 1975</u>, § 36-26-9.

**History:** Filed September 29, 1981.

---



**ALABAMA
PUBLIC LIBRARY
SERVICE**



REBECCA S. MITCHELL
DIRECTOR

August 2, 2006

To Whom it May Concern,

I have worked with Annie Lucas Brown for five years. I would like to express my gratitude and my very high opinion of her as a professional and as a friend.

When I was a public library director, my library, community, and staff benefited enormously from Annie's expertise, her courtesy, the excellent workshops she implemented at the Alabama Public Library Service, and her generosity with the very best of resources libraries need to maintain and improve services. Her pleasant manner and professionalism meant it was always a pleasure to see her, and I looked up to her. She has been a public library director, so she understands the challenges public libraries face. Many changes for the better would never have taken place at my library if it were not for Annie's support.

I began working for the Alabama Public Library Service, under Annie Brown's supervision, in November of 2005. I am very impressed by Annie's foresight, vision, and organizational skills. She is constantly listening to public libraries to tailor her services to their real needs and help them to be the best they can be.

I have admired and learned from her example each and every day. As a supervisor she communicates clearly and kindly. She asks that her supervisees participate in the process of planning and making initiatives a success. She encourages her supervisees to innovate and stay positive. She is punctual about meeting requirements to support her staff, and advocates strongly for her staff. She endeavors to help employees succeed by helping them meet their needs for information, training, resources, experience, and work-life balance. She strives to continue learning every day so that her services may better support public library and APLS staff. I appreciate her kindness, honesty, integrity and professionalism so much.

Sincerely,

*Kim Wilson Owen*

Kim Wilson Owen

6030 MONTICELLO DRIVE • MONTGOMERY, ALABAMA 36130-6000 • 334/213-3900 • 800/723-8459 • FAX 334/213-3993
REGIONAL LIBRARY FOR THE BLIND AND PHYSICALLY HANDICAPPED 800/392-5671

responsibilities have changed, she has been denied the communication, information authority or resources to continue her high level of service. As just one example, we have fewer workshops in spite of the excellent feedback received from librarians who attended workshops and workshops coordinated by Annie are pertinent, on time, and have the ability to make library staff's travels to Montgomery less burdensome. When Annie does not coordinate a workshop, those meetings are sometimes poorly publicized, run over the allotted time, have mistakes or problems with handouts or refreshments, have no refreshments, and suffer confusion as to responsibilities and deadlines to create a successful workshop or meeting.

As I transitioned into my new responsibilities here at APLS, I found that my ability to be productive and find useful focus was curtailed by the pressure placed on, or the resources and information denied to, Annie. I felt uncomfortable going 'above her head' to promote myself, due to her integrity and kindness to me. I came to the organization with very high hopes of being able to learn and contribute to Alabama's Public Libraries at the same high level as the many other professionals on APLS staff. I was very disappointed to see the situation Annie has endured, and its impact on my ability to grow professionally and serve public libraries.

I deeply regret the situation here at APLS. It is painful to see the inappropriate treatment of staff who have been such a wonderful support for public libraries and staff for many years. If it can happen to Annie and other employees with long term high performance and good standing, it can certainly happen to anyone. I have spoken with my director on three occasions regarding the communication problems and (as I perceive them, from my limited perspective) bullying in this agency. I hope that these problems may be resolved quickly so that the agency and its staff may begin to heal and return to our high standard of vision and service for Alabama's Public Libraries.

It is certainly not up to me to determine guilt, responsibility, or resolution. The resolution will come from APLS management, state government and perhaps the judicial system.

If I were able to influence that resolution, I would ask that all agency staff, especially top management, would be absolutely required to take training in the following areas, and held accountable for insuring that the principles in the training were implemented:
- Identifying and stopping workplace bullying and psychological harassment.
- Retooling communication, behaviors, and disciplinary actions to fit the principles set out in the state of Alabama's personnel training classes, to implement methods of communication that are appropriate and effective in a professional environment.
- Training in encouraging staff participation in, and clear articulation of, strategic plans, vision, and implementation, would also help us move forward.

Please do not hesitate to contact me if you have any further questions.

Sincerely,

Kim Wilson Owen
Alabama Public Library Service

EXHIBIT H

December 3, 2007

Executive Board
Alabama Public Library Service
6030 Monticello Drive
Montgomery, AL 36130

Dear Board Members:

I was employed by the Alabama Public Library Service (APLS) from October 2000 through March 2004 as an Administrative Support Assistant (ASA) II and from October 2004 through May 31, 2007 as the Executive Secretary. I enjoyed most of my time while there.

During my time with APLS, I saw the work environment steadily decline. The oppressive feeling on the premises and in the building had begun to make me physically sick. My departure from the Agency earlier this year was precipitated by feelings of racial bias and hostility that I had expressed to the Agency Director and to several members of the Executive Board, to no avail.

After my supervisory role was removed from me in October 2006 to justify a white female employee's promotion, I decided that something needed to be done. In November 2006 I confidentially (due to fear of retaliation) spoke to two (2) Board members expressing my concerns over the work environment becoming hostile. I spoke to Mr. Snider and Mrs. Dickey (the then Board Chair) and asked each of them to keep my identity secret because I was afraid of losing my job as retaliation for speaking out. After the leadership of the Agency became aware that an employee had spoken to the Board members, I overheard several conversations in the Director's office where they were trying to determine who had spoken up and comments made to the effect that if they found out who it was that person would be fired. When I spoke to Mrs. Dickey she expressed a concern in what was going on and in finding a solution to the problem and she asked me to give her until after the holidays to come up with a solution. After witnessing several closed door meetings between Mrs. Dickey and the Director and Assistant Director, it became very clear to me that any solution found would inevitably be in favor and support of the Agency's leadership yet again leaving the employees to cope the best way they could with the tensions in the building.

In April 2007 (I had spoken to Mrs. Mitchell on several occasions prior to this one) I was asked in to Mrs. Mitchell's office. We went into her office and she asked me what was wrong that I seemed to have been sick a lot recently. After telling her several times that she really did not want to get into that and insisting that we needed to talk about it, I asked her if she had any idea what it was like to feel the only reason you have your job is because of the color of your skin and not your true abilities? If she knew what it was like to get physically ill every time you drove into the parking lot. I told her that is what I go through every time I wake up and have to get dressed to come to work, that every time I drove into the parking lot I would get sick at my

LaTonya Moore ◦ 3004 Southmall Circle Apt A ◦ Montgomery, AL 36116 ◦ (334) 315-3737

stomach. She immediately became defensive and asked me how I could accuse of her that. I told her that I did not accuse her of anything directly and that her silence allowed people to be mistreated. When I would talk to her about how the Confidential Assistant (CA) made no attempts to hide the fact that he would rather have a white person in my position and went as far as to hire a white woman that he said to me and others "would show Mrs. Mitchell what an Executive Secretary should be," her words to me were "you just have to ignore Harry." I even went as far as to tell Mrs. Mitchell that the CA and his secretary were creating a hostile work environment for one of their employees and that the employee had every right to sue the Agency and name Mrs. Mitchell because she refused to take any action on the employees' behalf and all she said was "I told her that if she needed to talk she could come talk to me." After this employee was not able to prove the CA's point where the Executive Secretary was involved, he no longer had a need for her; once he received his new ASA III the plot began to get rid of this employee.

On several occasions I even asked if she would prefer to have someone else in my position and again she would tell me no that I just have to learn to ignore what Harry and his people were doing or saying. It became increasingly harder for me to do my job appropriately. I had informed Mrs. Mitchell of a racial comment made to me by a former subordinate that had just been promoted and given my supervisory duties as well as other duties, and that this same employee had even instructed some of her subordinates not to associate with certain other staff members which was breeding an air of contention throughout the Agency, again Mrs. Mitchell's reply was to simply ignore what was going on.

There are more incidents that need to be investigated independently of the leadership at APLS.

I hope this letter gives more insight to the treatment of employees and the work environment at the Agency and that a positive solution can be found quickly to ensure no more good employees are lost to other agencies or to early retirement.

Thank you for your time and consideration. If you have any questions please feel free to contact me at (334) 315-3737.

Sincerely,

LaTonya D. Moore

LaTonya Moore ≈ 3004 Southmall Circle Apt A ○ Montgomery, AL 36116 ○ (334) 315-3737

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **ANNIE LUCAS BROWN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) CASE NO.:2:07-cv-841-MHT-WC |
| | ) |
| **Vs.** | ) |
| | ) |
| **ALABAMA PUBLIC LIBRARY SERVICE,** | ) |
| | ) |
| **Defendant.** | ) |

**PLAINTIFF'S ANSWERS TO DEFENDANT'S
INTERROGATORIES AND REQUESTS FOR PRODUCTION**

Comes now the Plaintiff, **ANNIE LUCAS BROWN,** and answers Defendant's Interrogatories and Requests for Production as follows:

1.  **Annie M. Lucas Brown,** 55 years of age; SS# 4▇▇▇▇▇▇; Alabama Drivers' License No.: ▇▇▇▇ 2508 Brothers Drive, Tuskegee, Alabama 36083.

2.  2508 Brothers Drive, Tuskegee, Alabama 36083.

3.  I have been employed for the past ten years with the Alabama Public Library Service.

4.  I have an Associates of Arts Degree from Alexander City State Jr. College. I also have a B.S. from Alabama State University in Sociology with a minor in Business Administration. I also have a Masters Degree in Library and Information Studies from Atlanta University.

5.  Objection, irrelevant and immaterial.

6.  About three years ago, I sued an individual for
    property damage and bodily injuries resulting from an
    automobile accident.  I recovered but I do not recall
    the amount of the damages awarded.

7.  The written reprimand of July 25, 2006 by Rebecca
    Mitchell, who is white, was unwarranted because the
    underlying allegations of Ms. Mitchell were not based
    in fact and it violated the definition of a "reprimand"
    as described in the State of Alabama Progressive
    Discipline Manual, June 2006 Edition.  According to the
    manual, a reprimand should "state the continued or
    additional unwanted behavior and the necessity of
    the desired behavior."  It should also state that
    "further disciplinary action would take place if the
    behavior does not come in line with job standards."  A
    corrective action plan was to be developed and the
    reprimand should have included the reprimand and the
    corrective action plan.  More importantly, a reprimand
    is the "second step" of the discipline system for Ms.
    Mitchell should have utilized step one of the
    discipline process which is a "written warning".
    Finally, there is no language in the Alabama Public
    Library Service Employee Handbook, "Travel" section
    that prohibits an employee checking on his or her

travel reimbursement, especially when one has incurred more than $1,500 on his or her personal credit card and is in need of reimbursement.

8. Yes, but it was more than 10 years ago in the Middle District of Alabama, Eastern Division. I do not know the case number.

9. See my response to Question 7.

10. In addition to the improper and unwarranted written reprimand of July 25, 2006, Ms. Mitchell and other managerial staff, intentionally created a hostile work environment for me. Other white co-workers have been instructed not to associate with me; I have been denied the use of supplies to conduct workshops; my performance appraisal for 2005-2006 was unreasonably reduced to "Partially Meets Standards" to prevent me from receiving a pay raise; my supervisory duties were removed from me, as the only black professional hired by Defendant; my job title as Library Operations Manager, a professional position was changed to a mere "Consultant"; and I am constantly being treated differently from my white counter-parts employed by Defendant.

11. Rebecca Mitchell informed me that my title was Consultant and no longer Library Operations Manager in June of 2006.

12.  See my response to Question 10.

13.  See my response to Question 10.

14.  Judith Shepard, who is a white professional, also received a letter of reprimand during the same time period and her supervisory authority was retained and her performance appraisal for the period in which she received the reprimand was completed in such a manner to allow her to receive a pay raise.

    None of the white employees are forbidden from using supplies and none of the white employees are ostracized.

15.  The allegation by Rebecca Mitchell in her July 25, 2006 written reprimand that I committed "gross insubordination, and disruptive conduct undermining her authority" is false and is pretextual.  Ms. Mitchell's allegations that "I made false accusations on staff and that my demeanor and words created an environment of personal and professional embarrassment for the agency and Ms. Mitchell, are false and pretextual.

16.  See my responses to Questions 7, 9, 10, 11, 12 and 13.

17.  Rebecca Mitchell, Director; Hulen Bivens, Assistant Director and Harry Lensch, Confidential Assistant/Business Manager, all of whom are employed by Defendant.

18. The discriminatory employment actions perpetuated against me have caused me to have high blood pressure; and I have broken out in spots on my arms, back and legs due to emotional stress caused by my job; the emotional stress has prompted my thyroid to act up; I have gone to see a psychologist to assist me to deal with the emotional stress of my job.

19. Dr. Robert M. Combs, 2165 Normandie Drive, Montgomery, Alabama 36111 and Dr. Daniel C. Clark, 4146 Carmichael Court, Montgomery, Alabama 36130.

20. Objection to going back to 1997 for such information is irrelevant, immaterial and unduly burdensome.

21. The persons who witnessed or who have information relevant to the claims of the basis of this suit are: Rebecca Mitchell; Hulen Bivens; Judith Shepard; Christine Bowman; Kim Owen; Cheryl Fondon; LaTonya Moore, Joanna Bice; Jackie Barnes; Amanda Daniel; Kim Goodson; Mack Butler; George T. Washburn, Jr., Robert E. Hodge; Ronald A. Snider; Donald Dickey; Bobbie Lou Leigh; Helen Harrison Phillips; Robert Schremser; DeLois Humphrey and Aseelah Salaam.

22. Back pay which is the difference between what I could have earned if I had received an "Exceeds Standards" in all areas of my 2005-2006 performance appraisal with a pay raise and what I had actually earned without the

pay raise. I also am requesting compensatory damages in the amount of $300,000 and punitive damages for the intentional employment discriminatory conduct of Defendant.

23. The experts identified at this time are Plaintiff's medical providers identified in the response to Question 19.

24. I was provided a copy of the December 3, 2007 letter that LaTonya Moore, who is black, sent to the Executive Board members of the Alabama Public Library Service regarding the hostile work environment she faced as an Administrative Support Assistant from October 2000 through March 2004 and as Executive Secretary from October 2004 through May 31, 2007. Ms. Moore cited many instances of racial discrimination and hostile work environment, in her letter.

25. Objection, not relevant and immaterial.

26. Objection, not relevant and immaterial.

### PLAINTIFF'S RESPONSES TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS

Comes now Plaintiff, **ANNIE LUCAS BROWN** and answers Defendant's Request for Production of Documents as follows:

1. I have attached a copy of the July 25, 2006 improper and unwarranted "written reprimand" to me from Rebecca Mitchell. I have also attached a copy of the "Reprimand" section from the State of Alabama

Progressive Discipline Manual; a copy of the Travel Policy from the Alabama Public Library Service Employee Handbook; a copy of my rebuttal to the contested Performance Appraisal attached copies of my previous Performance Appraisals; a copy of a June 2, 2006 memo from me to Rebecca Mitchell requiring me to justify my request for office supplies; copies of the salary schedule for a Library Operations Manager and salary schedule for a Library Consultant; a copy of the July 11, 2006 Amendment, Request for Out of State Travel for Annie Brown; a copy of Chapter 670-X-4 Prohibition of Discrimination policy from the State Personnel Board's Administrative Code; and a copy of a June 14, 2006 memo from Rebecca Mitchell to Annie Brown and others about their respective consultant assignments.

2.   In addition to the documents referenced in 1 above, I have enclosed a copy of an August 9, 2006 letter to Rebecca Mitchell from my attorney, copies of relevant communication with EEOC and copies of an August 11, 2006 letter to each of Defendant's Board Members from my attorney regarding the August 9, 2006 letter to Rebecca Mitchell regarding her discriminatory actions. I also have enclosed a copy of a March 8, 2007 letter to me from Beta Kappa Chapter of Beta Phi Mu selecting

me as 2007 Librarian of the Year.

3.    None

4.    Copy of a December 3, 2007 letter from LaTanya Moore to Executive Board of Alabama Library Service.

5.    I have requested such records but I have not received them. Therefore, I will supplement this response with the records upon receipt of same.

6.    None

7.    None other than those produced, but additional documents could be revealed during further discovery.

8.    See documents provided showing difference in salary according to Salary Schedule for Library Consultant and Library Operations Manager. My performance appraisal for 9/01/2005 to 9/01/2006 indicating "Partially Meets Standards" also prevented me from receiving a pay raise.

9.    See response as that to Question 5.

10.   None

11.   None other than those provided.

12.   Not available, which is the automobile accident in which I was the Plaintiff as referenced in my interrogatory Response to Question 6.

13.   See attached.

14.   The medical records which I have requested from my treating physicians and the salary schedules produced

herein.

15. Undetermined at this time.

16. None

17. I am relying on the Title VII of the Civil Rights Act
of 1964, 42USCA Section 2000e et seq. as amended by the
Equal Employment Opportunity Act of 1972.

18. See attached.

19. See attached.

20. Objection, irrelevant and immaterial.

21. See attached.

22. Objection, overly burdensome and poses an undue
hardship since Plaintiff has been employed with
Defendant since 1997.

23. Objection, overly burdensome and poses an undue
hardship since Plaintiff has been employed with
Defendant since 1997.

24. I have copied and attached the relevant portions of the
manual.  The entire manual is available for inspection
by Defendant's counsel.

25. See attached.

26. Objection, irrelevant and immaterial.

**Done this the 11th day of January, 2008.**

ANNIE LUCAS BROWN

STATE OF ALABAMA    )
                      )
COUNTY OF MACON     )

    I, _____Barbara E. Adams_____, Notary Public for said state in said county hereby certify that **ANNIE LUCAS BROWN** whose name is signed to the foregoing **Plaintiff's Answers to Defendant's Interrogatories and Requests for Production,** and who is known to me, acknowledged before me on this day that, being informed of said contents of said foregoing, she executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal this the ___11th___ day of ___January___, 2008.

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 8, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

NOTARY PUBLIC
**My Commission Expires:  6/08/09**

### CERTIFICATE OF SERVICE

    I hereby certify that I have served a copy of the foregoing **Plaintiff's Answers to Defendant's Interrogatories and Requests for Production,** upon the following attorney of record, by U. S. Mail, postage prepaid and properly addressed, this the 11th day of January, 2008:

**R. Austin Huffaker, Jr.**
**Attorney for Defendant,**
**Alabama Public Library Service**
**Post Office Box 270**
**Montgomery, AL  36101**

**DEBORAH HILL BIGGERS**
**Attorney at Law**

*Jill Copy*

**Form 13P**
**Revised**

## EMPLOYEE PERFORMANCE *APPRAISAL*
## STATE OF ALABAMA
## Personnel Department

Emr ...... R SHEPARD                          Social Security Number: XXX-XX-4389

...... ARY SERVICES                           Division:

...... RARY OPERATIONS MGR                    Class Code: 30515 Position #: 03880100

Period Covered From: 08/01/2005 To: 08/01/2006    Annual Raise Effective: OCTOBER 2006

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN  XXX-XX-3100 | | SSN  XXX-XX-0058 |
| *Hulen Bivins* | | *Rebecca S. Mitchell* |
| Rater Signature | | Reviewer Signature |
| Hulen E. Bivins | *Judith R. Shepard* | Rebecca S. Mitchell |
| Rater Printed Name | Employee Signature | Reviewer Printed Name |
| 7/28/06 | 7-28-06 | 7-28-06 |
| Date | Date | Date |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

| 25.70 | − | 7.00 | = | 18.70 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) XX | Exceeds Standards (26.6 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |
|---|---|---|---|---|
| [ ] | [ ] | [XX] | [ ] | [ ] |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| . Plan, organize, coordinate, monitor, and evaluate the Information Services | 3 |
| . Interviews, slects, and trains new staff, monitors, and evaluates professional | 3 |
| . Provides agency administration with accurate and timely reports of divisional | 3 |
| . Maintains positive working relationships with other agency staff, library | 2 |
| . Provides, either directly or by delegation, reference, research, and ____ | 2 |
| . Assists in collection development activities for the agency to insure that | 3 |
| . Plans for the on-going development of resource sharing programs and manages | 2 |
| | |
| | |
| ). | |

**RESPONSIBILITY SCORE:**

| 18 | ÷ | 7 | = | 2.57 | × | 10 | = | 25.70 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| Warning | Reprimand | Suspension | Demotion |
|---|---|---|---|
| -0- | 1 | -0- | -0- |

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, suspension, and demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:** _____ 7 _____

*full copy*

Form 13P
Revised (r

## EMPLOYEE PERFORMANCE *APPRAISAL*
## STATE OF ALABAMA
## Personnel Department

Empl    R SHEPARD                         Social Security Number: XXX-XX-4389

Ar      ARY SERVICES                      Division:

        ___RARY OPERATIONS MGR            Class Code: 30515 Position #: 03880100

Period Covered From: 08/01/2005 To: 08/01/2006    Annual Raise Effective: OCTOBER 2006

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote upervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures re mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN XXX-XX-3100 | | SSN XXX-XX-0058 |
| *Hulen Bivins* | *Judith R. Shepard* | *Rebecca S. Mitchell* |
| Rater Signature | Employee Signature | Reviewer Signature |
| Hulen E. Bivins | | Rebecca S. Mitchell |
| Rater Printed Name | | Reviewer Printed Name |
| 7/28/06 | 7-28-06 | 7-28-06 |
| Date | Date | Date |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

| 25.70 | − | 7.00 | = | 18.70 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| [ ] | [ ] | [XX] | [ ] | [ ] |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary. No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

|  | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | ____ | X | _____ |
| Punctuality | ____ | X | _____ |
| Cooperation with Coworkers | ____ | X | _____ |
| Compliance with Rules | ____ | X | _____ |

Form 13P          **EMPLOYEE PERFORMANCE** *PREAPPRAISAL*
Revised (01/2006)          **STATE OF ALABAMA**
                          **Personnel Department**

| | |
|---|---|
| Employee Name: <u>JUDITH R SHEPARD</u> | Social Security Number: <u>XXX-XX-4389</u> |
| Agency: <u>045/PUBLIC LIBRARY SERVICES</u> | Division: |
| Classification: <u>LIBRARY OPERATIONS MGR</u> | Class Code: <u>30515</u> |
| Period Covered From: <u>08/01/2006</u> To: <u>08/01/2007</u> | Position Number: <u>03880100</u> |

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These factors should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of preparing, conducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop responsibilities and results.

1. Plan, organize, coordinate, monitor, and evaluate the Information Services Division and its services.

2. Trains new staff, monitors, and aids in the evaluation of professional and paraprofessional staff performance so that recommendations can be submitted to supervisor and so that positive/negative feedback is provided, unsatisfactory performance is corrected, and documentation is kept for personnel actions.

3. Provides supervisor with accurate and timely reports of divisional activities on a monthly basis. No more than two late reports per year.

4. Maintain positive working relationships with other agency staff, library associates in public and other types of libraries, and the general public.

5. Provides, either directly or by delegation, reference, research, and interlibrary loan services, in an accurate and timely fashion. Reviews the agency collection development policy yearly and reports any recommendations for changes to the position's supervisor.

6. Assists in collection development activities for the agency to insure that the collection reflects the needs of its clientele.

7. Plans for the on-going development of resource sharing programs and manages the STARS program so that the agency is actively involved and lends materials in a timely and accurate manner. Plans and conducts workshops for updates on ILL for the public librarians.

**WORK HABITS:** Provide a check in the appropriate space to document that the policies and procedures concerning the following areas have been discussed with the employee. For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

| | |
|---|---|
| _____ | Attendance |
| _____ | Punctuality |
| _____ | Cooperation with Coworkers |
| _____ | Compliance with Rules |

## *PREAPPRAISAL SIGNATURES:* Signatures are mandatory.

Date the Preappraisal Session was held with the employee: _____

Employee Signature: (denotes discussion and receipt of form, not agreement) *Judith R. Shepard*

Rater Signature: (denotes discussion and employee receipt of form) *Hazel Burns*

Reviewer Signature: _____

## EMPLOYEE PERFORMANCE *MIDAPPRAISAL*

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period.

_____

_____

Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period. Document any actions taken or the corrective action plan that was developed to improve the areas of weakness. If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.

_____

_____

State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period. Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this section should be completed.

_____

_____

A Midappraisal session has been held on this date and performance has been discussed: _____

Employee Signature: _____    Initial if comments attached: _____

Rater Signature: _____    Initial if comments attached: _____

Reviewer Signature: _____    Initial if comments attached: _____

(Signatures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are mandatory. Employee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. The person attaching comments must initial in the appropriate space.)

February 27, 2006

To:         Judith Shepard

From:       Hulen E. Bivins

Re:         Employee Reprimand

This memo to your attention is with regard to two items of employee conduct that
are unacceptable. One item is intentional statements of false data in a written form.
(See: <u>Alabama Administrative Code</u>, Chapter 670-X-19-.01(a)(4), (5), and (7)). The
second item is insubordination. (See: <u>Alabama Administrative Code</u>, Chapter 670-X-19-
.01(b)(2)

1.      In a written communication from you concerning the topic of "Videos and
DVDs" (see attachment) issued on February 24, 2006 to the attention of Rebecca
Mitchell, State Librarian, and myself, you conclude with a suggested action that
you claim to have proposed in the past. Such a statement is false and without
basis. Rather, it is Ms. Mitchell who, as State Librarian, has suggested for the
past two years the action that you now claim as your thought. Indeed, it is fact,
confirmed by several APLS employees including Ms. Mitchell herself, that not
only did you not propose the action for which you credit yourself, what you did do
is delay the implementation of any action regarding the matter of videos and
DVDs that was suggested by the State Librarian. Your statement therefore
shows an inattention to your job tasks resulting in a failure to perform your job
properly thus causing a disruptive influence. (See: <u>Code</u>, items (a)(4), (5) and
(7)).

Furthermore, your communication of February 24, suggest, "We need to
notify these patrons that we are no longer purchasing videos and that we are
going to stop circulating them." You present such as a statement of fact. This is
not true. APLS has in the past month, placed an order for new video titles in the
DVD format and plan to add additional titles in the hope that increased
circulation, through and including FY '07, will indicate a usefulness of this library
circulation service. To incorrectly imply any other decision has been made by the
agency, certainly to the public, has a disruptive effect showing an inattention to
your specific job and its inherent duties resulting in a failure to perform your job
properly. (See: <u>Code</u>, items (a)(4), (5) and (7)).

As you are aware following many years of service as a professionally
trained librarian, honesty is an integral part of the profession of librarianship. For
example, issues such as plagiarism have been and continue to be of great
importance. Personal honesty is of no less importance. Diligence must be

1

exercised to preserve the truth and you are directed to conform to this standard. Certainly, to appropriate the words, thoughts and the directives of the State Librarian as your own is not acceptable.

2.    Under the reorganization of APLS as announced in January of this year, I am now designated as your immediate supervisor. Your memo of February 24 (cited above) was given to Ms. Mitchell prior to any discussion with me. You did not even have the courtesy to inform me personally of the memo but rather sent an email after already insuring the delivery of your comments to Ms. Mitchell. Your conduct in this matter is disrespectful, hurtful and mean-spirited. It is simply an act of insubordination. (See: Code, item (b)(2)). Such will not be tolerated.

Further, this is the second time, in recent days, of conduct of insubordination on your part, the former time being when you discussed, in January (2006), a wedding celebration party for APLS employee Beverly Davis. Again, you talked with Ms. Mitchell prior to me. To make the matter of greater disrespect, you then scheduled the function of honor for Ms. Davis on a date that you, for more than two weeks prior, knew was a date on which I would not be at APLS. Further compounding the disrespect, the date and time you selected to honor Ms. Davis was a date on which Ms. Mitchell, the State Librarian, could not be present. (See: Code, item (b)(2)).

Everyone at APLS is participating in a period of great change designed to assure that the agency fulfills the charge placed before it via the Code of Alabama. In so doing, the status quo of the past is being left behind as APLS molds itself into an agency prepared to fulfill its charge in the future. You, as a member of the APLS staff, must participate in these changes and you must be supportive of said changes. Anything less in your words, conduct, or countenance, shall not be appreciated, shall not be rewarded, and will not be acceptable.

You are encouraged to make positive change so as not to allow a recurrence of the problems outlined herein. A copy of this employee reprimand as directed to your attention this day shall be placed in the APLS Personnel File. You may provide a written explanation of your actions as cited in this reprimand and/or you may provide in writing any factors which you believe mitigate your responsibility for your actions as cited. You are requested to provide said writing within a period of three (3) working days from the date of this reprimand.

_Hulen E. Bivins_
Hulen E. Bivins
Assistant Director
Alabama Public Library Service

Received 27th day of February, 2006

_____
Judith Shepard

2

February 24, 2006

From:  Judith Shepard, Head Information Services

To:  Rebecca Mitchell
     Hulen Bivins

Recommendation: Videos and DVDs

We have libraries and state employees who still use APLS videos. Some of them book in advance. We need to notify these patrons that we are no longer purchasing videos and that we are going to stop circulating them.

Our patrons need to be given a date and they need to have time to purchase DVD players. I think abruptly stopping the circulation of videos, if that is what is planned, will upset the patrons who are using them.

I suggest what I have proposed in the past: we phase out the videos and weed them as we get replacement DVDs or new DVDs.

EXHIBIT L

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

| ENTER CHARGE NUMBER |
| --- |
| ☐ FEPA |
| ☐ EEOC |

_____ and EEOC

*(State or local Agency, if any)*

| NAME *(Indicate Mr., Ms., or Mrs.)* | HOME TELEPHONE NO. *(Include Area Code)* |
| --- | --- |
| Mrs. Annie Lucas Brown | **(334) 727-2080** |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
| --- | --- | --- |
| 2508 Brothers Drive, | Tuskegee, Alabama 36083 | Macon |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(Include Area Code)* |
| --- | --- | --- |
| Alabama Public Library Service | 20+ | **(334) 213-3900** |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
| --- | --- |
| 6030 Monticello Drive, | Montgomery, AL 36130-6000 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
| --- | --- |
| Rebecca S. Mitchell, Director | **(334) 213-3900** |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
| --- | --- |
| 6030 Monticello Drive | Montgomery, AL 36130-6000 |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

[X] RACE  [X] COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ AGE  ☐ RETALIATION  ☐ OTHER *(Specify)*

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE *(Month, day, year)*
July 25, 2006

THE PARTICULARS ARE *(If additional space is needed, attached extra sheet(s)):*

Annie Brown, who is a black female, has been employed with the Alabama Public Library Service since 1997. Mrs. Brown was initially hired as a consultant in Library Administration and Management. In May 2002, Mrs. Brown was promoted to Library Operations Manager. Mrs. Brown is the only professional minority employed in the Alabama Public Library Service.

On July 25, 2006 Ms. Rebecca Mitchell, who is white and the Director of the Alabama Public Library Service, gave Mrs. Brown an alleged written reprimand based on erroneous facts and advised Mrs. Brown of an adverse disciplinary action.

Although Ms. Mitchell's letter indicated that it was a "written reprimand" the reprimand letter fails to comply with the definition of "reprimand" described in the **State of Alabama Progressive Discipline Manual, June 2006 Edition.** According to the manual, a "reprimand" should state the continued or additional unwanted behavior and the necessity of the desired behavior. It should also state that further disciplinary action would take place if the behavior does not come in line with the job standards. A corrective action plan should be developed, if possible. The reprimand letter should contain the reprimand and the corrective action plan.

| | |
| --- | --- |
| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary to meet State and Local Requirements)* <br><br> I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. <br><br> *[signature]* Annie Lucas Brown <br> Date  8/28/06   *Charging Party (Signature)* | SIGNATURE OF COMPLAINANT <br> *[signature]* <br><br> SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)*  28th day of August 2006. <br> *[signature]*   My Commission Expires: 6/08/09 |

MRS. ANNIE L. BROWN
2508 BROTHERS DRIVE
TUSKEGEE, AL 36083


## CHARGE OF DISCRIMINATION
(Continued – Page 2 of 2)


**THE PARTICULARS ARE:**

Therefore, Ms. Mitchell has violated the State's Progressive Discipline Policy by failing to properly write a letter of reprimand; by reprimanding Mrs. Brown based on false accusations; and thirdly, by removing any and all supervising responsibilities associated with Mrs. Brown's current position.    The latter action is an adverse employment action, which should have provided Mrs. Brown with her due process rights, and should not be included in a letter of reprimand.  Mrs. Brown, who is black is being treated differently from the white Library Operations Manager, who have not been relegated to a "consultant" like Mrs. Brown.

Mrs. Brown has been discriminated against because of her race and color by Ms. Mitchell's actions in the attached letter dated July 25, 2006.  Ms. Mitchell has always treated Mrs. Brown in an adverse manner since she is the only black professional in the office, thus exposing Mrs. Brown to an hostile work environment on a day to day basis.

The discriminatory action by Rebecca Mitchell of reducing Ms. Brown from a Library Operations Manager to a Library Consultant is an adverse employment action. As a Library Operations Manager, Mrs. Brown is at Step 15, and is eligible for three more steps of advancements up to Step 18 for an annual salary of $67,879.20.  (See attached)

However, as a Library Consultant, Mrs. Brown is already at Step 17 with only one opportunity for advancement to Step 18 for an annual salary of $64,622.40.  (See attached)   Therefore, a Library Operations Manager can earn much more than a Library Consultant.

Mrs. Brown is the only Library Operations Manager who is black and is the only Library Operations Manager who has been reduced to a Library Consultant.

Mrs. Brown desires to be immediately re-instated as a Library Operations Manager.



# State Personnel Depar...
## Online Employment S...

| Home | Job Listings | Applicants | Employees | Exams | Agency Services | About Us |

Search

**Class:** 30520    **Library Consultant**
**Grade:** 0078      **Rate Comparison**

|          | Semi-Monthly | Annual   | Hourly |
|----------|-------------|----------|--------|
| Step 01: | 1769.10     | 42458.40 | 20.41  |
| Step 02: | 1812.40     | 43497.60 | 20.91  |
| Step 03: | 1856.70     | 44560.80 | 21.42  |
| Step 04: | 1903.20     | 45676.80 | 21.96  |
| Step 05: | 1950.90     | 46821.60 | 22.51  |
| Step 06: | 2000.20     | 48004.80 | 23.08  |
| Step 07: | 2049.50     | 49188.00 | 23.65  |
| Step 08: | 2099.80     | 50395.20 | 24.23  |
| Step 09: | 2151.70     | 51640.80 | 24.83  |
| Step 10: | 2204.80     | 52915.20 | 25.44  |
| Step 11: | 2259.40     | 54225.60 | 26.07  |
| Step 12: | 2316.40     | 55593.60 | 26.73  |
| Step 13: | 2373.70     | 56968.80 | 27.39  |
| Step 14: | 2433.40     | 58401.60 | 28.08  |
| Step 15: | 2495.90     | 59901.60 | 28.80  |
| Step 16: | 2559.60     | 61430.40 | 29.53  |
| Step 17: | 2626.00     | 63024.00 | 30.30  |
| Step 18: | 2692.60     | 64622.40 | 31.07  |

Act # 2005-316 REQUIRES STATE EMPLOYEES TO BE PAID AT A SEM...
RATE.
COMPARISON TABLE IS PROVIDED FOR INFORMATIONAL PURPOS...

| Previous Steps | Search Again | Next Steps |

The information presented here is updated regularly and is accurate as o...
08/01/2006

State Personnel Department

Copyright © 2006 State of Alabama. All rights reserved.





Alabama   State Personnel Depar
          Online Employment Sy

Home   Job Listings   Applicants   Employees   Exams   Agency Services   About Us

| | Search |
|---|---|

**Class:    30515    (LIBRARY OPERATIONS MGR)**
**Grade:  0079        Rate Comparison**

| | Semi-Monthly | Annual | Hourly |
|---|---|---|---|
| Step 01: | 1856.70 | 44560.80 | 21.42 |
| Step 02: | 1903.20 | 45676.80 | 21.96 |
| Step 03: | 1950.90 | 46821.60 | 22.51 |
| Step 04: | 2000.20 | 48004.80 | 23.08 |
| Step 05: | 2049.50 | 49188.00 | 23.65 |
| Step 06: | 2099.80 | 50395.20 | 24.23 |
| Step 07: | 2151.70 | 51640.80 | 24.83 |
| Step 08: | 2204.80 | 52915.20 | 25.44 |
| Step 09: | 2259.40 | 54225.60 | 26.07 |
| Step 10: | 2316.40 | 55593.60 | 26.73 |
| Step 11: | 2373.70 | 56968.80 | 27.39 |
| Step 12: | 2433.40 | 58401.60 | 28.08 |
| Step 13: | 2495.90 | 59901.60 | 28.80 |
| Step 14: | 2559.60 | 61430.40 | 29.53 |
| (Step 15: | 2626.00 | 63024.00 | 30.30) |
| Step 16: | 2692.60 | 64622.40 | 31.07 |
| Step 17: | 2759.00 | 66216.00 | 31.84 |
| Step 18: | 2828.30 | 67879.20 | 32.63 |

Act # 2005-316 REQUIRES STATE EMPLOYEES TO BE PAID AT A SEM
RATE.
COMPARISON TABLE IS PROVIDED FOR INFORMATIONAL PURPOS

| Previous Steps | **Search Again** | Next Steps |
|---|---|---|

The information presented here is updated regularly and is accurate as o
08/01/2006

State Personnel Department
Copyright © 2006 State of Alabama. All rights reserved.



VERIFIED B\
GeoTrus
Alabama State
CLICK 29.08.06 19:03 (



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

**EXHIBIT M**

Charge Number:     420 2006 04866

Annie Lucas Brown
2508 Brothers Drive
Tuskegee, AL 36083                              Charging Party


Alabama Public Library Service
6030 Monticello Drive
Montgomery, AL 36130-6000                       Respondent


DETERMINATION

I issue the following determination on the merits of this charge.

Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. (Title VII). Timeliness and all other requirements for coverage have been met.

Charging Party alleged that she was discriminated against on the basis of her race, Black, in that Respondent removed her supervisory duties as part of a disciplinary reprimand, which resulted in the denial of her annual raise.

Evidence disclosed that a similarly situated White person was issued a similar disciplinary reprimand, yet did not lose her supervisory duties, nor her annual raise.

I have determined that the evidence obtained during the investigation establishes reasonable cause to believe a violation of the statute has occurred.

Upon finding there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. Please complete the enclosed Invitation to Conciliate and return it to the Commission at the above address no later than March 19, 2007. You may fax your response directly to (205) 212-2105 to the attention of Glenn Todd. Failure to respond by March 19, 2007 will indicate that you are not interested in conciliating this matter and the Commission will determine that efforts to conciliate this charge as required by Title VII, Section 706(b), have been unsuccessful.

Letter of Determination
Charge Number 420 2006 04866

If the Respondent declines to participate in conciliation discussions or when, for any other reason, a conciliation agreement acceptable to the Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission.

On Behalf of the Commission:

3/7/07
Date

Delner Franklin-Thomas
District Director

Enclosure:     Invitation to Conciliate

Copy:  Deborah Hill Biggers, Attorney for Charging Party
          Margaret L. Fleming,  Attorney for Respondent

EXHIBIT N

July 21, 2007

To:     Janet Hamilton
From:   Hulen E. Bivins
Re:     Agency Vehicle

This notice to your attention is a written reprimand as to your negligence in the usage of an agency vehicle on June 19, 2007.

The facts of negligence are based in your return trip from Athens, AL on June 19, 2007 in the agency's 2005 Dodge Caravan. By your own admission, at a fuel stop in Prattville/Autauga County, you fueled the van with diesel fuel rather than gasoline. This error of negligence has caused damage to the vehicle, the extent of which is still being determined. Such negligence cannot be deemed acceptable or excused. Whether or not financial penalties for the repair of the vehicle will be charged to you personally are yet to be determined.

Your admission of negligence is commended. However, upon recognition of your negligence, you further compounded this negligence by driving the agency vehicle which should have been parked immediately and the agency notified to best determine what, if any, corrective action could have been undertaken. An example of such corrective action would have been to immediately park the vehicle, tow the vehicle to a repair facility, and drain the fuel tank prior to driving the vehicle any distance. Had this simple procedure been completed, it is unlikely any damage would have been done to the vehicle.

As this is a written reprimand, you are offered the opportunity to respond in writing noting any circumstances that mitigate your actions. Your written comments should be given to me within 5 working days. You are especially encouraged to note any special circumstances that impacted your actions at the time of your negligent act that directly affected your decision to use diesel rather than gasoline and then drive the vehicle after taking note of the fact that incorrect fuel had been used.

This reprimand regarding your negligence will be placed in the agency personnel files and will be a consideration in your next personal evaluation.

Hulen E. Bivins
Assistant Director
Alabama Public Library Service
6030 Monticello Dr.
Montgomery, AL 36130
(334)213-3974
(800)723-8459
(334)213-3993 FAX

Employee acknowledges receipt of this Reprimand on June 21, 2007. Employee's signature does not necessarily acknowledge agreement.

_____
Janet Hamilton



U.S. Department of Justice

Civil Rights Division

**EXHIBIT O**

Employment Litigation Section - PHB
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
www.usdoj.gov/crt/emp/emphome.html

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

WJK:WBF:mdw
DJ 170-2-122

JUN 1 8 2007

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Annie Lucas Brown
2508 Brothers Drive
Tuskegee, AL 36083

Re: Annie Lucas Brown v. Alabama Public Library
Service, EEOC No. 420-2006-04866

Dear Ms. Brown:

It has been determined that the Department of Justice will not file suit on the above-referenced charge of discrimination that was referred to us by the Equal Employment Opportunity Commission (EEOC). This should not be taken to mean that the Department of Justice has made a judgment as to whether or not your charge is meritorious. You are hereby notified that conciliation in this matter was unsuccessful by the EEOC. You are further notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent. If you choose to commence a civil action, such suit must be filed in the appropriate court within 90 days of your receipt of this Notice.

Therefore, you should consult an attorney of your own choosing at your earliest convenience. If you are unable to locate an attorney, you may wish to contact the EEOC, or apply to the appropriate court, since that court may appoint an attorney in appropriate circumstances under Section 706(f)(l) of Title VII, 42 U.S.C. 2000e-5(f)(l).

We are returning the files in this matter to EEOC's Birmingham District Office. If you or your attorney have any questions concerning this matter or wish to inspect the investigative file, please feel free to address your inquiry to: Delner Franklin-Thomas, District Director, EEOC, 1130 22nd Street, South, Birmingham, AL 35205.

Sincerely,

Wan J. Kim
Assistant Attorney General
Civil Rights Division

By:

William B. Fenton
Deputy Chief
Employment Litigation Section

cc: Margaret L. Fleming, Esq.
    Alabama Public Library Service

*Deborah Hill Biggers*
*Attorney at Law*
*113 E. Rosa Parks Avenue*
*Tuskegee, Alabama  36083-1750*

*Telephone: (334) 727-0092*
*and*
*Fax: (334) 727-7117*
*E-Mail: debbig@debbig.com*

March 7, 2007

*Please Reply to:*
*P. O. Box 1183*
*Tuskegee Institute,*
*Alabama 36087-1183*

Mr. Glenn Todd, Investigator
U.S. Equal Employment Opportunity Commission
Birmingham District Office
Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, Alabama  35205

RE:   **CHARGE NO.:  420-2006-04866**
      **ANNIE L. BROWN VS. ALABAMA PUBLIC LIBRARY SERVICE**

Dear Mr. Todd:

Mrs. Annie L. Brown, the Complainant in the above-referenced charge is amending her previously filed Charge of Discrimination dated August 8, 2006, to add that the facts as outlined in her factual narrative is evidence of a hostile work environment, based on Mrs. Brown's race and color.

Sincerely,

**DEBORAH HILL BIGGERS**
**Attorney for Annie L. Brown, Complainant**

STATE OF ALABAMA )
                 )
COUNTY OF MACON )

**VERIFICATION**

ANNIE L. BROWN, being duly sworn, deposes and says that I am a resident of Tuskegee, Macon County, Alabama.  I am the Complainant named in the foregoing.  I have read over the above-stated, and the facts stated therein are true and correct according to my knowledge, information and belief.

Done this 7th day of March, 2007.

ANNIE L. BROWN

Sworn to and subscribed before me, a Notary Public, this 7th day of March, 2007.

NOTARY PUBLIC

MY COMMISSION EXPIRES: 6/08/09

*Deborah Hill Biggers*
*Attorney at Law*
*113 E. Rosa Parks Avenue*
*Tuskegee, Alabama 36083-1750*

*Telephone: (334) 727-0092*
*and*
*Fax: (334) 727-7117*
*E-Mail: debbig@debbig.com*

March 7, 2007

*Please Reply to:*
*P. O. Box 1183*
*Tuskegee Institute,*
*Alabama 36087-1183*

Mr. Glenn Todd, Investigator
U.S. Equal Employment Opportunity Commission
Birmingham District Office
Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, Alabama 35205

RE:  CHARGE NO.:  420-2006-04866
ANNIE L. BROWN VS. ALABAMA PUBLIC LIBRARY SERVICE

Dear Mr. Todd:

Mrs. Annie L. Brown, the Complainant in the above-referenced charge is amending her previously filed Charge of Discrimination dated August 8, 2006, to add that the facts as outlined in her factual narrative is evidence of a hostile work environment, based on Mrs. Brown's race and color.

Sincerely,

DEBORAH HILL BIGGERS
Attorney for Annie L. Brown, Complainant

STATE OF ALABAMA )
)
COUNTY OF MACON )

VERIFICATION

ANNIE L. BROWN, being duly sworn, deposes and says that I am a resident of Tuskegee, Macon County, Alabama. I am the Complainant named in the foregoing. I have read over the above-stated, and the facts stated therein are true and correct according to my knowledge, information and belief.

Done this 7th day of March, 2007.

ANNIE L. BROWN

Sworn to and subscribed before me, a Notary Public, this 7th day of March, 2007.

NOTARY PUBLIC

MY COMMISSION EXPIRES: 6/08/09

*Deborah Hill Biggers*
*Attorney at Law*
*113 E. Rosa Parks Avenue*
*Tuskegee, Alabama  36083-1750*

*Telephone: (334) 727-0092*
*and*
*Fax: (334) 727-7117*
*E-Mail: debbig@debbig.com*

November 17,  2006

*Please Reply to:*
*P. O. Box 1183*
*Tuskegee Institute,*
*Alabama 36087-1183*

Mr. Glenn Todd, Investigator
U. S. Equal Employment Opportunity Commission
Birmingham District Office
Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, Alabama  35205

RE:    CHARGE NO.:  420-2006-04866
       ANNIE L. BROWN v. ALABAMA PUBLIC LIBRARY SERVICE

Dear Ms. Todd:

As attorney for Annie L. Brown, I am writing to submit additional documentation in support of Ms. Brown's claim of employment discrimination by the Alabama Public Library Services.  You requested that we identify a similarly situated white person employed as a Manager who received a letter of reprimand and the similarly situated white manager's supervisory duties were not removed and she was not relegated  to a consultant, as was done with Ms. Brown. Ms. Brown is or was the only black manager employed with the State Public Library Service.

The white similarly situated person is Judith Shepard, who is the manager of Circulation-Reference and Information Service & Videos and DVDs collection.   The reprimand to Judith Shepard was from Hulen E. Bivins, Assistant Director, a white male, dated February 27, 2006.  (A copy of the reprimand is enclosed which complains about two (2) actions by Ms. Shepard, and is labeled as Exhibit "A".)

According to the reprimand, Ms. Shepard was accused of (1) making a false statement and (2) insubordination.

Following this letter of reprimand, Ms. Shepard is still allowed to supervise her same employees and she has not been reassigned as a consultant.

On the other hand, Ms. Brown, who received a letter of reprimand for allegedly being insubordinate by not complying with the Agency's travel protocol and for allegedly attempting to cover up her actions when confronted, had her supervisory duties wrongfully removed and she has been relegated to a Consultant only.

Secondly, the Director, Rebecca Mitchell told Ms. Brown to go to the Governor's Office to pick up her amended travel on July 24, 2006, per the attached e-mail identified as attached Exhibit "B".

It is my understanding that the Alabama Public Library Service represented in its response to the Complaint, that it made Ms. Brown a Consultant after the incident occurring on or about July 24, 2006 involving the Governor's Office and Ms. Brown's travel.

However, attached Exhibit "C" proves that Ms. Brown was made a Consultant as early as June 14, 2006, which is more than a month before the incident regarding Ms. Brown's amended travel.

The Agency's fraudulent representation is further evidence that the response to Ms. Brown's complaint by the Alabama Public Library Service is pretexual and that as the only black Division Head in the Agency, her supervisory responsibilities were removed and she was demoted because of her race.

The letter of reprimand is merely a subterfuge, since Judith Shepard, a white female also received a letter of reprimand for two infractions in February 2006, and her supervisory responsibilities were not removed, nor was she made a Consultant.

Finally, I have enclosed a copy of the Agency's Travel Policy from the Agency's Employee Handbook, that fails to list any travel protocol as alleged by the Agency.  (See Exhibit "D".)

We are asking that you request that the Alabama Public Library Service provide you with the following:  (1) the current job title for Ms. Annie Brown and (2) the pay scale on which she is currently on, i.e. that of a Consultant or that of an Library Operations Manager.

If you have any questions, please do not hesitate to contact me.

Sincerely,

DEBORAH HILL BIGGERS
Attorney at Law

DHB/bea

attachments

cc:  Ms. Annie Brown

February 27, 2006

To:       Judith Shepard

From:     Hulen E. Bivins

Re:       Employee Reprimand

This memo to your attention is with regard to two items of employee conduct that are unacceptable. One item is intentional statements of false data in a written form. (See: <u>Alabama Administrative Code</u>, Chapter 670-X-19-.01(a)(4), (5), and (7)). The second item is insubordination. (See: <u>Alabama Administrative Code</u>, Chapter 670-X-19-.01(b)(2)

1.     In a written communication from you concerning the topic of "Videos and DVDs" (see attachment) issued on February 24, 2006 to the attention of Rebecca Mitchell, State Librarian, and myself, you conclude with a suggested action that you claim to have proposed in the past. Such a statement is false and without basis. Rather, it is Ms. Mitchell who, as State Librarian, has suggested for the past two years the action that you now claim as your thought. Indeed, it is fact, confirmed by several APLS employees including Ms. Mitchell herself, that not only did you not propose the action for which you credit yourself, what you did do is delay the implementation of any action regarding the matter of videos and DVDs that was suggested by the State Librarian. Your statement therefore shows an inattention to your job tasks resulting in a failure to perform your job properly thus causing a disruptive influence. (See: <u>Code</u>, items (a)(4), (5) and (7)).

Furthermore, your communication of February 24, suggest, "We need to notify these patrons that we are no longer purchasing videos and that we are going to stop circulating them." You present such as a statement of fact. This is not true. APLS has in the past month, placed an order for new video titles in the DVD format and plan to add additional titles in the hope that increased circulation, through and including FY '07, will indicate a usefulness of this library circulation service. To incorrectly imply any other decision has been made by the agency, certainly to the public, has a disruptive effect showing an inattention to your specific job and its inherent duties resulting in a failure to perform your job properly. (See: <u>Code</u>, items (a)(4), (5) and (7)).

As you are aware following many years of service as a professionally trained librarian, honesty is an integral part of the profession of librarianship. For example, issues such as plagiarism have been and continue to be of great importance. Personal honesty is of no less importance. Diligence must be

1

exercised to preserve the truth and you are directed to conform to this standard. Certainly, to appropriate the words, thoughts and the directives of the State Librarian as your own is not acceptable.

2.    Under the reorganization of APLS as announced in January of this year, I am now designated as your immediate supervisor. Your memo of February 24 (cited above) was given to Ms. Mitchell prior to any discussion with me. You did not even have the courtesy to inform me personally of the memo but rather sent an email after already insuring the delivery of your comments to Ms. Mitchell. Your conduct in this matter is disrespectful, hurtful and mean-spirited. It is simply an act of insubordination. (See: Code, item (b)(2)). Such will not be tolerated.

Further, this is the second time, in recent days, of conduct of insubordination on your part, the former time being when you discussed, in January (2006), a wedding celebration party for APLS employee Beverly Davis. Again, you talked with Ms. Mitchell prior to me. To make the matter of greater disrespect, you then scheduled the function of honor for Ms. Davis on a date that you, for more than two weeks prior, knew was a date on which I would not be at APLS. Further compounding the disrespect, the date and time you selected to honor Ms. Davis was a date on which Ms. Mitchell, the State Librarian, could not be present. (See: Code, item (b)(2)).

Everyone at APLS is participating in a period of great change designed to assure that the agency fulfills the charge placed before it via the Code of Alabama. In so doing, the status quo of the past is being left behind as APLS molds itself into an agency prepared to fulfill its charge in the future. You, as a member of the APLS staff, must participate in these changes and you must be supportive of said changes. Anything less in your words, conduct, or countenance, shall not be appreciated, shall not be rewarded, and will not be acceptable.

You are encouraged to make positive change so as not to allow a recurrence of the problems outlined herein. A copy of this employee reprimand as directed to your attention this day shall be placed in the APLS Personnel File. You may provide a written explanation of your actions as cited in this reprimand and/or you may provide in writing any factors which you believe mitigate your responsibility for your actions as cited. You are requested to provide said writing within a period of three (3) working days from the date of this reprimand.

Hulen E. Bivins
Assistant Director
Alabama Public Library Service

Received 27th day of February, 2006

Judith Shepard

2

February 24, 2005

From: Judith Shepard, Head Information Services

To: Rebecca Mitchell
    Hulen Bivins

Recommendation: Videos and DVDs.

We have libraries and state employees who still use APLS videos. Some of them book in advance. We need to notify these patrons that we are no longer purchasing videos and that we are going to stop circulating them.

Our patrons need to be given a date and they need to have time to purchase DVD players. I think abruptly stopping the circulation of videos, if that is what is planned, will upset the patrons who are using them.

I suggest what I have proposed in the past: we phase out the videos and weed them as we get replacement DVDs or new DVDs.

I have told Mrs. Mitchell that I support her, her plans and the agency and I will continue to do so. I have devoted my professional life to APLS and its goals. Any delay in implementation of any plans has not been intentional. I have prioritized my activities and kept Mrs. Mitchell informed of them. I will work with you also even though the tone of your reprimand has shocked me and hurt me and makes me think you are trying to force me out of my position. I would gladly answer any questions that you may have about my actions. I ask you to please keep me informed of the changes you make in the departments I supervise.

EXHIBIT "B"

**Brown, Annie**

**To:**       Mitchell, Rebecca
**Subject:**  RE: Travel

-----Original Message-----
**From:**     Mitchell, Rebecca
**Sent:**     Monday, July 24, 2006 2:47 PM
**To:**       Brown, Annie
**Subject:**  Travel

Go ahead and pick up your amended travel from the Governor's office.

Rebecca Mitchell
Director
Alabama Public Library Service
6030 Monticello Drive
Montgomery, AL 36130
Direct: (334) 213-3901
Within AL: (800) 723-8459 ext:901
FAX: (334) 213-3993

1

EXHIBIT "C"

MEMORANDUM
June 14, 2006

To:    Annie Brown, Jim Smith, Kim Owen, Chris Bowman, Hulen Bivins, Kelyn Ralya
From:  Rebecca Mitchell
Subj:  Consultant assignment by district and duty

Attached is a copy of the division of the state into library districts and duties for each
consultant and reporting format. We will begin this process on July 1, 2006 will official
kickoff on October 1, 2006. This is both an old and new concept. It is new in that many
of you were not a part of APLS when this method was used back in the 80's. It is old in
that it is a process that has been used before both here and in other states. The purpose is
to provide closer ties between our role as the state library and the role of the public
libraries in their communities.

The reports will be due to me by the 10th of each month.

EXHIBIT "B"

## TRAVEL

(For examples of travel forms filled out by state employees, refer to the back of the manual.)

1.  Travel Approval:  A travel request form must be filed with the Director as soon as possible prior to the date of travel.  All travel must be approved by the Director and is not considered definite until such time as it is approved.

2.  Schedule:  Each person is responsible for submitting to his/her supervisor, no later than Wednesday of the preceding week, any travel for the following week.  Supervisors of each division are responsible for submitting to the Director, no later than Thursday of the preceding week, any travel for the next week.

3.  In-State:  A reimbursement form must be submitted upon return.  In-state travel is reimbursed on a per diem schedule with the Director's approval.  Check with the Business Office for the reimbursement rates.  For overnight travel, check with the Business Office to determine what receipts are required.

4.  Out-of-State:  A "Request for Out-of-State Travel" form must be submitted to the Director as soon as possible prior to date of travel.  Then a letter must be sent to the Governor's Office for approval and is not valid until signed.  A copy of the approved form will be returned to the employee.  In rare situations, advances for travel expenses can be issued. If an employee receives a travel advance, he/she will submit all receipts, excess funds, etc. to the Business Office upon return. Reimbursements will be made only after an expense form is submitted to the Business Office.  Check with the Business Office to determine what receipts are required.

## TRAVEL ALLOWANCES

Employees are entitled to reimbursement for official travel. Act No. 91-564 allows you to receive mileage and per diem rates for in-state travel based on trips of six hours or more. Out-of-state trips are reimbursed for actual expenses with prior approval.

Employees must be pre-approved for all travel. See the section in the back on forms which must be filled out for approval and then for reimbursement.

## STATE VEHICLES

All state vehicles must be scheduled and checked out through the Business Office.  Any needed repairs should be reported to the Business Manager immediately after the vehicle is returned.

24